S/I

DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
KELLY C. BOWERS (Cal. Bar No. 164007)
Email: bowersk@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Katharine E. Zoladz, Associate Regional Director and
Acting Co-Regional Director
Gary Y. Leung, Associate Regional Director
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**FILED**
CLERK, U.S. DISTRICT COURT

OCT 20 2023

CENTRAL DISTRICT OF CALIFORNIA
BY: _____EEE_____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Western Division

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

    vs.

JULIE ANNE DARRAH and VIVID
FINANCIAL MANAGEMENT, INC.,

    Defendants, and

PC&J JOINT VENTURES, LLC,

    Relief Defendant.

2:23-CV-08843-CAS-AGRx

Case No.

**COMPLAINT**

**(FILED UNDER SEAL)**

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a), and Sections 209(d), 209(e)(1) and 214 of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §§ 80b-9(d), 80b-9(e)(1) & 90b-14.

2.      Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and Section 214(a) of the Advisers Act, 15 U.S.C. § 80b-14, because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because defendant Julie Anne Darrah ("Darrah") resides in this district, and because defendant Vivid Financial Management, Inc. ("VFM") and relief defendant PC&J Joint Ventures, LLC ("PC&J") have their principal places of business in this district.

## SUMMARY

4.      This emergency action concerns Darrah's scheme to misappropriate millions of dollars from the bank and brokerage accounts of her clients and spend those funds on herself and on relief defendant PC&J, an ailing restaurant company that Darrah co-owns.  In doing so, Darrah abused her position as an investment adviser to the clients that she stole from, and violated the fiduciary duties she owed

1

those advisory clients.  Darrah's misconduct is ongoing because she still retains control of certain client assets and has been actively selling and dissipating the ill-gotten proceeds of her misappropriation.

5.     The scheme began in at least November 2016, if not earlier, while Darrah was still working for VFM, which was at the time an SEC-registered investment adviser partially owned by Darrah and where she served as its president and chief compliance officer.  Darrah primarily targeted elderly female advisory clients for the scheme, many of whom had come to rely on Darrah for their financial well-being ("the defrauded clients").  Indeed, in addition to giving Darrah discretionary authority over their brokerage accounts, many of the defrauded clients appointed Darrah to serve as a trustee over the trusts they had established for themselves, while others gave Darrah power of attorney to handle their financial affairs.

6.     Instead of honoring the fiduciary duty that she owed as an investment adviser to act in the best interest of the defrauded clients, Darrah began stealing from them by funneling money out of the defrauded clients' brokerage and bank accounts and taking those funds for herself and relief defendant PC&J.

7.     In total, between November 2016 and July 2023, Darah misappropriated approximately $2.25 million in funds from the accounts of nine defrauded clients who hired VFM and Darrah as their investment adviser.

8.     The fact that Darrah had custody of the defrauded clients' assets also led VFM to violate what is known as the Custody Rule.  Under that rule, an investment adviser cannot have custody of client funds or securities unless the adviser, among other things:  (1) provides clients with notice of any custodial accounts opened on clients' behalf, (2) has a reasonable basis for believing that clients will get at least quarterly statements from those qualified custodians and (3) ensures that client accounts are subject to annual surprise examinations to verify that client funds and securities are in the accounts.  Darrah aided and abetted VFM in its violation of the

Custody Rule by carrying out the scheme in the manner that she did.

9.     VFM, the registered investment adviser where Darrah worked when the scheme began, failed to implement the policies and procedures designed to prevent Darrah from carrying out this scheme.  As the president and chief compliance officer of VFM, Darrah aided and abetted VFM in these compliance failures.  For example, VFM's compliance manual claimed that it would "take measures" to avoid VFM personnel like Darrah from serving as a trustee for client accounts and claimed that it would take measures to ensure that clients received their quarterly account statements from the custodians of their funds.  Had these policies been enforced, Darrah's fraud may well have been detected earlier, or even prevented.  VFM clearly failed to implement these policies and procedures because for several years Darrah was able to do both things that VFM claimed it would take measures to "avoid," and she was able to do it with respect to multiple clients.

10.     Similarly, the Forms ADV and Client Brochures that Darrah submitted to the SEC on behalf of VFM during the scheme contained false and misleading statements regarding VFM's custody of its clients' assets.  For instance, VFM's Client Brochures claimed that its personnel would not have custody of their clients' funds or their securities, and that VFM would make sure that clients "receive at least quarterly account statements directly from their custodians."  These statements in VFM's SEC filings were materially false and misleading because Darrah did, in fact, have custody of more than $2 million of the defrauded clients' assets and was able to take steps to prevent them from getting the quarterly statements from the custodians that would have showed this.

11.     By engaging in this conduct, Darrah and VFM violated Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, and Sections 207 and 206(1) and (2) of the Advisers Act; VFM violated Section 206(4) of the Advisers Act and Rules 206(4)-2 and 206(4)-7 thereunder; and Darrah, pursuant to Section 209(f) of the Advisers Act, aided and abetted VFM's

3

violation of Section 206(4) of the Advisers Act and Rules 206(4)-2 and 206(4)-7 thereunder.

12. To prevent future violations of these federal securities laws, to disgorge all ill-gotten gains for the benefit of the defrauded clients, including any unjust enrichment that relief defendant PC&J received from the scheme, and to punish violations of the securities laws, the SEC seeks permanent injunctions, disgorgement with prejudgment interest, and civil penalties.

13. To halt Darrah's dissipation of assets commingled with funds belonging to the defrauded clients and possibly others, the SEC further seeks, as detailed in its *Ex Parte* Application for a Temporary Restraining Order and Order to Show Cause, the immediate entry of the following:

(a) A Temporary Restraining Order ("TRO"), which shall remain in force until the Court's resolution of the SEC's application to convert the TRO to a preliminary injunction:

i. temporarily restraining Darrah from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5, and Sections 206(1) and 206(2) of the Advisers Act; and

ii. temporarily restraining Darrah from directly or indirectly participating in the offer, sale, or transfer of any security on behalf of any other person or any entity, including in her capacity as a trustee for such other person or entity; provided, however that such injunction shall not prevent Darrah from purchasing or selling securities for her own personal accounts.

(b) An order requiring Darrah to provide sworn accounting.

(c) An order prohibiting Darrah from destroying, mutilating, concealing, disposing of or altering documents.

(d) An order allowing expediting discovery.

(e) An order freezing: (i) the assets of Darrah; (ii) the assets held for Darrah's direct or indirect benefit; and (iii) the assets subject to Darrah's direct or

4

indirect control.

## THE DEFENDANTS

14.     Defendant Julie Anne Darrah, age 50, a resident of Santa Maria, California, was VFM's president, chief compliance officer, and an approximately one-third shareholder of VFM from 2015 through 2021.  In January 2022, Darrah and the other owners of VFM sold VFM's investment advisory business to another SEC-registered investment adviser based in Minnesota ("Minnesota Investment Adviser"). Darrah was associated with Minnesota Investment Adviser as a senior vice president from January 2022 until July 25, 2023, when Minnesota Investment Adviser placed her on administrative leave.  Following an internal investigation into her conduct alleged in this complaint, Minnesota Investment Adviser terminated Darrah on September 15, 2023.

15.     Defendant Vivid Financial Management, Inc. is a California corporation with its principal place of business in Santa Maria, California.  VFM was an SEC-registered investment adviser from 2015 to January 2022, when it sold its advisory business to Minnesota Investment Adviser and terminated its registration with the SEC.  VFM remains a corporation in good standing with the State of California.

## THE RELIEF DEFENDANT

16.     Relief defendant PC&J is a California limited liability company with its principal place of business in Orcutt, California.  PC&J operates two restaurants in Santa Maria and Orcutt, California.  Darrah is an officer, 33.4% owner, and registered agent of PC&J.

## RELEVANT ENTITY

17.     Minnesota Investment Adviser is a Minnesota limited liability company with its principal place of business in Plymouth, Minnesota.  Minnesota Investment Adviser is dually registered with the SEC as an investment adviser and a broker-dealer.

## THE ALLEGATIONS

**A.      Darrah's Advisory Business at VFM and Minnesota Investment Adviser**

18.      From 2015 to January 2022, when Darrah and the other VFM owners sold VFM's advisory business to Minnesota Investment Adviser, VFM provided investment advisory services to its clients.  During that time period, VFM was an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because VFM was engaged in the business of providing, for compensation, investment advice as to the value of securities and as to the advisability of investing in, purchasing, and selling securities.

19.      From 2015 to January 2022, Darrah was VFM's president and an owner of the firm.  She provided investment advisory services to VFM clients who compensated Darrah for that investment advice through VFM.  During that time period, Darrah was an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because she was engaged in the business of providing, for compensation, investment advice as to the value of securities and as to the advisability of investing in, purchasing, and selling securities.

20.      After the sale of VFM's advisory business to Minnesota Investment Adviser in January 2022, Darrah was associated with Minnesota Investment Adviser firm as a senior vice president.  She continued to provide investment advisory services to clients in exchange for compensation until July 25, 2023, when Minnesota Investment Adviser placed Darrah on administrative leave.  During that time period, Darrah remained an investment adviser within the meaning of Section 202(a)(11) of the Advisers Act, 15 U.S.C. § 80b-2(a)(11), because she was engaged in the business of providing, for compensation, investment advice as to the value of securities and as to the advisability of investing in, purchasing, and selling securities.

21.      As investment advisers, Darrah and VFM were fiduciaries for their advisory clients.  As such, they owed their clients both a duty of care and a duty of loyalty.  Those fiduciary duties obligated Darrah and VFM to serve, at all times, the

best interests of their clients and not subordinate those clients' interests to their own. By engaging in a scheme to misappropriate advisory client assets for her personal use, Darrah and VFM breached the duty of utmost good faith they owed to their advisory clients, and violated the antifraud provisions of the federal securities laws.

**B.     Darrah's Misappropriation of Client Money**

22.     From 2016 to July 2023 (the "relevant period"), Darrah misappropriated approximately $2.25 million from nine (9) of her advisory clients (collectively, "defrauded clients"). Across these nine instances, Darrah gained control of defrauded client assets, often liquidated defrauded clients' securities, and then took their money for herself, or for the benefit of relief defendant PC&J, a restaurant operator that she was an owner of.

23.     As detailed below, Darrah controlled defrauded client assets in several different ways: (1) she was the trustee of their trusts; (2) defrauded clients' brokerage accounts had standing letters of authorization ("SLOA") authorizing Darrah, as their investment adviser, to transfer funds from those brokerage accounts to defrauded clients' bank accounts; (3) Darrah was a signatory on defrauded clients' bank accounts; and/or (4) Darrah had power of attorney over defrauded clients' property, including all of their bank and brokerage accounts.

**1.     Defrauded Client S.S.**

24.     On or about October 6, 2015, S.S. hired VFM and Darrah to manage her personal brokerage accounts and her trust's brokerage accounts as her investment adviser. At the time, S.S. was a 75-year-old widow. In January 2022, when Minnesota Investment Adviser acquired VFM's business and Darrah joined Minnesota Investment Adviser, S.S. became an advisory client of Minnesota Investment Adviser.

**a.     Darrah's control of S.S.'s assets**

25.     As the investment adviser for S.S. and S.S.'s trust, Darrah had discretionary authority to buy and sell securities in S.S.'s brokerage accounts.

26.     In addition, a SLOA authorized Darrah to transfer funds from S.S.'s brokerage accounts to S.S.'s bank accounts.

27.     In April 2017, S.S. appointed Darrah as the trustee of her trust.  As its trustee, Darrah had the power to manage and invest all of the trust's property, including S.S.'s bank accounts and brokerage accounts.

28.     Beginning in October 2017, all of S.S.'s bank account statements were addressed to Darrah's home.

29.     Beginning in November 2017, all of S.S.'s brokerage account statements were addressed to another house owned by Darrah.

30.     In March 2021, Darrah opened a new bank account in the name of S.S.'s trust.  Darrah was the only signatory for this new bank account, and she had the account's statements addressed to her home.

> **b.     Darrah's misappropriation of S.S.'s assets**

31.     Darrah used her control of S.S.'s assets to misappropriate $1,057,800 from S.S.

32.     In the relevant period, Darrah sold nearly all of the securities held in S.S.'s brokerage accounts.  Next, Darrah used a SLOA to transfer the proceeds from the sale of these securities from S.S.'s brokerage accounts to S.S.'s bank accounts.  Because Darrah also controlled S.S.'s bank accounts, she was then able to take funds out of S.S.'s bank accounts for Darrah's own benefit.

33.     In all, Darrah transferred $631,975 to herself, $190,000 to relief defendant PC&J, $200,000 to a third-party to buy a business then held in Darrah's own name, $3,500 to another advisory client of Darrah's, and $2,240 to VFM.  In addition, from mid-May 2023 to mid-July 2023, Darrah used $30,085 from S.S.'s bank accounts to pay for personal charges Darrah had made on S.S.'s credit card.

34.     In the relevant period, VFM still charged and collected $19,093 in advisory fees from S.S.'s for Darrah's investment management services.

### c.   S.S.'s current financial condition

35.   As of July 31, 2023, S.S.'s bank and brokerage accounts had a total balance of $87,032.  Besides her investments, S.S.'s only source of regular income is her social security payment of $1,631 per month.  S.S. has been living in a memory care facility since April 2022, where her monthly expenses are $7,845 per month.

### 2.   Defrauded Client M.S.

36.   M.S. is the older sister of S.S.

37.   In May 2015, M.S., then a 78-year-old widow, hired VFM and Darrah to manage her personal and her trust's brokerage accounts as her investment adviser.  In January 2022, when Minnesota Investment Adviser acquired VFM's business and Darrah joined Minnesota Investment Adviser, M.S. became an advisory client of Minnesota Investment Adviser.

### a.   Darrah's control of M.S.'s assets

38.   As M.S.'s investment adviser, Darrah had discretionary authority to buy and sell securities in M.S.'s brokerage accounts.

39.   In addition, a SLOA authorized Darrah to transfer funds from M.S.'s brokerage accounts to M.S.'s bank accounts.

40.   In 2016, Darrah became a signatory to M.S.'s checking accounts.

41.   In 2019, Darrah became a signatory to M.S.'s savings accounts.

42.   In March 2020, Darrah became a successor trustee of M.S.'s trust.

### b.   Darrah's misappropriation of M.S.'s assets

43.   Darrah used her control of M.S.'s assets to misappropriate $578,400 from M.S.

44.   In the relevant period, Darrah sold nearly all of the securities held in M.S.'s brokerage accounts.  Next, Darrah used a SLOA to transfer the proceeds from the sale of these securities from M.S.'s brokerage accounts to M.S.'s bank accounts.  Because Darrah also controlled M.S.'s bank accounts, she was then able to take funds out of M.S.'s bank accounts for Darrah's own benefit.

9

45.     In all, Darrah transferred $ 515,400 to herself, and $63,000 to relief defendant PC&J.

### c.     M.S.'s current financial condition

46.     As of July 31, 2023, M.S.'s bank and brokerage accounts had a total balance of $24,605.  Besides her investments, M.S.'s only source of regular income is her social security payment of $2,027 per month.

### 3.     Defrauded Client C.H.

47.     In March 2022, C.H. hired Darrah and Minnesota Investment Adviser as her investment adviser.  C.H. was an 82-year-old widow at that time.

### a.     Darrah's control of C.H.'s assets

48.     When she hired Darrah as her investment adviser, C.H. also executed a power of attorney that appointed Darrah as her agent, and vested in Darrah the power to dispose of, sell, and convey C.H.'s real and personal property, including assets held in all of C.H.'s bank and brokerage accounts.

49.     In addition, a SLOA authorized Darrah to transfer funds from C.H.'s brokerage accounts to C.H.'s bank account.

50.     Then, in late May 2023, Darrah became a co-owner of and signatory for C.H.'s bank account.

### b.     Darrah's misappropriation of C.H.'s assets

51.     Darrah used her control of C.H.'s assets to misappropriate $242,000 from C.H.

52.     From late May 2023 to July 20, 2023, Darrah sold $210,000 of securities held in C.H.'s brokerage accounts.  She then used a SLOA to transfer $177,800 of those sales proceeds to C.H.'s bank account, which Darrah had become a signatory to and co-owner of as of late May 2023.  With her control of that bank account, Darrah took C.H.'s funds for her own benefit.

53.     In all, Darrah transferred $236,500 to herself, and another $5,500 to another bank account co-owned by Darrah.

### 4.    Defrauded Clients C.H. and C.L.

54.    In May 2015, S.A., then 72 years old, hired VFM and Darrah to manage her personal brokerage accounts and her trust's brokerage accounts as her investment adviser.

#### a.    Darrah's control of S.A.'s assets

55.    As S.A.'s investment adviser, Darrah had discretionary authority to buy and sell securities in S.A.'s brokerage accounts.

56.    In September 2019, S.A. appointed Darrah as the trustee of her trust.  As its trustee, Darrah had the power to manage and invest all of the trust's property, including S.A.'s bank accounts and brokerage accounts.  S.A.'s daughters, C.H. and C.L., were the trust's beneficiaries.

57.    S.A. died less than a year later, in April 2020.  S.A.'s daughters, C.H. and C.L., became VFM and Darrah advisory clients in May 2020.

58.    In July 2020, Darrah opened, in the name of S.A.'s trust that she controlled, a bank account that Darrah also controlled.  Darrah then consolidated S.A.'s assets – including funds from S.A.'s bank and brokerage accounts and from the sale of her home – in that bank account.

#### b.    Darrah's misappropriation of C.H.'s and C.L.'s assets

59.    Darrah used her control of S.A.'s assets to misappropriate $5,793 from S.A.'s daughters, C.H. and C.L., who were the beneficiaries of S.A.'s trust.

60.    With all of S.A.'s assets consolidated into a bank account in the name of S.A.'s trust, which Darrah controlled as trustee, Darrah transferred $7,900 from the account to herself, and the remainder to S.A.'s daughters.

61.    Darrah provided no financial reporting concerning the trust to S.A.'s daughters, and they did not know that Darrah had kept $7,900 of S.A.'s assets for herself.

62.    Because Darrah separately transferred a total of $2,107 to S.A.'s daughters, C.H. and C.L., from her personal account, Darrah took a net of $5,793

from S.A.'s daughters.

**5.      Defrauded Client B.C.**

63.      At the start of 2020, B.C., then a 79-year-old retired teacher, was also an advisory client of VFM and Darrah.  In January 2022, when Minnesota Investment Adviser acquired VFM's business and Darrah joined Minnesota Investment Adviser, B.C. became an advisory client of Minnesota Investment Adviser.

**a.      Darrah's control of B.C.'s assets**

64.      In September 2020, B.C. executed a power of attorney that appointed Darrah as her agent, and vested in Darrah the power to dispose of, sell, and convey B.C.'s real and personal property, including assets held in all of B.C.'s bank and brokerage accounts.

**b.      Darrah's misappropriation of B.C.'s assets and her efforts to conceal that fraud**

65.      In August 2021, Darrah asked B.C. to sign a $150,000 check for a restaurant Darrah was opening, and B.C. did.

66.      In June 2023, Darrah asked B.C. to sign a check for $50,000 so that Darrah could buy a house, and B.C. did.

67.      The $200,000 transferred to Darrah was funded in significant part by Darrah's sale of securities held in B.C.'s brokerage accounts.

68.      Later in September 2023, Darrah went to B.C.'s home and had her initial two promissory notes, both backdated: (1) a $150,000 promissory note backdated to August 3, 2021; and (2) a $50,000 promissory note backdated to July 15, 2023.

69.      The purported notes stated that Darrah would repay the $150,000 and $50,000 in ten years on December 31, 2033, when B.C. would be in her nineties, along with interest of 2% per annum.

70.      The backdated promissory notes that Darrah had B.C. initial in September 2023 also stated that, "This note is intended as a term of endearment from [B.C.] to Julie Darrah.  We agree we have been like sisters for over 20 years.  We feel

as though we are family and this agreement is between family members."

### 6.     Defrauded Client B.H.

71.     In November 2021, B.H., then 75 years old, hired Darrah and VFM as her investment adviser.  In January 2022, when Minnesota Investment Adviser acquired VFM's business and Darrah joined Minnesota Investment Adviser, B.H. became an advisory client of Minnesota Investment Adviser.

#### a.     Darrah's control of B.H.'s assets

72.     A month after hiring Darrah as her investment adviser, B.H. created a special needs trust for herself, and appointed Darrah the trustee of that trust in December 2021.

73.     B.H.'s trust provided that Darrah, as trustee, was to use trust assets "for the satisfaction of [B.H.'s] special needs," which meant "maintaining [B.H.'s] good health, safety, education and welfare."

74.     As its trustee, Darrah had the power to manage and invest all of the trust's property, including B.H.'s bank accounts and brokerage accounts.

#### b.     Darrah's misappropriation of B.H.'s assets

75.     Darrah used her control of B.H.'s assets to misappropriate $96,200 from B.H.

76.     In 2022, B.H. received an inheritance.  Darrah opened a bank account in the trust's name that Darrah solely controlled.  In January 2022, Darrah deposited the $141,618 that B.H. had inherited into that bank account, and then told B.H. that she would provide B.H. with money as needed.

77.     However, from February 2022 to mid-June 2023, Darrah took $128,250 from the trust's bank account.  Taking into account one payment and a purchase of an automobile for B.H. from these funds, Darrah kept $96,200 of B.H.'s assets for herself.

#### c.     B.H.'s current financial condition

78.     As of mid-June 2023, B.H.'s trust bank account had a balance of $1,012.

13

The account would have had a negative balance but for Darrah's deposit of $3,500 that she took from S.S.

**7.  Defrauded Client D.C.**

79.  In August 2020, L.C. was an advisory client of Darrah and VFM.  At the time, L.C. was a widowed 85-year-old retired elementary school teacher.

**a.  Darrah's control of L.C.'s assets**

80.  That month, L.C. appointed Darrah as trustee of her trust.  As its trustee, Darrah had the power to manage and invest all of the trust's property, including L.C.'s bank accounts and brokerage accounts.

81.  In addition, as L.C.'s investment adviser, Darrah had discretionary authority to buy and sell securities in L.C.'s brokerage accounts.

82.  In October 2020, L.C. died.  The trust's beneficiary was L.C.'s son, D.C., who himself became an advisory client of VFM and Darrah.  In January 2022, when Minnesota Investment Adviser acquired VFM's business and Darrah joined Minnesota Investment Adviser, D.C. became an advisory client of Minnesota Investment Adviser.

83.  In November 2020, Darrah opened a bank account in the L.C. trust's name that she controlled.

**b.  Darrah's misappropriation of D.C.'s assets**

84.  Darrah used her control of D.C.'s assets to misappropriate $27,937 from D.C., the beneficiary of L.C.'s trust.

85.  In November 2020, through her authority as trustee, Darrah transferred $20,000 from L.C.'s brokerage account to the trust bank account that Darrah had opened and also controlled.

86.  Separately, in October 2021 and February 2022, Darrah deposited another $8,170 into that trust bank account using L.C.'s tax refund and a payment from the California teacher's retirement system.

87.  Rather than giving the money in the L.C. trust bank account to D.C.,

Darrah took $27,937 of those funds for herself by transferring it to her bank accounts.

88. After repeatedly requesting an accounting of L.C.'s estate, which Darrah failed to provide, D.C. terminated Darrah as his investment adviser in 2022.

**8.   Defrauded Client P.S.**

89. In March 2019, J.S. was an advisory client of Darrah and VFM. In January 2022, when Minnesota Investment Adviser acquired VFM's business and Darrah joined Minnesota Investment Adviser, J.S. became an advisory client of Minnesota Investment Adviser

90. In March 2019, J.S. created a special needs trust for his brother, P.S., and funded the trust with $54,125, his brother's inheritance from their father's estate.

**a.   Darrah's control of the special needs trust**

91. J.S. appointed Darrah as trustee for the special needs trust he created for his brother P.S. because he wanted a third-party to oversee his brother's use of his inheritance. As its trustee, Darrah had the power to manage and invest all of the trust's property, including its bank accounts.

92. In July 2020, Darrah opened a bank account in the name of the special needs trust, and deposited $54,125, the inheritance of J.S.'s brother into the account. Darrah had sole control over that account.

**b.   Darrah's misappropriation of trust assets**

93. Darrah used her control of special needs trust bank account to misappropriate $39,200 from J.S.'s brother, the beneficiary of that special needs trust.

94. From July 2020 to May 2023, Darrah took $54,100 from the trust's bank 03.ccount. Taking into account payments she later made to J.S.'s brother totaling $14,900, Darrah kept $39,200 in trust assets for herself.

**C.   Darrah's Use of Misappropriated Client Funds**

95. In total, between November 2016 and July 2023, Darah misappropriated approximately $2.25 million in funds from defrauded clients S.S., M.S., C.H., S.A.'s daughters, B.C., B.H., D.C. and J.S.'s brother.

96.     Darrah transferred most of this misappropriated money into her personal bank accounts, where she commingled stolen defrauded client funds with funds relating to Darrah's other business ventures.  She then used those commingled funds to buy and improve properties, pay her personal expenses, buy luxury vehicles, and buy and operate food-related businesses at a loss.

**D.     Darrah's Scienter and Negligence**

97.     Over the course of years, Darrah repeatedly took money from her advisory clients, thus demonstrating her scienter and her negligent conduct.

98.     In addition, Darrah took several steps to conceal the scheme.  These steps demonstrate that VFM and Darrah, whose conduct is imputed to VFM, both acted with scienter in carrying out the scheme and in violating their fiduciary duties to the defrauded clients.  They further show that VFM and Darrah failed to exercise the standard of care reasonably expected of investment advisers in carrying out their fiduciary duties, including the duty of loyalty and duty of care.

99.     Some of the steps Darrah took that show her scienter and negligence are as follows:

(a)     In November 2021, Darrah entered into an agreement on behalf of VFM to sell all VFM's wealth management assets to Minnesota Investment Adviser. As part of the asset purchase agreement, Minnesota Investment Adviser agreed to hire Darrah as a senior vice president, but she was required to provide Minnesota Investment Adviser with certain information as part of the asset purchase agreement and her ongoing employment with Minnesota Investment Adviser.  On or about November 4, 2021, before the asset purchase agreement closed, a representative for Minnesota Investment Adviser asked Darrah whether she served as a trustee for any of her VFM advisory clients and, if so, whether she was the trustee on those accounts or a successor trustee.  The Minnesota Investment Adviser representative made it clear to Darrah that she was being asked these questions as part of its compliance obligations.  In fact, this Minnesota Investment Adviser representative was the third

person to ask Darrah this question in connection with the asset purchase agreement. On or about November 4, 2021, Darrah sent a response to the Minnesota Investment Adviser representative falsely stating that she was "only a successor trustee" and "not currently acting as trustee on any of our clients" accounts. Darrah's false statement was designed to conceal her scheme to misappropriate the victim client's money, many of whom had appointed Darrah as a trustee.

(b)     On or about November 11, 2021, Darrah provided Minnesota Investment Adviser representatives with a list of VFM clients for whom she was supposedly serving as a "successor trustee," but the list did not M.S. or B.C., who had each appointed Darrah as the successor trustee of their trusts. The successor trustee list Darrah submitted to Minnesota Investment Adviser therefore concealed her broad scheme to misappropriate victim clients' money upon obtaining control over their assets.

(c)     On or about February 6, 2023, as part of her employment obligations with Minnesota Investment Adviser, a representative of Minnesota Investment Adviser asked Darrah to reaffirm that she was still only acting as a successor trustee for the individuals she had listed previously and that she was "not acting as trustee currently for any clients." Once again, Darrah falsely stated, "Yes this is accurate." Darrah's statement was materially false and misleadingly and designed to conceal her scheme to misappropriate the defrauded client's money.

(d)     On or about February 21, 2023, Minnesota Investment Adviser asked Darrah to confirm that she had not borrowed money or securities from any advisory clients and had not loaned any money or securities to any advisory clients. Darrah affirmed to Minnesota Investment Adviser that same day she had not done either of these things. However, beginning on or about July 17, 2023, and continuing through on or about September 26, 2023, the SEC issued several subpoenas to Darrah for documents relating to her advisory clients, including S.S. and M.S. Two of the documents Darrah produced to the SEC in response to these subpoenas were

17

purported promissory notes in which S.S. and M.S. supposedly agreed to loan Darrah, their investment adviser, $200,000 and $100,000, respectively, at a two percent annual interest rate. Even if the promissory notes she produced to the SEC are authentic, Darrah's representation to Minnesota Investment Adviser that she had not borrowed any money from her advisory clients was therefore false and designed to conceal Darrah's scheme. In any case, those purported promissory notes did not explain the additional $857,800 Darrah misappropriated from S.S., or the additional $478,400 Darrah misappropriated from M.S.

**E.      VFM Violated the Custody Rule**

100.   Rule 206(4)-2 under the Advisers Act provides that it is "a fraudulent, deceptive, or manipulative act, practice or course of business" for a registered adviser like VFM to have custody of client funds or securities unless the adviser complies with certain specified requirements intended to protect client assets from being lost, misused, misappropriated (the "Custody Rule").

101.   The Custody Rule provides that an adviser has custody of client assets if it holds, directly or indirectly, client funds or securities, or if it has the authority to obtain possession of those assets, including the capacity that gives the adviser legal ownership of, or access to, client funds or securities and any arrangement (including a general power of attorney or acting as a trustee) under which the investment adviser is authorized or permitted to withdraw client funds or securities maintained with a custodian upon instruction to the custodian.

102.   An adviser that has custody of client funds or securities must, among other things: (1) provide clients with notice of any custodial accounts opened on their behalf, (2) have a reasonable basis for believing that clients will get at least quarterly statements from those qualified custodians, and (3) have an independent public accountant conduct an annual surprise examination to verify clients' funds and securities.

103.   At all relevant times, VFM had custody of the defrauded clients' assets

due to Darrah (a) being appointed a trustee of the defrauded clients' trust accounts, (b) becoming a signatory on the defrauded clients' bank accounts and (c) being granted power of attorney over the defrauded clients' assets.  Additionally, VFM had custody of the defrauded clients' assets due to the "Move Money Advisor Authorization Form" (sometimes referred to as a standing letter of authorization or instruction "SLOA") the defrauded clients submitted to the broker-dealer for their trading accounts, authorizing VFM to move money out of their brokerage accounts and into bank accounts over which Darrah had been designated trustee, granted power of attorney or for which she had become a signatory on the account.

104.   Despite having custody of the defrauded clients' assets, VFM negligently failed to comply with the Custody Rule.  First, VFM did not inform clients in writing of the bank accounts opened and controlled by Darrah.  Second, VFM did not have a reasonable basis to believe the custodians of the defrauded clients' assets were sending account statements at least quarterly to the defrauded clients.  That is because Darrah had either changed the mailing address on the account statements to her residence or a residence she owned and controlled or had opened the account using her residence or a residence she owned and controlled.  Third, VFM did not verify the defrauded clients' funds and securities through an annual surprise examination.

105.   As VFM's president and part-owner, Darrah aided and abetted VFM in its violation of the Custody Rule by gaining custody of the defrauded clients' assets and having the account statements from the custodians of those assets sent to her residence or a residence she owned and controlled instead.  Darrah further aided and abetted VFM in its violation of the Custody Rule by not engaging any public accountant to conduct annual surprise examinations of either the brokerage or bank account assets over which VFM had custody.

**F.**   **Darrah and VFM Filed False and Misleading Forms ADV**

106.   Section 207 of the Advisers Act prohibits any person from willfully

making "any untrue statement of a material fact in any registration application or report filed with the Commission under Section 203 or 204, or willfully to omit to state in any such application or report any material fact which is required to be stated therein."

107. Between in or about March 2017, and in or about December 2021, Darrah, as the chief compliance officer of VFM, signed and/or filed approximately twenty-two (22) separate Forms ADV amendments and Firm Brochures with the SEC on behalf of VFM that contained materially false and misleading statements. Darrah, whose conduct and mental state are imputed to VFM, knew, or acted recklessly by not knowing, that the statements she submitted to the SEC on behalf of VFM were materially false and misleading at or around the time she submitted them.

108. The Form ADV amendments that Darrah signed and filed falsely stated that in connection with advisory services provided to clients, no VFM related person had custody of any advisory clients' cash, bank accounts, or securities.

109. These statements were false because Darrah, a related person of VFM, in connection with providing advisory services to clients had custody of advisory clients' cash, bank accounts, and securities.

110. The Firm Brochures Darrah filed from March 2017 to March 2019 stated that VFM did not have custody of client assets, its clients received at least quarterly account statements directly from their custodians listing the client's account balance, transaction history, and fees, and that it promptly notified clients in writing of the contact information for the client's qualified custodians.

111. These statements were false because VFM through Darrah did have custody of some clients' assets, not all of its clients received account statements directly from the custodians as Darrah had account statements for some clients addressed to her home or a home she owned, and VFM did not notify clients in writing of the contact information for the bank accounts that Darrah opened for certain clients.

112.   The Firm Brochures filed from April 2019 to March 2021 stated that VFM was deemed to have custody of certain client assets because SLOAs from clients gave it authority to disburse money from the client accounts to third parties. The Firm Brochures further stated that VFM had adopted certain safeguards to protect the clients' money, including that VFM maintained records showing the accounts that received money from clients' brokerage account pursuant SLOAs were not a related party of the investment adviser.

113.   These statements were false and misleading.  The statements were misleading because the Firm Brochures failed to disclose all the other ways by which VFM and Darrah had custody of certain client assets.  The statements were false because the bank accounts that received money from client brokerage accounts were related parties of VFM as Darrah had authority over the bank accounts.

114.   Darrah knew, or acted recklessly by not knowing, that the statements were materially false and misleading because, as detailed above, she knowingly took custody of the defrauded clients' assets by, in part, becoming a trustee for her advisory clients' accounts and a signatory on her advisory clients' bank accounts, and she had the account statements of the custodians sent to herself instead of her advisory clients.

**G.    VFM Failed to Implement Its Policies and Procedures**

115.   Section 206 of the Advisers Act and Rule 206(4)-7 require registered investment advisers like VFM to adopt and implement policies and procedures designed to prevent violations of the Advisers Act and its Rules.

116.   VFM negligently failed to adopt and implement policies and procedures reasonably designed to prevent VFM or its employees, like Darrah, from using advisory client money to benefit themselves.  VFM merely had a policy that, "[a]s a fiduciary under the Adviser's Act [sic], VFM recognize[d]," among other things that: "[i]t has an affirmative duty of utmost good faith to act solely in the best interests of the Client"; and "[t]he duty to render disinterested and impartial advice."  VFM,

however, had no procedures in place for implementing those general policies, as evidenced by the fact that Darrah misappropriated money from advisory clients for her benefit while a representative of VFM.

117.   Further, VFM failed to implement the policies that it did have concerning custody of client assets and fulfilling the fiduciary duty that Darrah and VFM owed to their advisory clients.

118.   VFM's compliance manual stated that custody of client assets was "generally defined as having direct or indirect access to such assets…. An investment adviser who itself or whose related person(s) have custody of Client assets is subject to extensive regulation, disclosure, and reporting requirements pursuant to Federal and State securities laws and regulations." VFM's compliance manual further stated that "VFM takes measure to avoid," among other things:  VFM personnel serving as trustee for client accounts; failing to meet the surprise examination requirements; and not having a reasonable basis, after due inquiry, for believing that a qualified custodian is sending quarterly account statements to the client.

119.   VFM negligently failed to implement these policies and procedures.  For example, as described above, while a representative of VFM, Darrah served as trustee for several of her advisory client accounts and did so for several years.  Darrah also changed the mailing address on several custodian accounts so that her clients stopped receiving monthly and quarterly statements from the custodians.

120.   VFM negligently failed to adopt and implement policies or procedures with respect to preparing and filing accurate Form ADV amendments and brochures. For example, Item 9 of VFM's Form ADV stated that VFM did not have, in connection with the advisory services defendants provided to clients, custody of clients' cash or bank accounts or securities.  These statements were inaccurate because Darrah had custody of the defrauded clients' funds and prevented those clients from receiving their account statements from the custodians.

121.   As the president and chief compliance officer of VFM, Darrah aided and abetted VFM in all of these compliance failures by not adopting or implementing these policies and procedures, and by carrying out the scheme in the manner described above.

**H.   Darrah's Invocation of Her Fifth Amendment Privilege Against Self-Incrimination**

122.   During the SEC's pre-filing investigation, Darrah invoked her privilege against self-incrimination under the Fifth Amendment to the U.S. Constitution and refused to answer any questions concerning her conduct alleged in this complaint.

**FIRST CLAIM FOR RELIEF**

**Fraud in the Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against All Defendants)**

123.   The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

124.   As alleged above, defendants Darrah and VFM knowingly or recklessly engaged in a scheme to defraud their clients, and engaged in acts, practices or courses of business that operated as a fraud upon their clients, by misappropriating the defrauded clients' funds and transferring them into accounts controlled by defendant Darrah.

125.   By engaging in the conduct described above, defendants Darrah and VFM, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, with scienter.

126.   By engaging in the conduct described above, defendants Darrah and

VFM violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1) of the Securities Act

### (against All Defendants)

127.   The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

128.   As alleged above, defendants Darrah and VFM knowingly or recklessly engaged in a scheme to defraud their clients, and engaged in acts, practices or courses of business that operated as a fraud upon their clients, by misappropriating the defrauded clients' funds and transferring them into accounts controlled by defendant Darrah.

129.   By engaging in the conduct described above, defendants Darrah and VFM, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes, or artifices to defraud, with scienter.

130.   By engaging in the conduct described above, defendants Darrah and VFM violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) of the Securities Act, 15 U.S.C. §§ 77q(a)(1).

## THIRD CLAIM FOR RELIEF

### Fraud by an Investment Adviser

### Violations of Sections 206(1) and 206(2) of the Advisers Act

### (against All Defendant)

131.   The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

132.   As alleged above, defendants Darrah and VFM were investment advisers and therefore owed a fiduciary duty to each of their clients.  Defendants Darrah and VFM each breached their fiduciary duty to their clients by misappropriating the defrauded clients' funds and transferring them into accounts controlled by defendant Darrah.

133.   By engaging in the conduct described above, defendants Darrah and VFM, and each of them, directly or indirectly, by use of the mails or means and instrumentalities of interstate commerce: (a) employed or are employing devices, schemes or artifices to defraud clients or prospective clients; and (b) engaged in or are engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients, with scienter and/or negligence.

134.   By engaging in the conduct described above, defendants Darrah and VFM have violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Sections 206(1) and (2) of the Advisers Act, 15 U.S.C. §§ 80b-6(1) & 80b-6(2).

## FOURTH CLAIM FOR RELIEF

### Failure to Adopt and Implement Compliance Policies and Procedures
### Violations of Section 206(4) of the Advisers Act and Rule 206(4)-7
### (against Defendant VFM)

135.   The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

136.   As alleged above, at all relevant times, defendant VFM was an investment adviser registered under Section 203 of the Advisers Act [15 U.S.C. § 80b-3].  By engaging in the conduct described above, defendant VFM, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative by providing investment advice to clients and failing to adopt and implement written policies and procedures reasonably designed to prevent violations,

by it or its supervised persons, of the Advisers Act and the rules that the SEC has adopted under the Advisers Act.

137.   By engaging in the conduct described above, Defendant VFM has violated, and unless restrained and enjoined will continue to violate, Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7.

**FIFTH CLAIM FOR RELIEF**

**Aiding and Abetting Violations of**

**Section 206(4) of the Advisers Act and Rule 206(4)-7**

**(against Defendant Darrah)**

138.   The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

139.   As alleged in paragraphs 135 through 137 above, by engaging in the conduct described above, defendant VFM has violated Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7.

140.   By engaging in the conduct described above, defendant Darrah knowingly or recklessly provided substantial assistance to, and thereby aided and abetted VFM in its violations of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder, in violation of Section 209(f) of the Advisors Act, 15 U.S.C. § 80b-9(f).

141.   By engaging in the conduct described above, defendant Darrah aided and abetted, and unless restrained and enjoined will continue to aid and abet violations of Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-7 thereunder, 17 C.F.R. § 275.206(4)-7.

**SIXTH CLAIM FOR RELIEF**

**False Statements in Reports Filed with the SEC**

**Violations of Section 207 of the Advisers Act**

**(against All Defendants)**

142.   The SEC realleges and incorporates by reference paragraphs 1 through

122 above.

143.   As alleged above, defendants Darrah and VFM made untrue statements of material fact in VFM's Forms ADV concerning its custody of client assets and clients receiving at least quarterly account statements direction from their custodians. At all relevant times, defendant Darrah and VFM acted willfully and recklessly in making the untrue statements of material fact.

144.   By engaging in the conduct described above, defendant Darrah and VFM willfully made untrue statements of a material fact in reports VFM filed with the SEC or willfully omitted to state in such reports material facts required to be stated therein.

145.   By engaging in the conduct described above, defendants Darrah and VFM violated, and unless restrained and enjoined will continue to violate, Section 207 of the Advisers Act, 15 U.S.C. § 80b-7.

### SEVENTH CLAIM FOR RELIEF

**Fraud by an Investment Adviser (The Custody Rule)**

**Section 206(4) of the Advisers Act and Rule 206(4)-2 Thereunder**

**(against Defendant VFM)**

146.   The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

147.   As alleged above, at all relevant times, defendant VFM was an investment adviser registered under Section 203 of the Advisers Act [15 U.S.C. § 80b-3].  By engaging in the conduct described above, defendant VFM, directly or indirectly, by use of the mails or means or instrumentalities of interstate commerce, engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative by having custody of client funds or securities without (1) having a reasonable basis , after due inquiry, for believing that the qualified custodian sends account statements at least quarterly to the clients and (2) ensuring that client funds and securities are verified by actual examination each year by an independent public accountant at a time chosen by the accountant without prior notice or announcement

to the adviser.

148.   By reason of the foregoing, defendant VFM, directly or indirectly, violated and, unless restrained and enjoined, will continue to violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. §§ 275.206(4)-2].

## EIGHTH CLAIM FOR RELIEF

### Aiding and Abetting Fraud by an Investment Adviser (The Custody Rule)
### Section 206(4) of the Advisers Act and Rule 206(4)-2 Thereunder
### (against Defendant Darrah)

149.   The SEC realleges and incorporates by reference paragraphs 1 through 122 above.

150.   As alleged in paragraphs 146 through 148 above, by engaging in the conduct described above, defendant VFM has violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-2 thereunder [17 C.F.R. §§ 275.206(4)-2].

151.   By engaging in the conduct described above, defendant Darrah knowingly or recklessly provided substantial assistance to, and thereby aided and abetted VFM in its violations of Section 206(4) of the Advisers Act and Rule 206(4)-2 thereunder, in violation of Section 209(f) of the Advisors Act, 15 U.S.C. § 80b-9(f).

152.   By engaging in the conduct described above, defendant Darrah aided and abetted, and unless restrained and enjoined will continue to aid and abet violations of Section 206(4) of the Advisers Act, 15 U.S.C. § 80b-6(4), and Rule 206(4)-2 thereunder, 17 C.F.R. § 275.206(4)-2.

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendants Darrah and VFM, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) & 80b-6(2)].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Darrah and VFM, and their agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 207 of the Advisers Act [15 U.S.C. § 80b-7].

## IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant VFM, and its agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rules 206(4)-2 and 206(4)-7 thereunder, [17 C.F.R. §§ 275.206(4)-2 & 275.206(4)-7].

## V.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining defendant Darrah, and her agents, servants, employees and attorneys, and those persons in active concert or participation with

1  any of them, who receive actual notice of the judgment by personal service or

2  otherwise, and each of them, from aiding and abetting any violation of Section 206(4)

3  of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rules 206(4)-2 and 206(4)-7

4  thereunder, [17 C.F.R. §§ 275.206(4)-2 & 275.206(4)-7].

## VI.

6       Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of

7  Civil Procedure, pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. §

8  78u(d)(5)], permanently enjoining Defendant Darrah from directly or indirectly

9  participating  in the offer, sale, or transfer of any security on behalf of any other

10  person or any entity, including in her capacity as a trustee for such other person or

11  entity; provided, however, that such injunction shall not prevent Defendant Darrah

12  from purchasing or selling securities for her own personal account.

## VII.

14       Order Defendants to disgorge all funds received from their illegal conduct,

15  together with prejudgment interest thereon, pursuant to Sections 21(d)(3), 21(d)(5),

16  and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

## VIII.

18       Order Relief Defendant PC&J to disgorge any unjust enrichment received by

19  PC&J from Defendants' illegal conduct, together with prejudgment interest thereon,

20  pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C.

21  § 78u(d)(3), 78u(d)(5), and 78u(d)(7)].

## IX.

23       Order Defendants to pay civil penalties under Section 20(d) of the Securities

24  Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §

25  78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## X.

27       Retain jurisdiction of this action in accordance with the principles of equity and

28  the Federal Rules of Civil Procedure in order to implement and carry out the terms of

all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## XI.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  October 20, 2023

/s/ Douglas M. Miller
DOUGLAS M. MILLER
Attorney for Plaintiff
Securities and Exchange Commission