1    DOUGLAS M. MILLER (Cal. Bar No. 240398)
     Email: millerdou@sec.gov
2    KELLY C. BOWERS (Cal. Bar No. 164007)
     Email: bowersk@sec.gov
3
     Attorneys for Plaintiff
4    Securities and Exchange Commission
     Katharine E. Zoladz, Associate Regional Director and
5    Acting Co-Regional Director
     Gary Y. Leung, Associate Regional Director
6    444 S. Flower Street, Suite 900
     Los Angeles, California 90071
7    Telephone: (323) 965-3998
     Facsimile: (213) 443-1904

```
                                    FILED
                            CLERK, U.S. DISTRICT COURT

                              OCT 20 2023

                        CENTRAL DISTRICT OF CALIFORNIA
                        BY: ___EEE___ DEPUTY
```

8

9                    **UNITED STATES DISTRICT COURT**

10                   **CENTRAL DISTRICT OF CALIFORNIA**

11                        **Western Division**

12                                        2:23-CV-08843-CAS-AGRx

13   SECURITIES AND EXCHANGE          Case No.
     COMMISSION,
14                                    **DECLARATION OF KELLY**
            Plaintiff,                **BOWERS IN SUPPORT OF**
15                                    **PLAINTIFF SECURITIES AND**
        vs.                           **EXCHANGE COMMISSION'S *EX***
16                                    ***PARTE* APPLICATION FOR A**
     JULIE ANNE DARRAH and VIVID      **TEMPORARY RESTRAINING**
17   FINANCIAL MANAGEMENT, INC.,      **ORDER AND ORDERS: (1)**
                                      **FREEZING ASSETS; (2) REQUIRING**
18          Defendants.               **ACCOUNTINGS; (3) PROHIBITING**
                                      **THE DESTRUCTION OF**
19   PC&J JOINT VENTURES, LLC,        **DOCUMENTS; AND (4) GRANTING**
                                      **EXPEDITED DISCOVERY**
20          Relief Defendant.

21

22

23

24

25

26

27

28

## <u>DECLARATION OF KELLY BOWERS</u>

I, Kelly Bowers, declare, pursuant to 28 U.S.C. § 1746, as follows:

1.      I have personal knowledge of the matters set forth herein, except as otherwise noted, and, if called as a witness, I could and would competently testify under oath to the facts stated herein.

2.      I am an attorney admitted to practice law by the State Bar of California and by this Court and am currently an Attorney in the Division of Enforcement in the Securities and Exchange Commission's ("SEC") Los Angeles Regional Office.

3.      In the course of my duties as an Attorney with the SEC, I investigate violations of the federal securities laws.  My responsibilities include, among other things: (i) subpoenaing documents and witnesses; (ii) obtaining and analyzing documents; (iii) taking testimony; and (iv) making recommendations concerning whether there have been violations of the statutes and regulations enforced by the SEC.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of the Declaration of Julie Anne Darrah.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of Darrah's employment history that was downloaded from the Central Registration Depository, or CRD, that is maintained by the Financial Industry Regulatory Authority, or FINRA.  CRD stores and maintains information on registered broker-dealers and persons affiliated with registered broker-dealers and investment advisers.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of Vivid Financial Management, Inc.'s ("VFM") April 2016 Form ADV Part 2A – Firm Brochure ("Brochure") that was downloaded from the Investment Adviser Registration Depository, or IARD, that is maintained by FINRA.  IARD stores and maintains information on registered investment advisers.

7.      Attached hereto as **Exhibit 4** is a true and correct copy of VFM's June 2019 Investment Adviser Compliance Manual & Written Supervisory Procedures.

1

8.      Attached hereto as **Exhibit 5** is a true and correct copy of Senior Vice President Financial Advisor Agreement dated November 11, 2021, between Darrah and Wealth Enhancement Group, LLC.

9.      As part of my investigation of Darrah's activities, I reviewed documents subpoenaed from third parties.  My review of such subpoenaed documents found that SS was born on February 23, 1940.

10.     Attached hereto as **Exhibit 6** is a true and correct copy of VFM's October 6, 2015 Wrap Comprehensive Portfolio Management Agreement with SS that covered brokerage accounts held by SS in her name personally and in the name of SS's trust.

11.     Attached hereto as **Exhibit 7** is a true and correct copy of Appointment of Co-Trustee and Acceptance of Appointment as Co-Trustee of SS's trust dated April 30, 2017.  To respect the privacy of Darrah's victims we have not included all of the trust's documents.  At the Court's request, we will provide complete copies of any or all of the trusts discussed in this declaration to the Court *in camera.*

12.     Attached hereto as **Exhibit 8** is a true and correct copy of the Residential Detail Ledger of the assisted-living and memory care facility in which SS lives.

13.     Attached hereto as **Exhibit 9** is a true and correct copy of the webpage for that facility showing that that memory care unit is known as Garden House, or GH.

14.     Attached hereto as **Exhibit 10** is a true and correct copy of Wealth Enhancement Advisory Services, LLC's ("WEAS") December 22, 2022 Master Services Agreement with SS that covered brokerage accounts held by SS in her name personally and in the name of SS's trust.

15.     As part of my investigation of Darrah's activities, I reviewed documents subpoenaed from third parties.  My review of such subpoenaed documents found that MS was born on February 2, 1937.

16.     As part of my investigation of Darrah's activities, I was told by MS's

2

1  relatives that MS is SS's older sister.

2      17.    Attached hereto as **Exhibit 11** is a true and correct copy of VFM's May

3  13, 2015 Wrap Comprehensive Portfolio Management Agreement with MS that

4  covered brokerage accounts held by MS in her name personally and in the name of

5  MS's trust.

6      18.    Attached hereto as **Exhibit 12** is a true and correct copy of WEAS's

7  December 20, 2022 Master Services Agreement with MS that covered brokerage

8  accounts held by MS in her name personally and in the name of MS's trust.

9      19.    As part of my investigation of Darrah's activities, I reviewed documents

10  subpoenaed produced from third parties.  My review of such subpoenaed documents

11  found that BC was born on October 31, 1940.

12      20.    Attached here at **Exhibit 13** is a true and correct copy of VFM's May

13  18, 2015 Wrap Comprehensive Portfolio Management Agreement with BC and a

14  June 1, 2016 updated Schedule A that covered brokerage accounts held by BC in her

15  name personally and in the name of BC's trust.

16      21.    As part of my investigation of Darrah's activities, I was told by a close

17  and trusted friend of BC that Darrah had told BC that Darrah was going to use the

18  $150,000 from BC to open a restaurant and the $50,000 from BC to purchase a small

19  house.

20      22.    Attached hereto as **Exhibit 14** is a true and correct copy of WEAS's

21  November 18, 2022 Master Services Agreement with BC that covered brokerage

22  accounts held by BC in her name personally and in the name of BC's trust.

23      23.    As part of my investigation of Darrah's activities, I reviewed documents

24  subpoenaed from third parties.  My review of such subpoenaed documents found that

25  BH was born on November 7, 1947.

26      24.    Attached hereto as **Exhibit 15** is a true and correct copy of VFM's May

27  November 1, 2021 Wrap Comprehensive Portfolio Management Agreement with BH

28  that covered brokerage accounts held by BH in her name personally.

25.     Attached hereto as **Exhibit 16** is a true and correct copy of BH's special needs trust.

26.     Attached hereto as **Exhibit 17** is a true and correct copies of documents relating to BH's claim for a death penalty payment under an annuity contract relating to a third party and the payment of the death benefit to BH.

27.     As part of my investigation of Darrah's activities, I was told by BH that Darrah had told BH that Darrah would take BH's death benefit payment and Darrah would provide BH with money as BH requested it.

28.     Attached hereto as **Exhibit 18** is a true and correct copy of the transcription of a January 24, 2022 voice mail from BH to Darrah.

29.     As part of my investigation of Darrah's activities, I reviewed documents subpoenaed from third parties.  My review of such subpoenaed documents found that LC was born on June 28, 1935, and passed away on October 4, 2020.

30.     Attached hereto as **Exhibit 19** is a true and correct copy of VFM's February 29, 2016 Wrap Comprehensive Portfolio Management Agreement with LC that covered brokerage accounts held by LC in her name personally and in the name of LC's trust.

31.     As part of my investigation of Darrah's activities, I reviewed documents subpoenaed from third parties.  My review of LC's trust found that upon LC's death, the assets in LC's trust would be allocated to a trust for the benefit of LC's son, DC.

32.     Attached hereto as **Exhibit 20** is a true and correct copy of Resignation of Trustee and Appointment of Co-Trustee and Acceptance of Appointment of Successor Trustee of LC's trust dated August 12, 2020.

33.     Attached hereto as **Exhibit 21** is a true and correct copy of VFM's October 23, 2020 Wrap Comprehensive Portfolio Management Agreement with DC that covered brokerage accounts held by DC in his name personally.

34.     As part of my investigation of Darrah's activities, I was told by DC and his daughter that they did not know that Darrah had received any money from LC's

4

trust and that Darrah never provided DC with an accounting of LC's assets that they had repeatedly requested from Darrah.

35.     As part of my investigation of Darrah's activities, I reviewed documents subpoenaed from third parties.  My review of such subpoenaed documents found that SA was born on July 25, 1942, and passed away on April 18, 2020.

36.     Attached hereto as **Exhibit 22** is a true and correct copy of VFM's May 18, 2015 Wrap Comprehensive Portfolio Management Agreement with SA that covered brokerage accounts held by SA in her name personally and in the name of SA's trust.

37.     As part of my investigation of Darrah's activities, I reviewed documents subpoenaed from third parties.  My review of SA's trust found that upon SA's death, the assets in SA's trust would be distributed to SA's two daughters.

38.     Attached hereto as **Exhibit 23** are true and correct copies of VFM's May 14, and 19, 2020 Wrap Comprehensive Portfolio Management Agreement with SA's daughters that covered brokerage accounts held by SA's daughters in in their names personally.

39.     As part of my investigation of Darrah's activities, I was told by SA's daughters that they did not know that Darrah had received any money from SA's trust and that Darrah never provided them with an accounting of SA's assets.

40.     Attached hereto as **Exhibit 24** is a true and correct copy of VFM's November 29, 2016 Wrap Comprehensive Portfolio Management Agreement with JS that covered brokerage accounts held by JS in his name personally and in the name of JS and his wife's trust.

41.     Attached hereto as **Exhibit 25** is a true and correct copy of a special needs trust created by JS for the benefit of PS.

42.     As part of my investigation of Darrah's activities, I was told by JS that he created the trust for his brother PS who was a veteran, funded the trust with PS's share of their father's estate, and asked Darrah to be the trustee for the trust.

43.     As part of my investigation of Darrah's activities, I reviewed documents subpoenaed from third parties.  My review of such subpoenaed documents found that CH was born on February 16, 1941.

44.     Attached hereto as **Exhibit 26** is a true and correct copy of WEAS's February 16, 2022 Master Service Agreement with CH that covered brokerage accounts held by CH in her name personally.

45.     Attached hereto as **Exhibit 27** is a true and correct copy of a May 27, 2022 Durable Power of Attorney and Nomination of Conservator by CH.

46.     Attached hereto as **Exhibit 28** is a true and correct copy of the Filing History for VFM showing the Form ADV filings by VFM to register, or to amend its registration, with the SEC as an investment adviser.  The Filing History was downloaded from IARD maintained by FINRA and through which investment advisers file Form ADV and Form ADV Amendments with the SEC.

47.     Attached hereto as **Exhibit 29** is a true and correct copy of the Brochure Filing History for VFM showing the Brochure filings by VFM as part of its Form ADV filings.  The Brochure Filing History was downloaded from IARD maintained by FINRA and through which investment advisers file Brochures with the SEC.

48.     As part of my investigation of Darrah's activities, I reviewed the VFM Form ADV filings since 2016.  All of the Form ADV filings were signed by Darrah, as VFM's Chief Compliance Officer, under the penalty of perjury that the information contained in the Form ADV, including exhibits and any other information submitted (e.g., Brochures), were true and correct.

49.     As part of my investigation of Darrah's activities, I reviewed the VFM Brochure filings since 2016.

   a.     All of the Brochure filings from April 1, 2016, to March 22, 2019, stated:  "We do not have custody of client funds or securities.  All of our clients receive at least quarterly account statements directly from their custodians.  Upon opening an account with a qualified

6

custodian on a client's behalf, we promptly notify the client in writing of the qualified custodian's contact information....  The custodians we do business with will send you independent account statements listing your account balance(s), transaction history and any fee debits or other fees taken out of your account."

b.   All of the Brochure filings from February 20, 2020, to March 18, 2021, stated:  "While our firm does not maintain physical custody of clients assets (which are maintained by a qualified custodian, as discussed above), we are deemed to have custody of certain client assets if given the authority to withdraw assets from client accounts, as further described below under 'Standing Instructions.'  All our clients receive account statements directly from their qualified custodian(s) at least quarterly upon opening of an account....  On February 21, 2017, the SEC issued a no-action letter ('Letter') with respect to Rule 206(4)-2 ('Custody Rule') under the [Advisers Act].  The letter provided guidance on the Custody Rule as well as clarified that an adviser who has the power to disburse client funds to a third party under a standing letter of instruction ('SLOA') is deemed to have custody.  As such, our firm has adopted the following safeguards in conjunction with our custodian:  The client provides an instruction to the qualified custodian, in writing, that includes the client's signature, the third party's name, and either the third party's address or the third parry's account number at a custodian to which the transfer should be directed.  The client authorizes the investment adviser, in writing, either on the qualified custodian's form or separately, to direct transfers to the third party either on a specified schedule or from time to time.  The client's qualified

7

custodian performs appropriate verification of the instruction, such as a signature review or other method to verify the client's authorization and provides a transfer of funds notice promptly after each transfer.  The client has the ability to terminate or change the instruction to the client's qualified custodian.  The investment adviser has no authority or ability to designate or change the identity of the third party, the address, or any other information about the third party contained in the client's instruction.  The investment adviser maintains records showing that the third party is not a related party of the investment adviser or located at the same address as the investment adviser.  The client's qualified custodian sends the client, in writing, an initial notice confirming the instruction and an annual notice reconfirming the instruction."

50.     Attached hereto as **Exhibit 30** is a true and correct copy of an email chain dated from November 4, 2021, to November 11, 2021.

51.     Attached hereto as **Exhibit 31** is a true and correct copy of an email chain dated February 6, 2023.

52.     Attached hereto as **Exhibit 32** is a true and correct copy of an attestation by Darrah dated February 21, 2023.

53.     Attached hereto as **Exhibit 33** is a true and correct copy of an attestation by Darrah dated June 13, 2023.

54.     Attached hereto as **Exhibit 34** is a true and correct copy of a Uniform Statutory Power of Attorney by BC in favor of Darrah.

55.     Attached hereto as **Exhibit 35** are true and correct copies of two promissory notes produced by Darrah dated August 3, 2021, and July 15, 2023.

56.     Attached hereto as **Exhibit 36** is a true and correct copy an email from a close and trusted friend of BC dated September 21, 2023, attaching copies of the

promissory notes dated August 3, 2021, and July 15, 2023, that are also in Exhibit 35 to an email stating that BC was presented the promissory notes and signed them on September 20, 2023.

57.     Attached hereto as **Exhibit 37** are true and correct copies of promissory notes produced by Darrah concerning her promise to pay SS, MS, and CH specified amounts.  The promissory note for MS refers to SS below Darrah's signature.

58.     Attached hereto as **Exhibit 38** is a true and correct copy of a Fourth Amendment to the SA trust.

59.     Attached here to as **Exhibit 39** are true and correct copies of listing for the sale of property bought by Darrah since 2020.

60.     On September 27, 2023, I spoke with Darrah's legal counsel for the SEC investigation.  Counsel said that Darrah was doing an accounting of the money she received from her clients.

61.     On October 16, 2023, I spoke with Darrah's SEC counsel.  Counsel said that Darrah was in the process of resigning from all her trustee positions and removing herself as signatory on bank accounts held with third parties.  Counsel also said that in the next few days, they would send the resignation notices and the previously promised accounting.  Counsel further said that Darrah had listed two or three of her properties for sale, that she would likely in the future list other properties for sale, that one of her businesses was temporarily closed for two weeks, and that the proceeds from the sale of any property would be deposited in the law firm's trust account so it would be available to pay any of her former clients.

62.     Attached hereto as **Exhibit 40** is a true and correct copy of an email from Darrah's SEC's counsel and an excel spreadsheet both of which I received from Darrah's SEC counsel on October 18, 2023.

63.     Attached hereto as **Exhibit 41** is a true and correct copy of an email from Darrah's SEC co-counsel and attachments to the email concerning Darrah's resignations and assets.  I have included in this exhibit only those attachments

relating to resignations concerning Darrah's former clients discussed in this declaration.

64.     Attached hereto as **Exhibit 42** is a true and correct copy of the complaint in *Wealth Enhancement Group, LLC v. Darrah,* Case No. 23-cv-03034 (D. Minn. Sept. 29, 2023).

65.     Attached hereto as **Exhibit 43** is a true and correct copy of the Notice of for Cause Termination sent to Darrah on September 15, 2023.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of October 2023, in Los Angeles, California.


*/s/ Kelly Bowers*
Kelly Bowers

# EXHIBIT 1

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION

| | |
|---|---|
| IN THE MATTER OF WEALTH ENHANCEMENT ADVISORY SERVICES, LLC (LA-5429) | **DECLARATION OF JULIE ANNE DARRAH** |

I, Julie Anne Darrah, declare pursuant to 28 U.S.C. § 1746 as follows:

1. On September 12, 2023, I was served with a subpoena from the U.S. Securities and Exchange Commission ("SEC"), attached as Exhibit A, that required me to appear on September 20, 203, before officers of the SEC to give testimony in the formal investigation titled *In the Matter of Wealth Enhancement Advisory Services, LLC* (LA-5429).

2. I have read the June 26, 2023 SEC *Order Directing Private Investigation and Designating Officers to Take Testimony in the Matter of Wealth Enhancement Advisory Services, LLC* ("Formal Order"), attached as Exhibit B.

3. On the advice of my attorney, I am asserting my privilege against self-incrimination, under the Fifth Amendment to the United States Constitution, and declining to answer questions asked by the SEC at my scheduled testimony. I assert this privilege against self-incrimination with respect to all questions about matters relating to the investigation referenced above, including in response to any and all questions regarding the following subjects:

(a) all matters relating to my biographical information, including my residence(s), property holdings, education, employment, bank and brokerage accounts, and email accounts;

(b) all matters relating to my work at Vivid Financial Management, Inc. ("VFM"), and Wealth Enhancement Advisory Services, LLC ("WEAS");

(c) all matters relating to my acting or being a trustee for any trust created by or for any person, including any person who was/is a client of VFM and/or

Exhibit 1 Page 11

1   WEAS;

2         (d)    all matters relating to the control of bank and/or brokerage

3   account in the name of myself, any client of VFM and/or WEAS, and any trust

4   created by or for the benefit of any client of VFM and/or WEAS;

5         (e)    all matters relating to the deposit or withdrawal of funds, or the

6   transfer of funds to or from, any bank and/or brokerage account in the name of

7   myself, any client of VFM or WEAS, and any trust created by or for the benefit of

8   any client of VFM and/or WEAS;

9         (f)    all matters relating to use of credit cards issued to myself, any

10  client of VFM and/or WEAS, and any trust created by or for the benefit of any client

11  of VFM and/or WEAS;

12        (g)    all matters relating to my outside business activities while

13  affiliated with VFM or WEAS, including 3twenty3, LLC; 2twenty3, LLC; Bradley

14  Partners, LLC; Bradley Management; Central Coast Palate, LLC, dba Central Coast

15  Specialty Foods; Casa of Hope; Orion 3 Holdings; PC & J Joint Ventures, LLC, dba

16  Cups and Crumbs and the Homestead; The Sausage Co; and Wanderlust Foods;

17        (h)    all matters relating to the deposit or withdrawal of funds,, the

18  transfer of funds to or from, or the use of funds from any account relating to my

19  outside business activities while affiliated with VFM or WEAS, including 3twenty3,

20  LLC; 2twenty 3, LLC; Bradley Partners, LLC; Bradley Management; Central Coast

21  Palate, LLC, dba Central Coast Specialty Foods; Casa of Hope; Orion 3 Holdings; PC

22  & J Joint Ventures, LLC, dba Cups and Crumbs and the Homestead; The Sausage Co;

23  and Wanderlust Foods;

24        (i)    All matters relating to ▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

28  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Exhibit 1 Page 12

1

2        (j)    all matters relating to my being and acting as the chief compliance

3  officer of VFM;

4        (k)    all matters relating to VFM's compliance policies and procedures

5  and any role I played in preparing and implementing them;

6        (l)    all matters relating to VFM's Form ADV amendments and any

7  role I played in preparing and filing them;

8        (m)   all matters relating to VFM's Form ADV Part 2A and any role I

9  played in preparing and filing them;

10       (n)    all matters relating to the making and keeping of records at VFM

11  and WEAS;

12       (o)    all matters relating to WEAS's compliance policies and

13  procedures;

14       (p)    all matters relating to the reporting of outside business activities to

15  WEAS;

16       (q)    all matters relating to responding to compliance questionnaires

17  from WEAS;

18       (r)    all matters relating to compliance attestations to WEAS; and

19       (s)    any non-privileged communications I have had with any person

20  regarding the SEC investigation identified by the Formal Order.

21     4.    I acknowledge and understand that my assertion of my Fifth Amendment

22  privilege against self-incrimination has the same effect in the context of this

23  investigation and/or any related enforcement action the SEC may bring against me as

24  if I had appeared for my subpoenaed testimony and asserted this privilege under oath

25  through live testimony.

26     5.    I understand that because of my decision on the advice of my attorney to

27  assert my Fifth Amendment privilege against self-incrimination, the SEC may seek

28

3

Exhibit 1 Page 13

1  an adverse inference based on my decision to decline to answer questions about the

2  matters set forth above in any civil enforcement action that the SEC may bring

3  against me.

4      6.      If compelled to testify in this SEC investigation, I will continue to assert

5  my Fifth Amendment privilege against self-incrimination as set forth above.

6      I declare under penalty of perjury under the laws of the United States of

7  America that the foregoing is true and correct.

8  Executed on _September 1?_, 2023, in _Santa Maria, Ca_.

9

10

11

12  Julie Anne Darrah

13

14

15

16  **APPROVED AS TO FORM:**

17

18

19  Patrick J. Burns, Jr.
   The Law Offices of Patrick J. Burns, Jr.

20  Attorney for Julie Anne Darrah

21

22

23

24

25

26

27

28

4

Exhibit 1 Page 14

# EXHIBIT 2

# U4 Employment History

**Individual CRD#:** 2102014                    **Individual Name: DARRAH, JULIE**

| Office of Employment Address History | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **From** | **To** | **Firm** | **CRD Branch Number** | **NYSE Branch Code Number** | **Firm Billing Code** | **Address** | **Type of Office** | **Private Residence** |
| 01/01/2022 | 09/15/2023 | WEALTH ENHANCEMENT ADVISORY SERVICES, LLC (116407) | IA Main | | | 505 NORTH HWY 169 SUITE 900 PLYMOUTH, MN 55441, United States | Supervised From | No |
| 01/01/2022 | 09/15/2023 | WEALTH ENHANCEMENT ADVISORY SERVICES, LLC (116407) | Non Registered Location | | | 214 E BRANCH ST SUITE B ARROYO GRANDE, CA 93240, United States | Located At | No |
| 01/01/2022 | 09/15/2023 | WEALTH ENHANCEMENT ADVISORY SERVICES, LLC (116407) | Non Registered Location | | | 511 N H ST SUITE G LOMPOC, CA 93436, United States | Located At | No |
| 01/01/2022 | 09/15/2023 | WEALTH ENHANCEMENT ADVISORY SERVICES, LLC (116407) | Non Registered Location | | | 340 E CLARK AVE ORCUTT, CA 93455, United States | Located At | No |
| 12/10/2021 | 01/18/2022 | WEALTH ENHANCEMENT BROKERAGE SERVICES, LLC (130139) | Non Registered Location | | | 505 NORTH HWY 169 SUITE 900 PLYMOUTH, MN 55441-, United States | Located At | No |
| 05/11/2021 | 12/31/2021 | MUTUAL SECURITIES, INC. (13092) | 759793 | 5672 | 13092 | 214 E. Branch St. Arroyo Grande, CA 93420, United States | Located At | No |
| 05/01/2015 | 01/04/2022 | VIVID FINANCIAL MANAGEMENT, INC. (281392) | IA Main | | | 340 EAST CLARK AVE. ORCUTT, CA 93455, United States | Located At | No |
| 05/01/2015 | 04/01/2016 | VIVID FINANCIAL MANAGEMENT, INC. (174072) | IA Main | | | 340 E. CLARK AVENUE ORCUTT, CA 93455, United States | Located At | No |
| 05/01/2015 | 04/01/2016 | VIVID FINANCIAL MANAGEMENT, INC. (174072) | IA Main | | | 340 E. CLARK AVENUE ORCUTT, CA 93455, United States | Located At | No |
| 06/28/2013 | 12/31/2021 | MUTUAL SECURITIES, INC. (13092) | 272113 | 1000 | 13092 | 807-A CAMARILLO SPRINGS ROAD CAMARILLO, CA 93012, United States | Supervised From | No |
| 06/28/2013 | 12/31/2021 | MUTUAL SECURITIES, INC. (13092) | 539759 | 5670 | 13092 | 340 East Clark Avenue Orcutt, CA 93455, United States | Located At | No |
| 01/16/2001 | 06/28/2013 | NATIONAL PLANNING CORPORATION (29604) | 138736 | | 50900 | 5075 S BRADLEY ROAD STE 234 SANTA MARIA, CA 93455, United States | Located At | No |
| 12/14/2000 | 05/03/2006 | NATIONAL PLANNING CORPORATION (29604) | Non Registered | | 50900 | 5075 S. BRADLEY RD. #234 | Located At | No |

Exhibit 2 Page 15

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | Location | | | SANTA MARIA, CA 93455, United States | | |
| 05/01/1992 | 12/29/2014 | WOODLAND LEISHMAN & ASSOCIATES ([109271](#)) | IA Main | | | 5075 S. BRADLEY ROAD SUITE 234 SANTA MARIA, CA 93455, United States | Located At | No |
| 10/08/1990 | 08/05/2003 | ASSOCIATED SECURITIES CORP. ([12969](#)) | Non Registered Location | | | 5933 W. CENTURY BLVD 9TH FLOOR LOS ANGELES, CA 90045-5454, United States | | No |

**Please note that data contained in the U4 EMPLOYMENT HISTORY SCREEN is updated only by a U4 and does not reflect any changes made by the filing of a U5.**

**Employment History**

| From | To | Name | Investment Related Business? | City | State | Country | Position |
|---|---|---|---|---|---|---|---|
| 01/2022 | Present | WEALTH ENHANCEMENT ADVISORY SERVICES | Y | ORCUTT | CA | United States | INVESTMENT ADVISOR REPRESENTATIVE |
| 01/2022 | Present | WEALTH ENHANCEMENT GROUP | Y | ORCUTT | CA | United States | SVP, FINANCIAL ADVISOR |
| 05/2015 | 12/2021 | VIVID FINANCIAL MANAGEMENT, INC. | Y | ORCUTT | CA | United States | OWNER AND CHIEF COMPLIANCE OFFICER |
| 06/2013 | 12/2021 | MUTUAL SECURITIES, INC | Y | CAMARILLO | CA | United States | LICENSED SALES ASSISTANT |
| 05/1992 | 04/2015 | WOODLAND LEISHMAN & ASSOCIATES | N | SANTA MARIA | CA | United States | CHIEF OPERATIONS OFFICER |
| 12/1999 | 06/2013 | NATIONAL PLANNING CORPORATION | Y | SANTA MARIA | CA | United States | ADMINISTRATION |
| 05/1992 | 12/1999 | ASSOCIATED SECURITIES | Y | SANTA MARIA | CA | United States | ADMIN. |
| 05/1990 | 05/1992 | ASSOCIATED SECURITIES | Y | LOMPOC | CA | United States | ADMINISTRATION |

© 2023 FINRA. All rights reserved. FINRA is a registered trademark of the Financial Industry Regulatory Authority, Inc.
Privacy | Legal | Terms & Conditions

Exhibit 2 Page 16

# EXHIBIT 3

---

### Form ADV Part 2A – Firm Brochure
### Item 1: Cover Page
### April 2016

---

## Vivid Financial Management, Inc.
## 340 East Clark Ave.
## Orcutt, CA 93455
## www.vividfm.com

## Firm Contact:
## Julie Darrah
## Chief Compliance Officer

This brochure provides information about the qualifications and business practices of Vivid Financial Management, Inc. If you have any questions about the contents of this brochure, please contact us by telephone at (805) 937-4556 or email Julie@vividfm.com. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission or by any State Securities Authority.

Additional information about Vivid Financial Management, Inc. is also available on the SEC's website at www.adviserinfo.sec.gov.

Please note that the use of the term "registered investment adviser" and description of Vivid Financial Management, Inc. and/or our associates as "registered" does not imply a certain level of skill or training. You are encouraged to review this Brochure and Brochure Supplements for our firm's associates who advise you for more information on the qualifications of our firm and our employees.

Exhibit 3 Page 17

## Item 2: Material Changes

Vivid Financial Management, Inc. is required to advise you of any material changes to the Firm Brochure ("Brochure") from our last annual update. As of July 2015, our firm has restructured its ownership. The new ownership schedule is as follows:

Julie Darrah, President – 35%
Todd Woodland, Vice President – 50%
Bradley Boulton, Secretary – 10%
Timothy Miller, Treasurer – 5%

ADV Part 2A – Firm Brochure                    Page 2                    Vivid Financial Management, Inc.

Exhibit 3 Page 18

## Item 3: Table of Contents

Item 1: Cover Page ................................................................................................................ 1
Item 2: Material Changes ...................................................................................................... 2
Item 3: Table of Contents ...................................................................................................... 3
Item 4: Advisory Business...................................................................................................... 4
Item 5: Fees & Compensation ............................................................................................... 5
Item 6: Performance-Based Fees & Side-By-Side Management ......................................... 6
Item 7: Types Of Clients & Account Requirements............................................................ 6
Item 8: Methods of Analysis, Investment Strategies & Risk of Loss ................................. 6
Item 9: Disciplinary Information........................................................................................... 7
Item 10: Other Financial Industry Activities & Affiliations ............................................... 8
Item 11: Code of Ethics, Participation or Interest in Client Transactions & Personal Trading............. 8
Item 12: Brokerage Practices ................................................................................................ 9
Item 13: Review of Accounts or Financial Plans.................................................................11
Item 14: Client Referrals & Other Compensation..............................................................12
Item 15: Custody....................................................................................................................12
Item 16: Investment Discretion............................................................................................13
Item 17: Voting Client Securities.........................................................................................13
Item 18: Financial Information.............................................................................................13

Exhibit 3 Page 19

## Item 4: Advisory Business

We are dedicated to providing individuals and other types of clients with a wide array of investment advisory services. Our firm has been in business as an investment adviser since 2015 and is registered in the State of California. Our firm is a corporation and is owned as follows:

Julie Darrah, President – 35%
Todd Woodland, Vice President – 50%
Bradley Boulton, Secretary – 10%
Timothy Miller, Treasurer – 5%

## Description of the Types of Advisory Services We Offer

**Wrap Comprehensive Portfolio Management:**

We offer a Comprehensive Portfolio Management service through our Vivid Wrap Program. Please see our Form ADV Part 2A Appendix 1 – Wrap Fee Program Brochure for more information regarding this advisory service.

**Pension Consulting:**

We provide pension consulting services to employer plan sponsors on an ongoing basis. Generally, such pension consulting services consist of assisting employer plan sponsors in establishing, monitoring and reviewing their company's participant-directed retirement plan. As the needs of the plan sponsor dictate, areas of advising could include: investment options, plan structure and participant education.

All pension consulting services shall be in compliance with the applicable state law(s) regulating pension consulting services. This applies to client accounts that are pension or other employee benefit plans ("Plan") governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). If the client accounts are part of a Plan, and we accept appointments to provide our services to such accounts, we acknowledge that we are a fiduciary within the meaning of Section 3(21) of ERISA (but only with respect to the provision of services described in section 1 of the Pension Consulting Agreement).

**Tax Preparation:**

We provide tax preparation services for our clients. Our firm will prepare individual local, state, and federal returns as needed. We ensure that the filings are done in a timely manner in order to avoid costly penalties and interest charges from missed deadlines.

## Tailoring of Advisory Services

We offer individualized investment advice to clients utilizing our Wrap Comprehensive Portfolio Management service. Additionally, we offer general investment advice to clients utilizing our Pension Consulting service.

Each client has the opportunity to place reasonable restrictions on the types of investments to be held in the portfolio. Restrictions on investments in certain securities or types of securities may not be

**Exhibit 3 Page 20**

possible due to the level of difficulty this would entail in managing the account. Restrictions would be limited to our Wrap Comprehensive Portfolio Management and Pension Consulting services.

## Participation in Wrap Fee Programs

We offer a wrap fee program as further described in Part 2A, Appendix 1 (the "Wrap Fee Program Brochure") of our Brochure. Our wrap fee accounts are managed on an individualized basis according to the client's investment objectives, financial goals, risk tolerance, etc. As further described in our Wrap Fee Program Brochure, we receive a portion of the wrap fee for our services.

## Regulatory Assets Under Management

As of December 31, 2015, our firm manages $224,543,695 on a discretionary basis.

## Item 5: Fees & Compensation

## How We Are Compensated for Our Advisory Services

### Wrap Comprehensive Portfolio Management:

Please see our Wrap Fee Program Brochure for more information.

### Pension Consulting:

Our firm's fees for pension consulting are assessed on a flat fee basis. Our fees range from 0.25% to 0.82% of the assets under management. Our firm's fees are billed on a pro-rata annualized basis quarterly in advance based on an average daily balance of the account for the previous quarter.  Flat fees will be charged annually for ongoing pension consulting services. Ultimately, total estimated fee, as well as the ultimate fee that we charge you, is based on the scope and complexity of our engagement with you.

### Tax Preparation:

Our firm may charge a maximum fee of $1,500 for tax preparation. The total estimated fee will be detailed in the engagement letter and determined on a case-by-case basis. The fee will be due upon completion of the services and renewed on an annual basis unless terminated by the client.

## Other Types of Fees & Expenses

Wrap fee clients will not incur transaction charges for trades executed in their accounts.  However, clients may pay custodial fees, charges imposed directly by a mutual fund, index fund, or exchange traded fund which shall be disclosed in the fund's prospectus (i.e., fund management fees and other fund expenses), mark-ups and mark-downs, spreads paid to market makers, wire transfer fees and other fees and taxes on brokerage accounts and securities transactions. These fees are not included within the wrap-fee you are charged by our firm.

ADV Part 2A – Firm Brochure                     Page 5                     Vivid Financial Management, Inc.

Exhibit 3 Page 21

**Termination & Refunds**

We charge our advisory fees quarterly in advance.  In the event that you wish to terminate our services, we will refund the unearned portion of our advisory fee to you. You need to contact us in writing and state that you wish to terminate our services.  Upon receipt of your letter of termination, we will proceed to close out your account and process a pro-rata refund of unearned advisory fees.

**Commissionable Securities Sales**

In order to sell securities for a commission, our supervised persons are registered representatives of Mutual Securities, Inc., member FINRA/SIPC. Our supervised persons may accept compensation for the sale of securities or other investment products, including distribution or service ("trail") fees from the sale of mutual funds. You should be aware that the practice of accepting commissions for the sale of securities:

1. Presents a conflict of interest and gives our firm and/or our supervised persons an incentive to recommend investment products based on the compensation received, rather than on your needs. We generally address commissionable sales conflicts that arise when explaining to clients that commissionable securities sales creates an incentive to recommend products based on the compensation we and/or our supervised persons may earn and/or when recommending commissionable mutual funds, explaining that "no-load" funds are also available.
2. In no way prohibits you from purchasing investment products recommended by us through other brokers or agents which are not affiliated with us.

## Item 6: Performance-Based Fees & Side-By-Side Management

We do not accept performance-based fees.

## Item 7: Types Of Clients & Account Requirements

We have the following types of clients:
- Individuals and High Net Worth Individuals;
- Trusts;
- Pension and Profit Sharing Plans.

We do not impose requirements for opening and maintaining accounts or otherwise engaging us.

## Item 8: Methods of Analysis, Investment Strategies & Risk of Loss

**Methods of Analysis**

We use the following methods of analysis in formulating our investment advice and/or managing client assets:

**Fundamental Analysis:** We attempt to measure the intrinsic value of a security by looking at economic and financial factors (including the overall economy, industry conditions, and the financial

Exhibit 3 Page 22

condition and management of the company itself) to determine if the company is underpriced (indicating it may be a good time to buy) or overpriced (indicating it may be time to sell). Fundamental analysis does not attempt to anticipate market movements. This presents a potential risk, as the price of a security can move up or down along with the overall market regardless of the economic and financial factors considered in evaluating the stock.

**Technical Analysis:** We analyze past market movements and apply that analysis to the present in an attempt to recognize recurring patterns of investor behavior and potentially predict future price movement. Technical analysis does not consider the underlying financial condition of a company. This presents a risk in that a poorly-managed or financially unsound company may underperform regardless of market movement.

## Investment Strategies We Use

We use the following strategies in managing client accounts, provided that such strategies are appropriate to the needs of the client and consistent with the client's investment objectives, risk tolerance, and time horizons, among other considerations.

**Long-Term Purchases:** When utilizing this strategy, we may purchase securities with the idea of holding them for a relatively long time (typically held for at least a year). A risk in a long-term purchase strategy is that by holding the security for this length of time, we may not take advantages of short-term gains that could be profitable to a client. Moreover, if our predictions are incorrect, a security may decline sharply in value before we make the decision to sell. Typically we employ this sub-strategy when we believe the securities to be well valued; and/or we want exposure to a particular asset class over time, regardless of the current projection for this class.

## Risk of Loss

Investing in securities involves risk of loss that clients should be prepared to bear. While the stock market may increase and your account(s) could enjoy a gain, it is also possible that the stock market may decrease and your account(s) could suffer a loss. It is important that you understand the risks associated with investing in the stock market, are appropriately diversified in your investments, and ask us any questions you may have.

## Description of Material, Significant or Unusual Risks

We generally invest client's cash balances in money market funds, FDIC Insured Certificates of Deposit, high-grade commercial paper and/or government backed debt instruments. Ultimately, we try to achieve the highest return on our client's cash balances through relatively low-risk conservative investments. In most cases, at least a partial cash balance will be maintained in a money market account so that our firm may debit advisory fees for our Wrap Comprehensive Portfolio Management service, as applicable.

## Item 9: Disciplinary Information

There are no legal or disciplinary events that are material to the evaluation of our advisory business or the integrity of our management.

Exhibit 3 Page 23

## Item 10: Other Financial Industry Activities & Affiliations

Representatives of our firm are registered representatives of Mutual Securities, Inc., member FINRA/SIPC, licensed insurance agents/brokers. They may offer products and receive normal and customary commissions as a result of these transactions. A conflict of interest may arise as these commissionable securities sales may create an incentive to recommend products based on the compensation they may earn.

## Item 11: Code of Ethics, Participation or Interest in Client Transactions & Personal Trading

An investment adviser is considered a fiduciary and our firm has a fiduciary duty to all clients. As a fiduciary, it is an investment adviser's responsibility to provide fair and full disclosure of all material facts and to act solely in the best interest of each of our clients at all times. Our fiduciary duty is considered the core underlying principle for our Code of Ethics which also includes Insider Trading and Personal Securities Transactions Policies and Procedures. If a client or a potential client wishes to review our Code of Ethics in its entirety, a copy will be provided upon request.

We recognize that the personal investment transactions of members and employees of our firm demand the application of a high Code of Ethics and require that all such transactions be carried out in a way that does not endanger the interest of any client.  At the same time, we believe that if investment goals are similar for clients and for members and employees of our firm, it is logical and even desirable that there be common ownership of some securities.

Therefore, in order to prevent conflicts of interest, we have in place a set of procedures (including a pre-clearing procedure) with respect to transactions effected by our members, officers and employees for their personal accounts[1].  In order to monitor compliance with our personal trading policy, we have a quarterly securities transaction reporting system for all of our associates. Upon employment or affiliation and at least annually thereafter, all supervised persons will sign an acknowledgement that they have read, understand, and agree to comply with our Code of Ethics.

Neither our firm nor a related person recommends to clients, or buys or sells for client accounts, securities in which our firm or a related person has a material financial interest. Related persons of our firm may buy or sell securities and other investments that are also recommended to clients. In order to minimize this conflict of interest, our related persons will place client interests ahead of their own interests and adhere to our firm's Code of Ethics. Further, our related persons will refrain from buying or selling the same securities prior to buying or selling for our clients in the same day. If related persons' accounts are included in a block trade, our related persons accounts will be traded in the same manner every time.

Our firm and supervised persons must conduct business in an honest, ethical, and fair manner and avoid all circumstances that might negatively affect or appear to affect our duty of complete loyalty to all clients.  This disclosure is provided to give all clients a summary of our Code of Ethics.

---

[1] For purposes of the policy, our associate's personal account generally includes any account (a) in the name of our associate, his/her spouse, his/her minor children or other dependents residing in the same household, (b) for which our associate is a trustee or executor, or (c) which our associate controls, including our client accounts which our associate controls and/or a member of his/her household has a direct or indirect beneficial interest in.

ADV Part 2A – Firm Brochure                    Page 8                    Vivid Financial Management, Inc.

Exhibit 3 Page 24

## Item 12: Brokerage Practices

**Selecting a Brokerage Firm**

We seek to recommend a custodian/broker who will hold your assets and execute transactions on terms that are overall most advantageous when compared to other available providers and their services. We consider a wide range of factors, including, among others, these:

- Timeliness of execution
- Timeliness and accuracy of trade confirmations
- Research services provided
- Ability to provide investment ideas
- Execution facilitation services provided
- Record keeping services provided
- Custody services provided
- Frequency and correction of trading errors
- Ability to access a variety of market venues
- Expertise as it relates to specific securities
- Financial condition
- Business reputation
- Quality of services

With this in consideration, our firm has an arrangement with Fidelity Brokerage Services, LLC member FINRA/SIPC and TD Ameritrade Institutional, a division of TD Ameritrade, Inc., member FINRA/SIPC/NFA. collectively known as the "Custodians". The Custodians offer services to independent investment advisers which include custody of securities, trade execution, clearance and settlement of transactions.

The Custodians may make certain research and brokerage services available at no additional cost to our firm all of which qualify for the safe harbor exemption defined in Section 28(e) of the Securities Exchange Act of 1934. These services may be directly from independent research companies, as selected by our firm (within specific parameters). Research products and services provided by the Custodians may include research reports on recommendations or other information about, particular companies or industries; economic surveys, data and analyses; financial publications; portfolio evaluation services; financial database software and services; computerized news and pricing services; quotation equipment for use in running software used in investment decision-making; and other products or services that provide lawful and appropriate assistance by the Custodians to our firm in the performance of our investment decision-making responsibilities.

We do not use client brokerage commissions to obtain research or other products or services. The aforementioned research and brokerage services are used by our firm to manage accounts for which we have investment discretion. Without this arrangement, our firm might be compelled to purchase the same or similar services at our own expense.

As a result of receiving these services, we may have an incentive to continue to use or expand the use of the Custodians' services. Our firm examined this potential conflict of interest when we chose to enter into the relationship with the Custodians and we have determined that these relationships are in the best interest of our firm's clients and satisfies our fiduciary obligations, including our duty to seek best execution.

Exhibit 3 Page 25

The Custodians charge brokerage commissions and transaction fees for effecting certain securities transactions (i.e., transaction fees are charged for certain no-load mutual funds, commissions are charged for individual equity and debt securities transactions), which are absorbed by the our firm. These Custodians enable us to obtain many no-load mutual funds without transaction charges and other no-load funds at nominal transaction charges. The Custodians' commission rates are generally discounted from customary retail commission rates. The commission and transaction fees charged by the Custodians may be higher or lower than those charged by other custodians and broker-dealers.

In seeking best execution, the determinative factor is not the lowest possible cost, but whether the transaction represents the best qualitative execution, taking into consideration the full range of a broker-dealer's services, including the value of research provided, execution capability, commission rates, and responsiveness.  Accordingly, although we will seek competitive rates, to the benefit of all clients, we may not necessarily obtain the lowest possible commission rates for specific client account transactions.

**Soft Dollars**

Our firm does not accept products or services that do not qualify for Safe Harbor outlined in Section 28(e) of the Securities Exchange Act of 1934, such as those services that do not aid in investment decision-making or trade execution.

**Client Brokerage Commissions**

We do not use client brokerage commissions to obtain research or other products or services. The aforementioned research and brokerage services are used by our firm to manage accounts for which we have investment discretion. Without this arrangement, our firm might be compelled to purchase the same or similar services at our own expense.

**Procedures to Direct Client Transactions in Return for Soft Dollars**

We do not direct client transactions to a particular broker-dealer in return for soft dollar benefits.

**Brokerage for Client Referrals**

Our firm does not receive brokerage for client referrals.

**Directed Brokerage**

Neither we nor any of our firm's related persons have discretionary authority in making the determination of the brokers with whom orders for the purchase or sale of securities are placed for execution, and the commission rates at which such securities transactions are effected. We routinely recommend that a client directs us to execute through a specified broker-dealer. Our firm recommends the use of either Custodian. Each client will be required to establish their account(s) with the Custodians if not already done. Please note that not all advisers have this requirement.

**Permissibility of Client-Directed Brokerage**

We allow clients to direct brokerage outside our recommendation. We may be unable to achieve the most favorable execution of client transactions. Client directed brokerage may cost clients more

Exhibit 3 Page 26

money. For example, in a directed brokerage account, you may pay higher brokerage commissions because we may not be able to aggregate orders to reduce transaction costs, or you may receive less favorable prices.

## Special Considerations for ERISA Clients

A retirement or ERISA plan client may direct all or part of portfolio transactions for its account through a specific broker or dealer in order to obtain goods or services on behalf of the plan. Such direction is permitted provided that the goods and services provided are reasonable expenses of the plan incurred in the ordinary course of its business for which it otherwise would be obligated and empowered to pay. ERISA prohibits directed brokerage arrangements when the goods or services purchased are not for the exclusive benefit of the plan. Consequently, we will request that plan sponsors who direct plan brokerage provide us with a letter documenting that this arrangement will be for the exclusive benefit of the plan.

## Aggregation of Purchase or Sale

We perform investment management services for various clients. There are occasions on which portfolio transactions may be executed as part of concurrent authorizations to purchase or sell the same security for numerous accounts served by our firm, which involve accounts with similar investment objectives. Although such concurrent authorizations potentially could be either advantageous or disadvantageous to any one or more particular accounts, they are affected only when we believe that to do so will be in the best interest of the effected accounts. When such concurrent authorizations occur, the objective is to allocate the executions in a manner which is deemed equitable to the accounts involved. In any given situation, we attempt to allocate trade executions in the most equitable manner possible, taking into consideration client objectives, current asset allocation and availability of funds using price averaging, proration and consistently non-arbitrary methods of allocation.

## Item 13: Review of Accounts or Financial Plans

We review accounts on at least a quarterly basis for our clients subscribing to our Wrap Comprehensive Portfolio Management service. Only our Financial Advisors or Portfolio Managers will conduct reviews. The nature of these reviews is to learn whether clients' accounts are in line with their investment objectives, appropriately positioned based on market conditions, and investment policies, if applicable. We may review client accounts more frequently than described above. Among the factors which may trigger an off-cycle review are major market or economic events, the client's life events, requests by the client, etc. We do not provide written reports to clients, unless asked to do so. Verbal reports to clients take place on at least an annual basis when we contact clients who subscribe to this service.

Pension Consulting clients receive reviews of their pension plans for the duration of the pension consulting service. Only our Financial Advisors or Portfolio Managers will conduct reviews. The nature of these reviews is to learn whether clients' accounts are in line with their investment objectives, appropriately positioned based on market conditions, and investment policies, if applicable. We may review client accounts more frequently than described above. Among the factors which may trigger an off-cycle review are major market or economic events, the client's life events, requests by the client, etc. We do not provide written reports to clients, unless asked to do so. Verbal reports to clients take place on at least an annual basis when we contact clients who subscribe to this service.

ADV Part 2A – Firm Brochure                    Page 11                    Vivid Financial Management, Inc.

Exhibit 3 Page 27

## Item 14: Client Referrals & Other Compensation

### Fidelity Brokerage Services, LLC

Except for the arrangements outlined in Item 12 of this brochure, we have no additional arrangements to disclose.

### TD Ameritrade, Inc.

As disclosed under Item 12 of this Brochure, we participate in TD Ameritrade's institutional customer program and we may recommend TD Ameritrade to Clients for custody and brokerage services. There is no direct link between our firm's participation in the program and the investment advice we give to our Clients, although we receive economic benefits through our participation in the program that are typically not available to TD Ameritrade retail investors. These benefits include the following products and services (provided without cost or at a discount): receipt of duplicate Client statements and confirmations; research related products and tools; consulting services; access to a trading desk serving our firm's participants; access to block trading (which provides the ability to aggregate securities transactions for execution and then allocate the appropriate shares to Client accounts); the ability to have advisory fees deducted directly from Client accounts; access to an electronic communications network for Client order entry and account information; access to mutual funds with no transaction fees and to certain institutional money managers; and discounts on compliance, marketing, research, technology, and practice management products or services provided to us by third party vendors. TD Ameritrade may also have paid for business consulting and professional services received by our firm's related persons. Some of the products and services made available by TD Ameritrade through the program may benefit our firm but may not benefit our Client accounts. These products or services may assist us in managing and administering Client accounts, including accounts not maintained at TD Ameritrade. Other services made available by TD Ameritrade are intended to help us manage and further develop our business enterprise. The benefits received by our firm or our personnel through participation in the program do not depend on the amount of brokerage transactions directed to TD Ameritrade. As part of our fiduciary duties to our clients, we endeavor at all times to put the interests of our clients first. Clients should be aware, however, that the receipt of economic benefits by our firm or our related persons in and of itself creates a potential conflict of interest and may indirectly influence our firm's choice of TD Ameritrade for custody and brokerage services.

### Referral Fees

We do not pay referral fees (non-commission based) to independent solicitors (non-registered representatives) for the referral of their clients to our firm in accordance with Rule 206 (4)-3 of the Investment Advisers Act of 1940.

## Item 15: Custody

We do not have custody of client funds or securities. All of our clients receive at least quarterly account statements directly from their custodians. Upon opening an account with a qualified custodian on a client's behalf, we promptly notify the client in writing of the qualified custodian's contact information. If we decide to also send account statements to clients, such notice and account statements include a legend that recommends that the client compare the account statements received from the qualified custodian with those received from our firm.

ADV Part 2A – Firm Brochure                    Page 12                    Vivid Financial Management, Inc.

Exhibit 3 Page 28

We encourage our clients to raise any questions with us about the custody, safety or security of their assets. The custodians we do business with will send you independent account statements listing your account balance(s), transaction history and any fee debits or other fees taken out of your account.

## Item 16: Investment Discretion

Clients have the option of providing our firm with investment discretion on their behalf, pursuant to an executed investment advisory client agreement. By granting investment discretion, we are authorized to execute securities transactions, which securities are bought and sold, and the total amount to be bought and sold. Limitations may be imposed by the client in the form of specific constraints on any of these areas of discretion with our firm's written acknowledgement.

## Item 17: Voting Client Securities

We do not accept proxy authority to vote client securities. Clients will receive proxies or other solicitations directly from their custodian or a transfer agent. In the event that proxies are sent to our firm, we will forward them on to you and ask the party who sent them to mail them directly to you in the future. Clients may call, write or email us to discuss questions they may have about particular proxy votes or other solicitations.

## Item 18: Financial Information

We are not required to provide financial information in this Brochure because:

- We do not require the prepayment of more than $1,200 in fees and six or more months in advance.
- We do not take custody of client funds or securities.
- We do not have a financial condition or commitment that impairs our ability to meet contractual and fiduciary obligations to clients.

We have never been the subject of a bankruptcy proceeding.

Exhibit 3 Page 29

# EXHIBIT 4



# Vivid Financial Management, Inc.

## Investment Adviser Compliance Manual
## &
## Written Supervisory Procedures
## ("WSPs")

## June 2019

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

## TABLE OF CONTENTS                                                                 Page

| | | |
|---|---|---|
| 1.0 | INTRODUCTION | 1 |
| | 1.1 Recognition of Rule 206(4)-7 | 1 |
| | 1.2 Designation of Chief Compliance Officer | 2 |
| | 1.3 Annual Review Requirement | 2 |
| | 1.4 Acknowledgement | 2 |
| 2.0 | CODE OF ETHICS | 2 |
| | 2.1 Fiduciary Responsibilities | 3 |
| | 2.2 Definitions | 3 |
| | 2.3 Prohibitions | 3 |
| | 2.4 Other Legal & Regulatory Matters | 4 |
| 3.0 | TRADING | 6 |
| | 3.1 Investment Process | 6 |
| | 3.2 Best Execution | 6 |
| | 3.3 Soft Dollars | 8 |
| | 3.4 Trading Errors | 8 |
| | 3.5 Trade Allocation Procedures | 8 |
| | 3.6 Aggregation of Orders | 8 |
| | 3.7 Transactions with Advisory Clients | 9 |
| | 3.8 Prohibited Activities in Advisory Accounts | 9 |
| | 3.9 Personal Trading Activities of Employees | 10 |
| 4.0 | INSIDER TRADING | 11 |
| | 4.1 The Law | 11 |
| | 4.2 Prohibited Conduct | 11 |
| | 4.3 Prohibited Communications | 12 |
| | 4.4 Penalties | 13 |
| | 4.5 Procedures to Implement Policy | 13 |
| | 4.6 Restrictions on Access to Material Non-Public Information | 14 |
| | 4.7 Resolving Issues Concerning Insider Trading | 14 |
| 5.0 | PERSONAL SECURITIES TRANSACTIONS PROCEDURES | 14 |
| | 5.1 Pre-Clearance Procedures | 14 |
| | 5.2 Reportable Securities | 15 |
| | 5.3 Exempt Securities | 15 |
| | 5.4 Beneficial Ownership | 15 |
| | 5.5 Exempt Transactions | 15 |
| | 5.6 Initial Public Offerings | 15 |
| | 5.7 Private Placements | 16 |
| | 5.8 Reporting | 16 |
| | 5.9 Trading & Review | 16 |
| | 5.10 Remedial Actions | 16 |
| | 5.11 Disclosure | 16 |
| | 5.12 Record-Keeping | 16 |
| | 5.13 Responsibility | 16 |
| 6.0 | DESCRIPTION OF SUPERVISED PERSONS | 17 |
| | 6.1 Outside Business Activity | 17 |
| 7.0 | INVESTMENT ADVISORY REPRESENTATIVES ("IAR") | 17 |
| | 7.1 Licensure | 17 |
| | 7.2 Allowed Activities | 17 |
| | 7.3 Representative Disqualification | 17 |

ii

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

8.0    FORM ADV ............................................................................................................ 18
       8.1    Initial Provision .................................................................................. 18
       8.2    Annual Delivery of Form ADV Part 2 ............................................. 18
       8.3    Wrap Fee Program .............................................................................. 18
       8.4    Other Disclosures ............................................................................... 18
       8.4.1  ERISA 408(b)(2) .................................................................................. 19
9.0    ADVISORY CONTRACTS (CLIENT AGREEMENTS) ................................... 19
       9.1    Written Agreement .............................................................................. 19
       9.2    Termination of Client Agreement ..................................................... 19
       9.3    Assignment of Advisory Client Agreement ...................................... 19
       9.4    Hedge Clauses ..................................................................................... 19
10.0   ADVISORY FEES .............................................................................................. 19
       10.1   Valuation ............................................................................................. 19
       10.2   Fee Calculation ................................................................................... 20
       10.3   Performance Fees ............................................................................... 20
       10.4   Prepaid Advisory Fees ....................................................................... 20
       10.5   Billing on Illiquid Securities ............................................................. 20
11.0   SUITABILITY .................................................................................................... 21
       11.1   Procedures for Client Suitability ...................................................... 21
12.0   CUSTODY OF CLIENT ASSETS ..................................................................... 21
       12.1   Constructive/Actual Custody ............................................................ 22
       12.2   Inadvertent Receipt of Funds or Securities. .................................... 22
       12.3   Receipt of Third Party Funds. ........................................................... 23
13.0   DISCRETION ..................................................................................................... 23
14.0   PLACING OF NON-DISCRETIONARY CLIENT ORDERS ........................... 23
15.0   SENIOR INVESTOR PROTECTION ............................................................... 23
       15.1   Identifying Signs of Diminished Mental Capacities ....................... 23
       15.2   Employee Training on Senior-Specific Issues ................................. 23
       15.3   Suitability ............................................................................................ 24
       15.4   Recommended Paperwork ................................................................. 24
       15.5   Documentation & Reporting Requirements .................................... 24
       15.6   Senior Safe Act ................................................................................... 25
16.0   BRANCH OFFICE SUPERVISION .................................................................. 25
17.0   SUBADVISER SUPERVISION ......................................................................... 25
18.0   ADVERTISING & MARKETING ...................................................................... 25
       18.1   Prohibited Advertising Practices ...................................................... 25
       18.2   Use of Terms "Investment Counsel" & "Registered Investment Adviser" ...... 26
       18.3   Factors to Consider ............................................................................ 26
       18.4   Review Process ................................................................................... 26
19.0   SOCIAL MEDIA ................................................................................................ 27
       19.1   Personal Profiles ................................................................................ 27
       19.2   Responding to Statements or Claims ................................................ 27
       19.3   Solicitation ......................................................................................... 27
       19.4   Disciplinary Action ........................................................................... 28
20.0   ELECTRONIC COMMUNICATION ................................................................ 28
       20.1   Correspondence .................................................................................. 28
       20.2   Prohibited Communications .............................................................. 28
       20.3   Electronic Delivery of Regulatory Documents ............................... 29
       20.4   Security ................................................................................................ 29

iii

| | 20.5 | Reporting Problems | 29 |
|---|---|---|---|
| | 20.6 | Monitoring & Surveillance Program | 30 |
| | 20.7 | Employee Consent & Non-Compliance with the Policy | 30 |
| 21.0 | | PRIVACY POLICY PROCEDURES | 30 |
| | 21.1 | Notice to Clients | 30 |
| | 21.2 | Information Collected | 30 |
| | 21.3 | Access to Information Collected | 31 |
| | 21.4 | Outside Contractors | 31 |
| | 21.5 | Maintenance of Records | 31 |
| | 21.6 | Requests for Information | 31 |
| 22.0 | | CYBER SECURITY | 31 |
| | 22.1 | Devices, Hardware & Data | 32 |
| | 22.2 | Software & Platforms | 32 |
| | 22.3 | Risk Assessment & Management | 33 |
| | 22.4 | Social Media & Websites | 33 |
| | 22.5 | Customer Access | 33 |
| | 22.6 | Vendors & Other Third Parties | 34 |
| | 22.7 | Detection of Suspicious Activity | 34 |
| 23.0 | | BUSINESS CONTINUITY/DISASTER RECOVERY PLAN | 34 |
| 24.0 | | PROXIES | 34 |
| 25.0 | | POLITICAL CONTRIBUTIONS | 34 |
| 26.0 | | BORROWING OF FUNDS | 34 |
| 27.0 | | "BLUE SKY" REQUIREMENTS | 35 |
| 28.0 | | RECORD KEEPING | 35 |
| | 28.1 | Accounting Records | 35 |
| | 28.2 | Advisory Records | 36 |
| | 28.3 | Advertising Records | 37 |
| | 28.4 | Code of Ethics Records | 37 |
| | 28.5 | Custody Records | 38 |
| | 28.6 | Compliance Program Records | 38 |
| | 28.7 | Corporate Records | 38 |
| 29.0 | | ANTI-MONEY LAUNDERING POLICY/USA PATRIOT ACT COMPLIANCE | 38 |
| | 29.1 | Anti-Money Laundering Procedures | 38 |
| | 29.1.1 | Account Openings & Ongoing Account Activity | 38 |
| | 29.1.2 | Personal Accounts | 39 |
| | 29.1.3 | Business Accounts | 39 |
| | 29.1.4 | High-Risk Business Entities | 40 |
| | 29.2 | Education & Training | 40 |
| | 29.3 | Books & Records | 40 |
| 30.0 | | COMPLIANCE POLICIES TO PREVENT SECURITIES LAWS VIOLATIONS | 40 |

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 4 Page 33

| 1.0 | INTRODUCTION |
|---|---|

Vivid Financial Management, Inc. (hereinafter "VFM", "We" "our firm", and "us") is an Investment Adviser registered with the Securities and Exchange Commission.

Our firm is a corporation formed in the State of California. VFM is owned by Julie Darrah, Bradley Boulton, Timothy Miller, and Calvin Harris.

VFM's clients are individuals and high net worth individuals, trusts, pension and profit sharing plans (hereinafter "Client" or "Clients"). Regardless of Client type, we always put our Client's interests first.

VFM has several types of programs and services available for its investment advisory Clients, which are further described in VFM's Form ADV, Part 2. They are VFM's:
- Financial Consulting/Planning Services
- Investment Advisory Services
- Retirement Plan Consulting Services
- Selection of Other Advisers

**Investment Management Services**

We provide investment management services based upon information furnished by the Client. Client's customized portfolios are designed with some or all of the following in mind:
- Risk Tolerance Level
- Cash Flow Requirements
- Anticipated Rate of Return
- Time Frame for Portfolio Growth and Development
- Income Tax Circumstances

Typical asset classes we might recommend to include in a Client's customized portfolio are:
- Cash Equivalents
- Corporate Bonds
- Municipal Bonds
- Government Bonds
- Mortgages
- Income Equities
- Growth Equities
- Aggressive Growth Equities
- International Equities
- International Bonds
- Real Estate
- Select Special Situations

**1.1    Recognition of Rule 206(4)-7**

VFM voluntarily adheres to SEC Rule 206(4)-7 under the Investment Advisers Act of 1940. This requires all registered advisers to implement written compliance policies and procedures reasonably designed to prevent violations of the relevant securities laws by the adviser or any of its Supervised Persons.

1

Investment Advisers are required to annually update their written supervisory procedures and retain all versions of the same for five years. The aforementioned programs will be referred to and covered throughout VFM's WSPs.

## 1.2    Designation of Chief Compliance Officer

VFM has designated Julie Darrah as Chief Compliance Officer, ("CCO"). The CCO is responsible for all compliance and supervisory functions. VFM has reasonably determined that the CCO is competent and knowledgeable regarding the applicable state and/or federal securities laws. The CCO has been empowered by VFM with full responsibility and authority to develop and enforce appropriate policies and procedures for VFM. These policies and procedures are reasonably designed to prevent violation of federal and/or state securities laws.

The CCO is licensed as an investment advisory representative of VFM. Among other things, the CCO is responsible for all investment advisory representative and firm licensing filings and issues, insider trading and code of ethics, and other compliance-related issues. The CCO may designate other individuals for compliance assistance, such as maintaining logs, compliance research, etc.

## 1.3    Annual Review Requirement

The CCO will be responsible for the review of VFM's WSPs on an annual basis, making changes in such policies and procedures when necessary. An outside regulatory consulting firm may be retained to assist in the process. In any event, all copies of VFM's WSPs will be maintained by the CCO for a minimum of 5 years.

## 1.4    Acknowledgement

This manual contains VFM's WSPs, which shall be followed by all personnel in the conduct of their responsibilities on behalf of VFM. Its purpose is to help ensure that VFM conducts its business in compliance with all applicable federal and state laws, rules and regulations and in keeping with the highest level of professional and ethical standards.

All Supervised Personnel are required to read this manual and to sign an acknowledgment of receipt and acceptance of responsibilities assigned to them. Copies of the WSPs shall be maintained, either in written or electronic format, in VFM's Main Office and at all other locations where supervisory activities are conducted.

## 2.0    CODE OF ETHICS

The success of VFM as a provider of investment management services depends upon its reputation for excellence and integrity in the investment marketplace. All officers and employees of VFM must therefore act in accordance with the highest ethical standards.

In order to ensure that officers and employees of VFM comply with their fiduciary duties and other standards imposed by federal securities law upon their personal investment activities, the Adviser has adopted this Code of Ethics (the "Code"). The Code includes specific provisions with which all officers, employees, and "Access Persons" (defined below) must comply. However, compliance with these technical provisions alone will not be sufficient to insulate from scrutiny actions or behavior which show a pattern of abuse of the individual's responsibilities. All officers and employees are

2

expected to abide by the spirit of the Code and the principles articulated herein.

**2.1         Fiduciary Responsibilities**

As a fiduciary under the Adviser's Act, VFM recognize:

- It has an affirmative duty of utmost good faith to act solely in the best interests of the Client and to make full and fair disclosure of all material facts, particularly where interests may conflict with the Clients;
- The duty to render disinterested and impartial advice;
- The duty to make suitable recommendations to Clients in light of their needs, financial circumstances and investment objectives;
- The duty to exercise a high degree of care to ensure that adequate and accurate representations and other information about securities are presented to Clients; and
- The duty to have an adequate basis in fact for our recommendations, representations, and projections.

**2.2         Definitions**

For purposes of this policy, the following definitions shall apply:

*"Access Persons"* are all employees, directors, officers, partners or members of VFM, as the case may be, who (i) have access to nonpublic information regarding Advisory Clients' purchases or sales of securities, (ii) are involved in making securities recommendations to Advisory Clients or (iii) have access to nonpublic recommendations or portfolio holdings of Clients (iv) all of VFM's directors, officers, members and Advisory Representatives. Client services personnel who regularly communicate with Advisory Clients also may be deemed to be Access Persons.

*"Advisory Client"* is any person or entity for which VFM serves as an investment adviser for, renders investment advice to or makes investment decisions for.

*"Supervised Person"* is any partner, officer, director (or other person occupying a similar status or performing similar functions), or employee of an investment adviser, or other person who provides investment advice on behalf of the investment adviser and is subject to the supervision and control of the investment adviser.

**2.3         Prohibitions**

VFM has established the following restrictions in order to ensure its fiduciary responsibilities:

- VFM emphasizes the unrestricted right of the Client to specify investment objectives, guidelines, and/or conditions on the overall management of their account. VFM's standard investment process begins with reviewing applicable state statutes, investment policy, and permitted investment language provided by the Client.
- Access Persons or their immediate family members shall not buy or sell securities for their personal portfolio(s) where their decision is derived, in whole or in part, by reason of the Access Person's employment, unless the information is also available to the investing public on reasonable inquiry. No person of VFM shall prefer his or her own interest to that of the advisory Client.

3

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

- Moreover, if the security is a thinly traded security (with average daily volume below 100,000 shares per day) investment personnel may be subject to a blackout period from trading in such securities.
- VFM or Access Persons with VFM may buy or sell for their personal accounts investment products identical to those recommended to Clients. It is the expressed policy of VFM that no person employed by VFM may enter an order to purchase or sell any security prior to a transaction being implemented for an advisory account (in accordance with standard "front running" guidelines), and therefore, preventing such employees from benefiting from transactions placed on behalf of advisory accounts.
- VFM and its employees generally may not participate in private placements or initial public offerings (IPOs) without pre-clearance from VFM's Compliance Officer.
- VFM requires that all individuals must act in accordance with all applicable federal and state regulations governing registered investment advisory practices.
- Records will be maintained of all securities bought or sold by VFM, Access Persons of VFM, and related entities. The CCO will review these records on a regular basis.
- Any individual not in observance of the above may be subject to termination.

**2.4       Other Legal & Regulatory Matters**

A.  *Confidentiality.* Access Persons are prohibited from revealing information relating to the investment intentions, activities or portfolios of Advisory Clients except to persons whose responsibilities require knowledge of the information.

B.  *Gifts.* The following provisions on gifts apply to Access Persons:

  1.  Accepting Gifts. On occasion, because of their position with VFM, Access Persons may be offered or may receive, without notice, gifts from Clients, brokers, vendors or other persons. Acceptance of extraordinary or extravagant gifts is prohibited. Any such gifts must be declined and returned in order to protect the reputation and integrity of VFM. Gifts of nominal value (i.e., a gift whose reasonable value, alone or in the aggregate, is not more than $100 in any twelve-month period), customary business meals, entertainment (e.g., sporting events), and promotional items (i.e., pens, mugs, T-shirts) may be accepted. All gifts received by an Access Person that might violate this Code must be promptly reported to VFM's CCO.

  2.  Solicitation of Gifts. Access Persons are prohibited from soliciting gifts of any size under any circumstances.

  3. Giving Gifts. Access Persons may not give any gift with a value in excess of $100 (per year) to an Advisory Client or persons who do business with, regulate, advise or render professional services to VFM.

  4.  Gift & Gratuities Log. A Gift and Gratuities Log shall be maintained by the CCO recording all gifts given and received. The Gift and Gratuities Log should record the following: Date, Received or given, Client/Customer Name, Type of gift, Name of employee, and Value of gift.

C.  *Company Opportunities.* Access Persons may not take personal advantage of any opportunity properly belonging to any Advisory Client or VFM. This includes, but is not limited to,

4

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

acquiring Reportable Securities for one's own account that would otherwise be acquired for an Advisory Client.

D.   *Undue Influence.* Access Persons shall not cause or attempt to cause any Advisory Client to purchase, sell or hold any security in a manner calculated to create any personal benefit to such Access Person. If an Access Person stands to materially benefit from an investment decision for an Advisory Client that the Access Person is recommending or participating in, the Access Person must disclose to those persons with authority to make investment decisions for the Advisory Client the full nature of the beneficial interest that the Access Person has in that security, any derivative security of that security or the security issuer, where the decision could create a material benefit to the Access Person or the appearance of impropriety. The person to whom the Access Person reports the interest, in consultation with the CCO, must determine whether or not the Access Person will be restricted in making investment decisions in respect of the subject security.

E.   *Reporting, Review and Record Keeping.* All violations of the Code must be reported promptly to the CCO. The CCO shall periodically review Access Persons' personal trading reports and otherwise take reasonable steps to monitor compliance with, and enforce, this Code. The CCO shall maintain in VFM's files (i) a current copy of the Code, (ii) records of violations and actions taken as a result of the violations, (iii) copies of all Access Persons' written acknowledgement of receipt of the Code, (iv) a copy of the initial holdings report and (vi) copies of the quarterly and annual compliance certificates required by the Code.

F.   *Sanctions.* If the CCO determines that an Access Person has committed a violation of the Code, the Company may impose sanctions and take other actions as it deems appropriate, including a letter of caution or warning, suspension of personal trading privileges, suspension or termination of employment, fine, civil referral to the SEC and, in certain cases, criminal referral. VFM may also require the offending Access Person to reverse the trades in question, forfeit any profit or absorb any loss derived there from; and such forfeiture shall be disposed of in a manner that shall be determined by VFM in its sole discretion. Failure to timely abide by directions to reverse a trade or forfeit profits may result in the imposition of additional sanctions.

G.   *Exceptions.* Exceptions to the Code will rarely, if ever, be granted. However, the CCO may grant an occasional exception on a case-by-case basis when the proposed conduct involves negligible opportunities for abuse. All exceptions shall be solicited and issued in writing. No reports shall be required under this Code for (i) transactions effected pursuant to an automatic investment plan and (ii) securities held in accounts over which the Access Person has no direct control.

H.   *Compliance Certification.* All Access Persons shall sign a certificate promptly upon becoming employed or otherwise associated with VFM that evidences his or her receipt of this Code of Ethics and submit to VFM a complete report of the Access Person's securities holdings. All Access Persons shall hold all personal brokerage accounts at an approved firm and submit to the CCO, no later than 30 days after the close of each quarter, in the form prescribed by VFM for this purpose, a list of all personal transactions in Reportable Securities. Annually, all Access Persons will be required to certify compliance with VFM's Code of Ethics.

I.   *Whistleblower Program.* Effective August 12, 2011, The Dodd-Frank Wall Street Reform and Consumer Protection Act (aka the Whistleblower Program) provided the SEC the authority

5

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 4 Page 38

to pay financial rewards to whistleblowers who provide new and timely information about any securities law violation. To be eligible, the whistleblower's information must lead to a successful SEC enforcement action with more than $1,000,000 in monetary sanctions. More information regarding eligibility and how to report anonymously can be found via the following link: www.sec.gov/whistleblower.

A person must be acting in good faith in reporting a complaint or concern and must have reasonable grounds for believing a deliberate misrepresentation has been made regarding accounting or audit matters or a breach of this Manual or the Firm's Code of Ethics. A malicious allegation known to be false is considered a serious offense and will be subject to disciplinary action that may include termination of employment.

It is further a policy of VFM that any misconduct by any VFM principal or employee (exempt or non-exempt) shall be reported to the CCO. Or if in the case the misconduct being reported is regarding the CCO, reports shall be made to the principals of the firm. VFM will protect the reporting person's identity and will not cause or threaten retaliation of any sort in connection with these reports.

*Appendices to the Code.* The Code shall be supplemented by the Compliance and Written Supervisory Procedures Manual in its entirety, specifically including, without limitation, those dealing with:
 (i) Trading (Item 3 of this Manual);
 (ii) Principal & Agency Cross Transactions (Items 3.2 and 3.5 of this Manual);
 (iii) Insider Trading (Item 4 of this Manual);
 (iv) Personal Securities Transactions (Item 5 of this Manual).

## 3.0 TRADING

### 3.1 Investment Process

VFM's Portfolio Managers ("PMs") are responsible for reviewing client accounts subject to oversight from the CCO. PMs also review the firm wide account reconciliation report on a regular basis. The account reconciliation report consists of an activity statement showing last trading day's activities for all client accounts, current client positions, and date to date gains and losses. Investment personnel are responsible for conducting periodic reviews of client portfolios to detect trading irregularities and unusual positions. The CCO is responsible for a regular review process of firm wide trading.

### 3.2 Best Execution

For guidance, the SEC defines best execution in Release 34-23170 Section V which states:

As a fiduciary, a money manager has an obligation to seek "best execution" of clients' transactions under the circumstances of the particular transaction. The money manager must execute securities transactions for clients in such a manner that the client's total cost or proceeds in each transaction is the most favorable under the circumstances.

A money manager should consider the full range and quality of a broker's services in placing brokerage including, among other things, the value of research provided as well as execution capability, commission rate, financial responsibility, and responsiveness to the money manager. The Commission wishes to remind money managers that the determinative factor is not the

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007474

Exhibit 4 Page 39

WEAS-SEC-00007465

lowest possible commission cost but whether the transaction represents the best qualitative execution for the managed account. In this connection, money managers should periodically and systematically evaluate the execution performance of broker-dealers executing their transactions.

As part of its obligation of best execution, VFM will avoid "interpositioning," or placing a Client transaction through a broker-dealer (for a commission) which then, in turn, places the order with a market maker (for which a mark-up/down is charged), when the order could be placed directly with the market maker for no disclosed brokerage commission and with no loss of service. Typically, to achieve best execution, VFM may "bunch" or block Client orders. If bunch trading is not available, VFM will disclose to Clients that it will not bunch transactions and the fact that Clients may pay higher commissions as a result. Based on information and speeches by SEC officials, examiners will be reviewing a firm's best execution practices and may expect Advisers to have the following:

- An organized process to establish best execution procedures, such as, written policies and procedures, at a minimum, a brokerage committee, criteria for selection and/or an approved list for broker-dealers;
- Participants in the execution practices process should include individuals using a broker/dealer's services such as traders, portfolio managers, analysts, operations, etc.;
- Gathering relevant information from and about broker-dealers which may include commission rates and spreads, quality of execution, research, clearance/settlement capabilities, trade error rate, access to IPO confidentiality, among other factors;
- Evaluate the information obtained and set criteria for selecting broker-dealers and consider electronic communications networks /ECNs as an alternative trading source;
- Document a firm's best execution practices through written evaluations, information or research obtained, periodic review of a firm's practices and the firms being utilized;
- Disclosing a firm's best execution practices in Form ADV Part 2, advisory agreements, as well as any conflicts of interest and making sure a firm's practices are consistent with its disclosures; and
- Conduct and document systematic and periodic reviews of the firm's best execution practices, at least annually.

VFM will review its best execution responsibilities when directing brokerage to any broker-dealer (especially affiliated entities), determining commission discounts and disclosing the various conflicts of interest inherent in this direction.

Ms. Darrah, CCO will be responsible for VFM's Best Execution Policy or assign the responsibility to a specific person. Qualitative Best Execution will be tested at least annually. Quantitative Best Execution analysis will be tested quarterly by Ms. Darrah, CCO who will take a random sample of trades and examine the routing of such trades, comparing the execution of the respective market centers utilized by the chosen Brokerage Company to other market centers.

VFM fully describes the program(s) and parties through which trades are or may be executed. Clients are under no obligation to use any particular firm and VFM does not have discretion to place Clients with any brokerage company absent their written consent.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007475

Exhibit 4 Page 40

WEAS-SEC-00007465

### 3.3        Soft Dollars

Consistent with its policy of obtaining best execution for its advisory clients when selecting broker-dealers, VFM may receive research products or services that fall within the "safe harbor" established by Section 28(e) of the Securities Exchange Act of 1934, in connection with its allocation of portfolio brokerage. Nevertheless, VFM will not accept any soft dollars.

### 3.4        Trading Errors

Upon identifying a trading error, the CCO will be notified and direct the process of assessing the cause and extent of the error. The CCO will review the research and analysis and, based on the assessment of the facts, make a determination as to where the fault for the trading error lies (whether with the Adviser or with a third party) and provide instructions as to the corrections necessary to position the account consistent with the client's objectives. Trade errors will be documented and reviewed by Ms. Darrah, CCO on a regular basis.

VFM adheres to the following restrictions on trading errors:

- VFM will work directly with a broker-dealer or other adviser when correcting any error whether the error was caused by VFM, Client, broker-dealer, another investment adviser or the account custodian.
- When VFM corrects an error, the Client must not be disadvantaged: The Client must be "made whole".
- Soft dollars will not be used by us to pay for correcting trading errors.
- VFM will review its WSPs to determine if, in correcting errors, an agency-cross transaction would take place. Should VFM find that such a transaction is warranted, VFM will ensure that all proper Client disclosures are made, and consents obtained, as required in Section 206(3)-2 of the Advisers Act.

The CCO will maintain a *Trading Error Log* that includes: date, security, client, account number, how money was credited back to client and amount, and any loss/gain of security. If there is a loss VFM must credit that loss to the client. Trading errors that result in the favor of the Client will be resolved on case-by-case basis.

### 3.5        Trade Allocation Procedures

VFM will not allocate trades in such a way that VFM's own or affiliated account(s) (including those of Supervised Persons) or selected Clients receive more favorable treatment than VFM's other Client accounts. It is important to note that VFM does not offer performance-based accounts and does not purchase "hot issues" for Clients.

### 3.6        Aggregation of Orders

Because Clients select the broker of choice for their account, they may forego any benefit from savings on execution costs that might be available through negotiated volume discounts or batched orders. In any event, VFM realizes that conflicts and restrictions exist for aggregating orders of various Client types, such as individuals, ERISA plans, investment companies, with the orders on behalf of accounts advised by VFM in which VFM, VFM's employees and/or principals have economic interests ("proprietary accounts"). In the SMC Capital, Inc. no-action letter (available Sept. 5, 1995), the SEC indicated that aggregation of Client orders would not violate

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED                                    WEAS-SEC-00007476

Exhibit 4 Page 41

WEAS-SEC-00007465

the anti-fraud provisions of Section 206 of the Advisers Act if the practice of allocating orders is fully disclosed in the Adviser's Form ADV and separately disclosed to existing Clients and no advisory account is favored over any other account. All Clients participating in the aggregated order shall receive an average share price with all other transaction costs shared on a pro-rata basis.

The SEC granted no-action relief based on several conditions as outlined below:

- The Adviser's policies for the aggregation of transactions shall be fully disclosed in the Adviser's Form ADV and separately to the Adviser's existing Clients and the broker-dealer through which such orders are placed;
- The Adviser will not aggregate transactions unless aggregation is consistent with its duty to seek best execution and the terms of the Adviser's investment advisory agreement with each Client for which trades are being aggregated;
- No advisory Client will be favored over any other Client; each Client that participates in an aggregated order will participate at the average share price for all Adviser's transactions in that security on a given business day, with transaction costs shared pro-rata based on each Client's participation in the transaction;
- The Adviser will prepare, before entering an aggregated order, a written statement ("Allocation Statement") specifying the participating Client accounts and how it intends to allocate the order among those Clients;
- If the aggregated order is filled in its entirety, it will be allocated among Clients in accordance with the Allocation Statement; if the order is partially filled, it should be allocated pro-rata based on the Allocation Statement; notwithstanding the foregoing, the order may be allocated on a basis different from that specified in the Allocation Statement if all Client accounts receive fair and equitable treatment. The reason for different allocation should be documented in writing;
- Adviser's books and records should separately reflect, for each Client account, the orders of which are aggregated, the securities held by, and bought and sold for that account;
- Adviser will receive no additional compensation of any kind as a result of the proposed aggregation;
- Individual investment advice and treatment will be accorded to each advisory Client;
- Periodic reviews should be conducted to ensure no accounts are being systematically disadvantaged.

### 3.7      Transactions with Advisory Clients

In no case shall VFM enter into agency or principal transactions with any Client or arrange agency cross transactions for any Client except as referenced in section 3.4.

### 3.8      Prohibited Activities in Advisory Accounts

The following activities are prohibited in advisory accounts:

- Charging Clients based upon a percentage of capital gains or appreciation. This prohibition would extend to charging Clients based upon avoidance of capital depreciation or losses;
- Earning 12b-1 fees in ERISA and IRA accounts;
- Earning commissions in Investment Management Accounts.

9

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007477

Exhibit 4 Page 42

WEAS-SEC-00007465

### 3.9      Personal Trading Activities of Employees

Personal trading and investment activities of employees are subject to various federal securities laws, rules and regulations, e.g., Investment Advisers Act Section 206 (anti-fraud provision); Advisers Act Rule 204-3 (requiring an Adviser to disclose its practices and interests in Client transactions); Exchange Act Section 16 (requiring disclosure of certain securities transactions by officers and principal shareholders of public companies) and Exchange Act Section 10(b) and Rule 10b-5 (prohibiting the use of manipulative and deceptive devices in connection with the purchase or sale of securities).

It is the express policy of VFM that no person employed by VFM may purchase or sell any security prior to a transaction(s) being implemented for an advisory account during the same day unless such transactions are at a price equal to or inferior to the price obtained by advisory Clients, and therefore, preventing such employees from benefiting from transactions placed on behalf of advisory accounts. VFM may utilize batched orders to carry out this policy.

Policies and procedures have been established to monitor at a minimum personal trading and activities of those employees who are deemed to be advisory representatives (as defined in Adviser Act Rule 204-2) and/or access persons (as defined in Investment Company Act 17j-1).

A record of securities transactions for the account of VFM and any of VFM's affiliated persons shall be established and maintained.
- A director, officer and/or employee of VFM shall not buy or sell securities for their personal portfolio(s) where their decision is substantially derived, in whole or in part, by reason of his or her employment unless the information is also available to the investing public on reasonable inquiry. No person of VFM shall prefer his or her own interest to that of the advisory Client.
- VFM maintains a list of all securities holdings for itself and anyone associated with its advisory practice with access to advisory recommendations. These holdings are reviewed on a regular basis by Ms. Darrah.

Such transactions must be recorded within thirty days of the end of each calendar quarter.

The record of such transactions shall reflect the following information:
- The title and amount of the security involved;
- The date and nature of the transaction (i.e., purchase, sale, or other acquisition or disposition);
- The price at which the transaction was effected; and
- The name of the broker-dealer or investment adviser through which the transaction was effected.

An employee's account is any account in which the employee has a beneficial interest, including:
- Spouse's account(s)
- Other dependent's account(s)
- Individual account(s)
- Corporate account(s)
- Joint account(s)
- Tenants in common

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007478

Exhibit 4 Page 43

- Investment club(s)
- Partnership(s)
- Account(s) where the investment advisory representative acts as custodian, trustee, executor, or in a similar capacity (prohibited in most cases by the chosen brokerage company's policies governing its registered representatives)

VFM requires that all individuals must act in accordance with all applicable federal and State regulations governing registered investment advisory practices.

Any individual not in observance of the above may be subject to disciplinary action.

## 4.0    INSIDER TRADING

VFM has adopted policies and procedures to prevent misuse of non-public information pursuant to Section 204A of the Investment Advisers Act of 1940. These legal requirements are consistent with VFM's business philosophy and its professional responsibilities as an investment adviser.

### 4.1    The Law

The legal prohibitions against "insider trading" and VFM's professional responsibility forbid the use or disclosure by all directors, officers and Access Persons of VFM, for direct or indirect personal gain or profit, of "insider information" received in connection with the business of VFM or from any source. Moreover, the use of material, non-public information in securities transactions ("insider trading") or the communication of such inside information to others ("tipping") may violate federal and/or state securities laws. Such a violation of law could result in severe personal consequences to the individuals involved, as described in more detail below.

VFM has adopted these policies and procedures to ensure that material non-public information will not be used by Access Persons (or members of their households) in securities transactions and that the confidentiality of such information will be maintained.

Set forth below are the Policies and Procedures required by Section 204A of the Investment Advisers Act of 1940, as amended, which are reasonably designed, taking into consideration the nature of the business of VFM, to prevent VFM and any person associated with it (including directors, officers and Access Persons) from trading securities on material, non-public information or communicating material, non-public information to others in violation of the law (such prohibited conduct is frequently referred to as "insider trading"). These Policies and Procedures apply to every person associated with VFM.

Every person associated with VFM must read, acknowledge receipt and understanding of, and retain these Policies and Procedures by acknowledging their receipt and understanding of VFM's WSPs. Any questions regarding these Policies and Procedures should be referred to Ms. Darrah, CCO.

### 4.2    Prohibited Conduct

All persons associated with VFM are prohibited from engaging in any securities transaction, for their own benefit or the benefit of others, while in possession of:

11

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

a. Material, non-public information concerning such securities which is known to the any person by virtue of his or her position as an insider with respect to the issuer of such securities or through such person's association with Adviser;

b. Material, non-public information concerning such securities where the information has been obtained by any person either through theft or misappropriation, or from an insider who has breached their fiduciary duty by disclosing the information to any person who knows or should know that a fiduciary duty has been breached.

The term "insider" includes officers, directors and Supervised Persons of a company. In addition, a person can be a "temporary insider" if he or she enters into a special confidential relationship in the conduct of a company's affairs and as a result is given access to information solely for the company's purposes. Temporary insiders can include, among others, a company's attorneys, accountants, consultants, advisers, bank lending officers, and the Access Persons of such organizations.

A "fiduciary duty" is breached by an insider when the insider personally will benefit, directly or indirectly, from his or her disclosure of material, non-public information. The prohibited benefit would include pecuniary gain, a reputational benefit that could translate into future earnings, a relationship between the insider and the recipient that suggests a quid pro quo from the recipient, or an intention to benefit the particular recipient. An intention to benefit a particular recipient includes a situation in which an insider makes a "gift" of confidential information to a relative or friend who trades in securities.

"Material" information is generally defined as information which a reasonable investor would consider important in making his or her investment decisions, or information which is reasonably certain to have a substantial effect on the price of a company's securities.

Information that is deemed "material" includes, but is not limited to: dividend changes, earnings estimates, changes in previously released earnings estimates, significant expansion or curtailment of operations, a significant increase or decline in orders, significant new products or discoveries, extraordinary borrowing, purchase or sale of substantial assets, significant merger or acquisition proposals or agreements, major litigation, liquidity problems, and extraordinary management developments.

"Material" information does not have to relate to a company's business. For example, information about the contents of a forthcoming newspaper or magazine article that is expected to affect the price of a security should be considered material. In the case of VFM's business as an investment adviser, information concerning significant transactions (purchases or sales) which VFM intends to execute on behalf of accounts which it manages for Clients could be material information and is prohibited from being communicated.

Information is considered "non-public" if it is confidential information disseminated only to corporate insiders; it is intended to be available only for a corporate purpose; and it has not yet been made available to all of the stockholders and the public generally.

**4.3        Prohibited Communications**

All Supervised Persons of VFM are prohibited from communicating material, non-public information concerning any security to others unless such communication is properly within their duties for VFM. Without limiting the foregoing, such persons may not disclose, except as

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

required by their duties for VFM, the identity of securities which VFM may purchase or sell for Clients.

## 4.4        Penalties

Penalties for trading on or communicating material, non-public information in violation of the law are severe, both for the individuals involved in such unlawful conduct and, possibly, their employers. A person who violates the prohibition against insider trading can be subject to some or all of the penalties below, even if he or she does not personally benefit from the violation. Penalties include:

- CIVIL INJUNCTIONS;
- TREBLE DAMAGES;
- DISGORGEMENT OF PROFITS;
- JAIL SENTENCES;
- FINES for the person who committed the violation of up to three times the profit gained, or loss avoided, whether or not the person actually benefited; and
- FINES for the employer or other controlling person of up to the greater of $1,000,000 or three times the amount of the profit gained, or loss avoided.

In addition, any violation of these Policies and Procedures can be expected to result in serious sanctions by VFM, including dismissal of the persons involved.

## 4.5        Procedures to Implement Policy

The following procedures have been established by VFM in order to prevent insider trading.

Before VFM's Access Persons trade for themselves or others in securities of a company about which they have or may have potential inside information, they should ask themselves the following questions:

a. Is the information material? Is this information that an investor would consider important in making his or her investment decisions? Is this information that would substantially affect the market price of the securities if generally disclosed?

b. Is the information non-public? From whom have they received the information? Has this information been communicated by an insider in breach of his or her fiduciary duties? Have they received this information for corporate purposes only by virtue of their position as an insider? Has the information been made available to the general public?

If, after consideration of the above, VFM's Access Persons are unsure whether they may be in violation of the law by disseminating or acting on the information they should:

a. Report the matter immediately to Ms. Darrah, CCO;

b. Refrain from the purchase or sale of the securities on behalf of themselves or others;

c. Refrain from communicating the information inside or outside VFM, other than to Ms. Darrah, CCO;

d. Wait for instructions from Ms. Darrah. Once Ms. Darrah has reviewed the issue, they will be instructed to continue the prohibitions against trading and communication, or they will be allowed to trade and/or communicate the information.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 4 Page 46

The following procedures have been established to aid Access Persons in avoiding insider trading, and to assist VFM in preventing, detecting and imposing sanctions against such conduct. Every Access Person must follow these procedures or risk serious sanctions, including dismissal, substantial personal liability and criminal penalties. Any questions about these procedures should be directed to Ms. Darrah. Interpretive issues which arise under these procedures shall be decided by, and are subject to the discretion of Ms. Darrah, CCO.

All Access Persons shall submit to Ms. Darrah an initial, quarterly and annual report of every securities transactions in which they, their families (including the spouse and minor children and adults living in the same household) and trust of which they are trustees or in which they have a beneficial interest have participated on the trade date of such transaction. The report shall include the name of the security, nature and date of the transaction, quantity, price, and broker-dealer or investment adviser through which the transaction was effected. The requirement may be satisfied by sending duplicate confirmations of such trades to Ms. Darrah, CCO.

**4.6       Restrictions on Access to Material Non-Public Information**

Information in the possession of VFM's Access Persons which has been identified as material, non-public information disseminated or used for VFM's corporate purposes may not be communicated to anyone, including persons within VFM, except as may be required in the performance of duties on behalf of VFM. In addition, care should be taken so that such information is secure. For example, files containing such information should be sealed, and access to computer files containing such information should be restricted by access codes, so that only those persons whose duties for VFM require such information shall have access thereto. Confidential matters (such as the identity of securities which may be purchased or sold by VFM or its Clients should not be discussed in public places.

Except in the performance of duties for VFM, Access Persons should not use or discuss information as to which securities VFM intends to purchase or sell for its Clients' accounts.

**4.7       Resolving Issues Concerning Insider Trading**

Any Access Person who is trading in securities on the basis of certain information and is unsure whether the contemplated transaction would not constitute "insider trading" should consult with Ms. Darrah, CCO before executing the transaction. In addition, if there is any unresolved question as to the applicability or interpretation of any of the foregoing Policies and Procedures, or as to the propriety of any action, such question must be resolved with Ms. Darrah, CCO before any action is taken.

**5.0     PERSONAL SECURITIES TRANSACTIONS PROCEDURES**

VFM's Access Persons may not buy or sell any security in which the person has a beneficial ownership unless the transaction occurs in an exempted security or the employee has complied with the Personal Security Transaction Policy set forth below.

**5.1       Pre-Clearance Procedures**

VFM's Access Persons must have written clearance for personal securities transactions meeting the following criteria before placing the transactions.

Individual Security (pre-clearance and post-trade review)

14

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

- Restricted security list
- Security watch list
- Initial Public Offerings
- Private Placements
- Limited Offerings

VFM reserves the right to disapprove any proposed transaction that may have the appearance of improper conduct. Access Person should complete VFM's Pre-Clearance Form. All pre-clearance requests must be submitted to VFM's CCO, while VFM's CCO shall submit pre-clearance requests for his/her personal transactions to VFM's Managing Member/Chief Executive Officer. Once pre-clearance is granted to an Access Person, such Access Person may only transact in that security for the remainder of the trading day.

**5.2       Reportable Securities**

VFM deems the following to be securities for the purpose for complying with its personal securities transactions policy:

Stocks, bonds, closed-end mutual funds, exchange traded funds (ETFs), notes, debentures, evidence of indebtedness, certificates of interest or participation in any profit-sharing agreement, collateral-trust certificates, fractional undivided interests in oil, gas, or other mineral rights, any options, or in general, any interest or instrument commonly known as a security.

**5.3       Exempt Securities**

Investments in commercial paper, money market accounts, unit investment trusts, treasury securities, certificates of deposit and shares of open-end mutual fund companies do not need to be reported by Access Persons.

**5.4       Beneficial Ownership**

Access Persons will be deemed to have beneficial ownership of securities if they have or share a direct or indirect financial interest in the securities. This will be the case where the Access Persons may directly or indirectly profit from a securities transaction.

**5.5       Exempt Transactions**

The following transactions are considered exempt transactions:
- Any transactions occurring in an account that is managed on a fully-discretionary basis by an unaffiliated money manager.
- Acquisitions or dispositions of securities as a result of a stock dividend, stock split, or other corporation actions.
- Any transaction in an account over which the Access Person does not have any direct or indirect influence or control.
- Purchases of securities in Dividend Reinvestment Plans (DRIPs).
- Purchases of securities by the exercise of rights issued to holders of a class of securities on a pro-rata basis.

**5.6       Initial Public Offerings**

15

WEAS-SEC-00007465

No Supervised Person shall acquire beneficial ownership of securities in an initial public offering without the consent of the CCO.

**5.7     Private Placements**

No Supervised Person shall acquire beneficial ownership of securities in a private placement without the consent of the CCO.

**5.8     Reporting**

Access Persons may only personally trade securities through an approved securities firm or a DRIP. Each Access Person must ensure that VFM is sent duplicate account statements and trade confirmations no less frequently than thirty (30) days after the end of each calendar quarter or provide electronic access to their accounts. Additionally, annual holdings reports will be submitted to the CCO by all Access Persons. Sample forms can be found in the Appendix hereto.

**5.9     Trading & Review**

VFM does not allow "front-running" of Client accounts, i.e., personal trading conducted by Access Persons before Client accounts are traded in the same security. Access Person accounts will be reviewed for this activity and other potential problems.

**5.10  Remedial Actions**

VFM has implemented remedial actions that are designed to discourage its Access Persons from violating the Personal Securities Transaction Policy. In general, these actions are as follows, but may be more severe based on the circumstances:
- 1st Violation—Verbal Warning;
- 2nd Violation—Written warning;
- 3rd Violation— Suspension and/or termination of employment.

**5.11  Disclosure**

VFM shall describe the Codes of Ethics to Clients in Part 2 of Form ADV and, upon request, furnish Clients with a copy of the Code of Ethics. All Client requests for VFM's Code of Ethics shall be directed to the CCO.

**5.12  Record-Keeping**

VFM shall maintain all records pertaining to personal securities transactions for a period of no less than five (5) years from the end of the fiscal year in which the document was last altered/amended.

**5.13  Responsibility**

The CCO will be responsible for administering Personal Securities Transaction Policy. All questions regarding the policy should be directed to the CCO.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007484

Exhibit 4 Page 49

WEAS-SEC-00007465

## 6.0    DESCRIPTION OF SUPERVISED PERSONS

Investment Advisers Act Rule 206(4)-7(a) and section 202(a) (25) of the Investment Advisers Act collectively define "Supervised Persons" as any partner, officer, director (or other person occupying a similar status or performing similar functions), or employee of an investment adviser, or other person who provides investment advice on behalf of the investment adviser and is subject to the supervision and control of the investment adviser. A list of VFM's Supervised Persons is kept as part of our organizational chart.

### 6.1    Outside Business Activity

VFM's Supervised Persons are not required to be employed with VFM as their sole and exclusive business. VFM's Supervised Persons may have other business interests and may participate in other investments or activities in addition to those relating to the VFM. All other business activities, whether paid or unpaid, must be reported to the CCO. The CCO will assess any conflicts of interest that may arise from such outside business activity. If the CCO approves the outside business, the CCO is responsible for any proper disclosures required.

## 7.0    INVESTMENT ADVISORY REPRESENTATIVES ("IAR")

### 7.1    Licensure

To qualify as an investment adviser representative, it is necessary for the individual to:

- Have passed all applicable state investment adviser representative examinations, unless the examination(s) has/have been waived; and
- Unless exempt, be registered as an investment advisory representative of VFM in all states where the individual conducts business activities. Passing an examination alone does not equate to licensure.

No investment advisory representative of VFM shall solicit potential business from a prospective advisory Client nor render any advice unless registered in the Client's or prospective Client's, state of residence, unless exempt from registration. Questions regarding registration requirements should be directed to Ms. Darrah, CCO.

### 7.2    Allowed Activities

IARs may do some or all of the following:

- Make recommendations regarding securities;
- Manage accounts or portfolios of Clients;
- Determine what advice should be given;
- Solicit the sale of or sells investment advisory services;
- Supervise employees who perform any of the foregoing.

VFM's administrative (non-investment advisory representatives) may not perform any of the aforementioned activities.

### 7.3    Representative Disqualification

17

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007485

Exhibit 4 Page 50

WEAS-SEC-00007465

VFM shall not permit a disqualified person to become associated with VFM absent the appropriate consent of the States in which the firm is registered and/or Securities and Exchange Commission.

## 8.0   FORM ADV

### 8.1         Initial Provision

Prior to providing advisory services for compensation to any Client, VFM will deliver Form ADV Part 2 to each client before or at the time that the client enters into an advisory agreement with VFM. VFM will deliver Form ADV Part 2 either (i) at least forty-eight hours before entering into any written contract with a Client, or (ii) at the time of entering into the contract with a Client. Where the Client has not received Form ADV Part 2 at least 48 hours prior to engagement, the Client may terminate advisory contract without penalty within five business days of signing the advisory contract.

### 8.2         Annual Delivery of Form ADV Part 2

VFM shall deliver its Form ADV Part 2 to each advisory Client no less than annually, within 120 days of VFM's fiscal year end. Each client must receive a free updated Form ADV Part 2 that either includes (i) a summary of material changes or is accompanied by a summary of the same, or (ii) deliver to each client a summary of material changes that includes an offer to provide a copy of the updated Firm Brochure free of charge and information on how a client may obtain it. VFM does not have to deliver to clients interim amendments of VFM's Firm Brochure unless the amendment includes information in response to Item 9 of Form ADV Part 2A or Item 3 of Form ADV Part 2B (disciplinary information). An interim amendment can be in the form of a document describing the material facts related to the amended disciplinary event. VFM shall keep a record or log of the delivery.

### 8.3         Wrap Fee Program

A Wrap Fee Program is any advisory program under which a specified fee or fees not based directly upon transactions in a client's account is charged for investment advisory services (which may include portfolio management or advice concerning the selection of other investment advisers) and the execution of client transactions. VFM participates in a Wrap Fee Program; all clients under the program will receive Form ADV Part 2A: Appendix 1 ("Wrap Fee Brochure") upon inception and annually thereafter. The Wrap Fee Brochure will contain all conflicts of interests that pertain to the program and a description of any portfolio managers used. VFM will decide on whether a wrap fee program is suitable for clients and it takes all necessary fiduciary responsibility in ensuring the best execution and overall value of the management of client accounts.

### 8.4         Other Disclosures

In fulfilling fiduciary duties to Clients, VFM shall make full and fair disclosures of all material facts necessary for Clients to make an informed decision as to whether to undertake our services. Examples may include, but are not limited to, material negative financial, legal, or disciplinary events applicable to VFM or its affiliated persons.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007486

Exhibit 4 Page 51

### 8.4.1 ERISA 408(b)(2)

The Department of Labor requires advisers that earn more than $1,000 for managing an ERISA plan are required to make explicit disclosures to the plan sponsor or trustee. VFM sends annual 408(b)(2) notifications informing the plan sponsor or trustee of its direct compensation and that there is never any indirect compensation.

## 9.0   ADVISORY CONTRACTS (CLIENT AGREEMENTS)

### 9.1      Written Agreement

Prior to providing advisory services for compensation to any Client, VFM and Client shall enter into a written Investment Advisory Client Agreement ("Client Agreement"). Among other things, this Client Agreement shall specify the services to be rendered by VFM, whether we have discretion over the account, and the compensation arrangements agreed to by Client.

### 9.2      Termination of Client Agreement

VFM or the Client may terminate an agreement for services at any time by providing notice to the other party, subject to the settlement of any outstanding trades. Termination will be effective within thirty (30) days after receipt of notification or such later date as specified in such notification. VFM will provide a pro-rated refund for any unearned fees and procedure to close the account, transfer or provide information on transferring account(s).

### 9.3      Assignment of Advisory Client Agreement

VFM shall not assign any Client Agreement to another party without the consent of the Client. Transactions that do not result in a change of actual control or management of us shall not be considered an assignment.

### 9.4      Hedge Clauses

No Client Agreement shall contain language (i.e. legend, hedge clause, or other provision) that is likely to lead Client to believe that Client has waived any right of action against VFM that is available under state or federal law.

## 10.0   ADVISORY FEES

### 10.1  Valuation

VFM's processes to value client holdings and assess fees based on those valuations are based on the market value assessed by the qualified custodian of the assets. VFM neither participates in the valuation nor adjusts those valuations.

It is important to note that in billing on securities for which no active market exists (excluding non-liquid assets such as partnerships), VFM shall use information such as independent audits or appraisals, as it in good faith deems relevant, to determine the value thereof (in the absence of a readily determinable value, such securities will be valued at purchase prices). CCO shall approve all valuations determined by VFM or its supervised persons.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007487

Exhibit 4 Page 52

## 10.2  Fee Calculation

The client is billed quarterly in advance calculated as a percentage of assets under management on an average daily balance basis. Any margin position will be subtracted from the account balance at that time. The quarterly management fee will be deducted automatically from the account when authorized unless there is an alternative form of payment arranged with the client. VFM reserves the right to accept a lower fee or none at all for current employees of the firm or members of their family, as well as negotiate the fees for clients to offer competitive pricing.

## 10.3  Performance Fees

No part of the compensation paid to VFM by Client shall be based on the capital gains of assets under management.

## 10.4  Prepaid Advisory Fees

In no event shall VFM charge advisory fees that are both in excess of $1,200 dollars and more than six months in advance of advisory services rendered. For Investment Management Services, VFM currently charges its advisory fees quarterly in advance.

## 10.5  Billing on Illiquid Securities

VFM may assess management fees for illiquid securities that it recommends to clients. These include private funds which may have liquidation schedules that can range from monthly to annual liquidation. VFM will not assess fees for private funds until client's financial interests have been liquidated. Once those interests are liquidated, we will assess an annualized fee per the client's agreed-upon fee schedule memorialized in their client agreement. The Risk Acknowledgement and Fee Agreement form will be collected from the client prior engaging in any illiquid security transactions. The fees associated with illiquid securities will be assessed to the client's brokerage account identified in the Risk Acknowledgement and Fee Agreement form.

Private funds will only be offered to accredited investors, as defined in Rule 501 of Regulation D of the Securities Act of 1933, and includes (*but is not limited to*) the following criteria:
1. Anyone who earned income that exceeded $200,000 (or $300,000 together with a spouse) in each of the prior two years, and reasonably expects the same for the current year; or
2. Anyone who has a net worth over $1 million, either alone or together with a spouse (excluding the value of the person's primary residence).

To justify billing on illiquid securities, VFM will perform extensive and ongoing due-diligence on the illiquid securities and will document it due-diligence and other fact-finding efforts. There efforts may include:

- Analysis of industry trends
- Audited financial statement review
- Investment strategy viability review
- Identification of conflicts of interest
- Management team fact finding
- Offering documents review

20

- Redemption terms
- On-site visits with management
- Regular phone calls with managers
- Concentration of holdings review
- Third party administrator review
- Marketing claims
- Legal action search and review

All investment recommendations will be reviewed and approved by the CCO prior to any transaction.

## 11.0   SUITABILITY

An Adviser is held to a higher standard in recommending an investment to a Client than is a Registered Representative ("RR") who is not an Adviser. Similar to a RR, an Adviser has a responsibility to recommend only those investments that are suitable for a Client, based on that Client's specific circumstances and situation. Whereas RRs are primarily concerned with the suitability at the "point-of-sale", Advisers have the added responsibility of ongoing suitability. The Adviser must maintain sufficient information on a Client's circumstances to determine whether particular investments are suitable and continue to be suitable. Where VFM provides investment management services (i.e., through a chosen Brokerage Co. on a non-discretionary basis), VFM is held to an initial suitability standard.

### 11.1  Procedures for Client Suitability

During VFM's initial Client meeting, we will gather information relative to the Client's Risk Tolerance and have them execute a Client Agreement. With these tools, VFM is able to establish suitable investments for the Client. VFM will attempt to contact its Clients no less than quarterly to review current investments, any changes in Clients financial or risk tolerance condition. VFM will keep records of documents related to these meetings in Client files for no less than 5 years after termination of the Client agreement.

## 12.0   CUSTODY OF CLIENT ASSETS

"Custody" of Client assets is generally defined as having direct or indirect access to such assets. Safeguarding of assets is central to investor protection. An investment adviser who itself or whose related person(s) have custody of Client assets is subject to extensive regulation, disclosure, and reporting requirements pursuant to Federal and State securities laws and regulations. VFM takes measures to avoid the following:

- Failure to recognize that VFM has custody:
  - **The Role of Employees or Related Persons**: The adviser's personnel or a "related person" serve as trustee or have been granted power of attorney for client accounts.
  - **Bill-Paying Services:** The adviser provides bill-paying services for clients and, therefore, is authorized to withdraw funds or securities from the client's account.
  - **Online Access to Client Accounts:** The adviser manages portfolios by directly accessing online accounts using clients' personal usernames and passwords without restrictions and, therefore, has the ability to withdraw funds and securities from the clients' accounts.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007489

Exhibit 4 Page 54

- o **Adviser Acts as a General Partner**: The adviser serves as the general partner of a limited partnership or holds a comparable position for a different type of pooled investment vehicle.
- o **Physical Possession of Assets**: The adviser has physical possession of client assets, such as securities certificates.
- o **Check-Writing Authority**: The adviser or a related person has signatory and check writing authority for client accounts.
- o **Receipt of Checks Made to Clients**: The adviser receives checks made out to clients and fails to return them promptly to the sender.

- Failure to meet the surprise examination requirements, if required. A Form ADV-E must be filed within 120 days after the date of the exam chosen by the accountant.

- Failure to satisfy qualified custodian requirements:
  - o Client assets held in the adviser's name, but not in an account that is under the adviser's name as agent or trustee for the client and that held only client assets.
  - o The adviser commingles client, proprietary, and employee assets into one account.
  - o Certificates of securities held by the adviser's fund are held in a safe deposit box controlled by the adviser at a local bank.
  - o The adviser does not have a reasonable basis, after due inquiry, for believing that a qualified custodian is sending quarterly account statements to the client.
  - o In instances where the adviser opens a custodial account on behalf of a client and sends account statements to the client, the statements sent by the adviser fail to include notification urging clients to compare the account statements from the custodian with those from the adviser.

## 12.1 Constructive/Actual Custody

Our advisory fees are directly billed to the Client or paid to VFM by the custodian of the Client's account. In all cases, VFM submits a detailed bill to the account custodian and the Client at the same time which shows the value of the assets the fee was based on, how it was calculated and the dollar amount of the fee. Additionally, the account custodian reports to the Client at least quarterly the amount of the advisory fee paid through an account statement. In any event, Clients are not billed more than $1,200 and more than six (6) months in advance.

## 12.2 Inadvertent Receipt of Funds or Securities.

VFM's policy is not to take receipt of Client funds or securities. If VFM inadvertently receives Client funds or securities, the following steps will be taken to correct this action:

- a. VFM will make a record of the receipt of the Client funds and/or securities in VFM's *Funds/Securities Received – Forwarded Log.* A notation of the receipt of the funds/securities received including the name of person who received the funds/securities, Client name, date received, amount of the funds or name of the security, number of shares or face value of such security, coupon and maturity date (if applicable) as well as the date the funds/securities were returned, how they were returned and by whom they were returned.
- b. When VFM inadvertently receives funds/securities, a photocopy of the check or security received will be made and placed in the Client's file.
- c. VFM will return the funds/securities to the Client with a letter of instructions on how and

22

where the Client should forward funds/securities now and in the future. VFM will return such funds or securities within three days of receipt by US Mail, registered, return receipt requested or by courier service. VFM will keep a copy of the cover letter and the return receipt/courier notice in the Client file.

**12.3  Receipt of Third Party Funds.**

If VFM receives a check from a Client payable to a third party, VFM will make a photocopy of the check and then forward the check directly to the third party. A copy of the check, the receipt and the transmittal form will be kept in the Client file. A notation of the receipt of the check including the Client's name, date received, amount, check number and name of third party to whom the check is payable, as well as the date the check was forwarded and how it was forwarded, will be made in a *Checks Received and Forwarded Log*.

## 13.0    DISCRETION

Discretion is the act of conducting a securities transaction without having obtained the Client's prior approval for a trade. VFM exercises discretion on Client's advisory accounts.

## 14.0    PLACING OF NON-DISCRETIONARY CLIENT ORDERS

VFM will not place an order to purchase or sell a security for the account of any non-discretionary Client without first obtaining authorization (i.e., "trading authorization") from the Client to do so.

## 15.0    SENIOR INVESTOR PROTECTION

A "Senior Client" is defined as any retail advisory client who is age 62 or older, retired, or transitioning to retirement, including accounts of deceased clients, and retail clients in joint accounts with at least one individual meeting this definition. With increasing numbers of senior clients and thus greater potential for diminished mental faculties and elderly abuse, VFM has implemented the following procedures to recognize signs of such behavior and address/escalate incidents accordingly.

### 15.1  Identifying Signs of Diminished Mental Capacities

Upon meeting or speaking with senior clients, VFM's advisors pay close attention to individual's behavior. Any encounters where the client appears to lack capacity to understand an investment or provide informed consent should be viewed as signs that the client may be lacking requisite mental stability. Specific examples include inability to process simple concepts, memory loss, difficulty speaking or communicating, inconsistency related to investment decisions, inability to cooperate with the advisor, or other erratic behavior.

### 15.2  Employee Training on Senior-Specific Issues

In order to identify signs of diminished mental capacities, VFM may engage in the following training procedures for its personnel:

- Training modules that focus on best practices for working with senior investors including various regulations, communication and marketing techniques, suitability consideration, identifying diminished capacity and suspected elder abuse, and how to report it to the proper individuals.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 4 Page 56

- Distribution of periodical newsletters containing articles about current policies and procedures related to senior investors
- Discussion forums with other securities professionals on a recurring or annual basis to discuss of any issues and to guarantee the continuous development of a firm's senior investor protection procedures.

The CCO will conduct an annual review of VFM's policy for senior clients to ensure it remains adequate and up-to-date. Personnel will be trained annually on senior specific issues and procedures.

### 15.3  Suitability

VFM meets with clients at least annually to assess the client's state and determine whether any investment profile changes are triggered based on their financial situation and time horizon. For senior clients, the CCO will review all new account forms that report investment objectives that would be considered more aggressive than "income with capital preservation." VFM will limit or prohibit the purchase of certain investment products which are deemed too risky or unsuitable given the client's age.

Relatives of these clients are encouraged to attend these meetings, giving their advisor a chance to get to know the client's family situation and ensure that relatives have the client's best interests in mind. VFM maintains detailed notes on senior clients in the CRM to track any changes in a client's investment profile.

### 15.4  Recommended Paperwork

Upon initial engagement or during annual meetings, VFM invites clients meeting the definition of a senior client to complete a "Trusted Contact Form" provided by the firm. This form will be provided by the firm either included in the advisory agreement or a separate standalone document. This Form will be treated separately from custodial forms. A trusted point of contact form serves as a resource which authorizes VFM to contact an alternate person to confirm a client's mental capacity. The Trusted Point of Contact will not grant any permissions with regard to investment decisions but will merely allow VFM to provide guidance on whether a client is capable of making said decisions. It is recommended that the Trusted Point of Contact be someone other than a spouse or a person with, direct or indirect, beneficial interest in client accounts.

Once a client begins to show early signs of diminished mental capacities, VFM will work with the client and any authorized individuals to complete and put into effect a Power of Attorney ("POA") form. Power of Attorney form requests should be submitted via a letter of authorization signed and notarized by the client. This applies to new POA paperwork and any POA change requests. VFM does not accept third-party POA paperwork.

### 15.5  Documentation & Reporting Requirements

Any instances of diminished mental capacity and subsequent elderly abuse will be documented immediately in the firm's CRM or client file. Any issues related to elderly abuse should be escalated to the CCO, who will then report it to the proper authorities, the national elder abuse hotline at (800) 677-1116, or the elder abuse hotline in client's county. During this time, VFM will

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 4 Page 57

keep open lines of communication with the client's Power of Attorney, if one exists. VFM will continue to conduct a close review of the investor's accounts to identify any problematic patterns.

### 15.6  Senior Safe Act

In accordance with the Senior Safe Act signed into law on May 24, 2018, employees of VFM who are trained to spot elder abuse are granted limited immunity for reporting such abuses to law enforcement and regulators.

## 16.0    BRANCH OFFICE SUPERVISION

VFM has multiple office locations ("Branch Offices"). In order to supervise the IARs operating out of Branch Office location, VFM has instituted the following procedures to be completed on an annual basis:

- Branch Office Evaluation conducted by a Home Office representative;
- All Advisory Client paperwork to be uploaded to VFM's CRM/cloud system, including signed advisory agreements and Advisory Client notes;
- Submission of all advertising materials to the CCO prior to submission;
- Review of outside business activities and Form U4;
- Review of all branch office correspondence;
- Review of personal securities transactions for all Branch Office IARs;
- Branch Office IARs to log Advisory Client complaints, gifts, trade errors, checks received & forwarded on the Home Office's master logs;
- Home Office to provide Branch Office with ADVs, privacy policy, advisory agreements, WSPs upon each revision;
- Signed Certification of Compliance with VFM's WSPs on an annual basis

## 17.0    SUBADVISER SUPERVISION

VFM may offer and utilize accounts with sub-advisers. We take reasonable steps to ensure they are properly registered before referring Clients to them.

## 18.0    ADVERTISING & MARKETING

The term "Advertisement" shall include any written correspondence or communication addressed to more than one person, or any notice or other announcement in any publication or broadcast by radio or television, which offers (1) any analysis, report, or publication concerning securities, or which is to be used in making any determination as to when to buy or sell any security, or which security to buy or sell, or (2) any graph, chart, formula, or other device to be used in making any determination as to when to buy or sell any security, or which security to buy or sell, or (3) any other investment advisory service with regard to securities. In general, all marketing materials will be considered advertisements. **Please note that FINRA Rule 2210 may affect advertising procedures for Advisers that are dually registered with a broker-dealer.**

### 18.1  Prohibited Advertising Practices

In communications with the public (i.e., advertising and sales literature), VFM shall not:

- Utilize testimonials of any kind concerning VFM or concerning any advice, analysis,

25

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

report or other service rendered by VFM, including online social media features such as "like," "endorse," or similar features.
- Refer, directly or indirectly, to past specific recommendations of VFM which were or would have been profitable to any person;
- Represent, directly or indirectly, that any graph, chart formula or other device being offered can in and of itself be used to determine or assist any person in determining which securities to buy or sell, or when to buy or sell them, without prominently disclosing in such advertisement the limitations thereof and the difficulties with respect to its use;
- Use any statement to the effect that any report, analysis, or other service will be furnished free or without charge, unless such report, analysis or other service actually is or will be furnished entirely free and without any condition or obligation, directly or indirectly;
- Make any statement of a material fact that is untrue or otherwise false and misleading.

## 18.2    Use of Terms "Investment Counsel" & "Registered Investment Adviser"

The term "Investment Counsel" is reserved by the Investment Advisers Act of 1940 for use by investment advisers whose principal business consists of acting as an investment adviser and of which a substantial portion consists of rendering investment supervisory services. VFM shall not refer to itself as "Investment Counsel" or some similar term.

Similarly, the initials "RIA" shall not be used after VFM's name to indicate or imply some form of professional designation (such as "CFP" or "ChFC"). This shall not preclude VFM from using the actual words "registered investment adviser."

## 18.3  Factors to Consider

In considering whether advertisements are misleading, the following factors should be considered:

- The presence or absence of any explanations and disclosures necessary to make the materials not misleading;
- The general economic or financial conditions affecting any assumptions in the materials;
- Any representations of future gains, income or expenses;
- Any portrayals of past performance that imply that past results may be repeated in the future, or that cannot be justified under the circumstances;
- Any discussion of benefits of the investment without giving equal prominence to the risks or limitations associated therewith; and
- Any exaggerated or unsubstantiated claims.
- The use of inappropriate terms by advisors that would imply that he or she has a level of professional competence, education or other special training, including but not limited to RIA, CFA or CFP.

Other factors that should be considered include the overall context in which the advertisement is made; the audience to which the advertisement is directed; the overall clarity of the advertisement; and the use of footnotes in the advertisement.

## 18.4  Review Process

All advertisements shall be reviewed by the CCO before being made public. The CCO shall verify

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007494

Exhibit 4 Page 59

that all advertisements are within the firm's advertising policies and procedures herein, as well as conform to applicable rules and regulations promulgated under state and federal securities laws. The CCO must determine that their web designer, hosts, and office staff understand the below requirements and wait for approval from the CCO prior to posting new content or making any changes to any advertisements. The CCO is responsible for regularly reviewing the content of their advertisements, including websites, and removing/archiving outdated content.

## 19.0    SOCIAL MEDIA

It is important to mention that there is a significant difference between a firm's profile page versus the personal profile of a firm employee. A firm's social media profile is a firm-sponsored representation of the company, similar to a website, and will be governed by the firm's policies addressing advertising and electronic communication. An employee's personal profile, on the other hand, is the proprietary responsibility of the individual employee.

All firm-sponsored social media content is subject to Rule 206(4)-1 under the Act (as referenced in Section 16 "Advertising & Marketing" and Section 18.2 "Prohibited Communication").

### 19.1  Personal Profiles

To avoid VFM's review of employee's personal profiles, VFM prohibits all VFM employees' from posting any firm-related content on their personal pages. Employees may use VFM's name as a reference to their employer, along with their title/position within the firm and dates of employment. If VFM is referenced in any other way on the website, it is no longer considered a Personal website, and shall be subject to VFM's policies and procedures, including but not limited to requiring approval by VFM.

### 19.2  Responding to Statements or Claims

With respect to statements or claims made on Social Media sites about VFM, and when responding to comments about VFM in Social Media, adhere to the following principles:

- Employee must comply with the posting guidelines and Terms of Use of any site on which Access Persons post content in reference to VFM;
- Employee shall not make deceptive or misleading claims about VFM's services, or VFM's competitors' services;
- Employee may not engage in any communication that is defamatory or infringes upon the intellectual property, or privacy and publicity rights of VFM or others;
- Employee may not make offensive comments that have the purpose or effect of creating an intimidating or hostile environment, including making false statements about VFM or competitors. Such comments include ethnic slurs, personal insults, obscenities, and any other language that may be deemed as offensive.

### 19.3  Solicitation

When soliciting clients through Social Media websites, Employee need to ensure that they do not inadvertently solicit beyond the states in which VFM is authorized to provide investment advisory services.

27

Exhibit 4 Page 60

Employees should not provide any specific recommendation as to the purchase or sale of a particular security in order to solicit clients. No specific investment advice shall be given without an advisory agreement in place.

### 19.4  Disciplinary Action

Policy violations shall be subject to disciplinary action, up to and including termination of employment. VFM retains the right to monitor and retain all files and messages stored on and transmitted through VFM computers. Access Persons have no reasonable expectation of privacy on Social Media websites accessed through VFM computers even if a private account is used. VFM reserves the right to periodically review Access Persons' Social Media websites when used in reference to VFM to ensure compliance with the policies and procedures.

## 20.0   ELECTRONIC COMMUNICATION

Electronic Communication includes, but not limited to, e-mail, fax, telephone and voice-mail. An employee's use of electronic communication is held to the same standard as all other business communications. VFM expects its employees to use good judgment in their use of these systems.

### 20.1  Correspondence

Any written electronic communications sent by an employee of VFM to clients, customers, service providers, another VFM employee, or any other party, including e-mail and fax should be treated in the same manner and with the same care as letters or other official communications on VFM's letterhead. In addition, such communications are subject to the marketing, ethics and recordkeeping requirements of VFM and regulations under the Advisers Act, which generally mandates that such documentation be maintained by an adviser for a period of five years from the date the communication was created. Investor or client complaints that are received by an employee via e-mail must immediately be forwarded to the CCO.

### 20.2  Prohibited Communications

VFM prohibits employees from using VFM's electronic facilities to do any of the following:

- Instant message which is an increasingly popular form of electronic communication that allows one user to communicate with another one in real time. A "chat room" differs from instant messaging as several users have the ability to communicate with one another in real time.

  It is difficult and burdensome for VFM to monitor and supervise its employees' chat room communications. In addition, it is typically cost prohibitive for an adviser to develop or acquire the sophisticated systems that are required to capture, archive, and retrieve chat room communications. Accordingly, VFM prohibits the use of chat rooms by its employees at work for business use.

- Download or transmit harassing, discriminatory, pornographic, obscene, violent, defamatory, offensive, derogatory or otherwise unlawful, inappropriate or unprofessional images or materials;

28

- Transmit externally any documents marked "For Internal Distribution Only" or forward any e-mail automatically to an outside e-mail account;

- "Hack" or attempt to gain unauthorized access to computers or databases, tamper or interfere with electronic security mechanisms, misrepresent a user's identity (e.g., spoofing") or disseminate intentionally any viruses or other destructive programs;

- Transmit chain letters, unapproved mass solicitations or any other form of unsolicited e-mail/SPAM for non-VFM approved purposes;

- Establish a personal business or use VFM facilities for personal profit; or

- Download, install or execute software, including patches and upgrades, without prior approval of either VFM's CCO or President.

### 20.3  Electronic Delivery of Regulatory Documents

The expansion of the Internet and electronic communications now allows advisers to deliver investment adviser regulatory documents electronically. The delivery of such communications, including, among other things, an adviser's Form ADV and privacy policy, must be made in accordance with the two elements of Access and Evidence of Delivery as discussed more fully below.

*Access* - Those who are provided with electronic documents should have access to receive the information sent. The use of a particular medium (i.e., Internet website or e-mail) should not be so burdensome that intended recipients cannot effectively access the information provided. Persons to whom information is sent electronically must have an opportunity to retain the information through the selected medium (i.e., recipient should be able to either download or print information delivered electronically such that they can maintain a permanent record).

*Evidence of Delivery* - When providing regulatory documents electronically, one must have reasonable assurance that such documents have been actually delivered. In order to evidence satisfaction of delivery obligations advisers may: 1) obtain the client's informed consent, 2) maintain evidence the client has actually received the document (i.e., return receipt), or 3) disseminating information via fax.

### 20.4  Security

The Internet is not a secure environment. Files and e-mail can be intercepted and read by technically savvy Internet users, including VFM's competitors. All employees should attempt to limit the amount of confidential, classified, or proprietary information that is transmitted electronically to only that which is absolutely necessary and required to conduct one's job.

### 20.5  Reporting Problems

If sensitive VFM information is lost, disclosed to unauthorized parties or suspected of being lost or disclosed, employees shall immediately notify VFM's CCO. In addition, the CCO should be notified if any unauthorized use of VFM's information systems has taken place or is suspected of taking place. Similarly, when passwords or other system access control mechanisms are lost, stolen, or disclosed, or suspected of being lost, stolen, or disclosed, VFMs CCO should be notified

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007497

Exhibit 4 Page 62

immediately. All unusual system behavior, such as missing files, frequent systems crashes, misrouted messages and the like should be reported immediately to VFM's technology expert as one of these issues may indicate a computer virus infection or similar security problem.

### 20.6  Monitoring & Surveillance Program

VFM may monitor the electronic communications of employees for any purposes, including without limitation: regulatory requirements, investigating possible employee theft or espionage, monitoring work flow, retrieving missing business data in an employee's absence, reviewing and evaluating employee performance, ensuring that VFM's systems are used for legitimate purposes and not for the transmittal of discriminatory or offensive messages, finding illegal software installed on an employee's computer, ensuring that employees are either not using VFM's equipment and resources for personal purposes, or complying with any state, federal or international laws or legal process, including without limitation, responding to subpoenas, court orders for surveillance or similar requests.

### 20.7  Employee Consent & Non-Compliance with the Policy

Employee consent and compliance with this policy is a term and condition of employment. Failure to abide by this policy or to consent to any interception, monitoring, copying, reviewing or downloading of any communications or files is grounds for discipline, up to and including suspension or dismissal, at the discretion of management. In any situation where the employee is unsure about the application of this policy, they are to discuss the situation confidentially with VFM's CCO.

### 21.0    PRIVACY POLICY PROCEDURES

VFM is committed to safeguarding the confidential information of its Clients. We hold all personal information provided to us in the strictest confidence. These records include all personal information that VFM collects from Clients in connection with any of the services provided by VFM. VFM will never disclose information to nonaffiliated third parties, except as permitted by law. If VFM anticipates a change in VFM's policy, VFM will advise its Clients in advance.

VFM may use financial and other information that the Client or their designated representatives provide VFM to help them meet their personal financial goals while guarding against any real or perceived infringements of their rights of privacy.

### 21.1  Notice to Clients

VFM delivers a Privacy Policy at the initial establishment of account and again when the Privacy Policy is amended.

### 21.2  Information Collected

The categories of nonpublic personal information that VFM collects from a Client depends upon the scope of the Client engagement. It will generally include information about their personal finances, information about their health to the extent that it is needed for the planning process, information about transactions between the Client and third parties and information from consumer reporting agencies.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007498

Exhibit 4 Page 63

### 21.3  Access to Information Collected

VFM maintains a secure office and computer environment to ensure that Client information is not placed at unreasonable risk.

VFM limits access to information to only employees and agents who have a business or professional reason for knowing such information, and only to nonaffiliated parties as permitted by law. (For example, federal regulations permit VFM to share a limited amount of information about a Client with a brokerage firm in order to execute securities transactions on their behalf, or so that VFM can discuss the Client's financial situation with their accountant or lawyer.)

Employees are advised that all information, transactions, records, etc. of VFM's Clients is confidential and must be held in strict confidence. Employees are advised not to discuss a Client's affairs with unauthorized persons including other employees of VFM. For unaffiliated third parties that require access to a Client's personal information, including financial service companies, consultants and auditors, VFM also requires strict confidentiality in our agreements with them and expect them to keep this information private. Federal and state regulators also may review firm records as permitted under law.

Client information on VFM's internal computer system is protected by access and/or by password. Access to information on VFM's system is assigned on an "as needed" and access by nonaffiliated third parties, if given, is protected by both access and by password.

### 21.4  Outside Contractors

VFM may, as necessary, use various services from nonaffiliated third parties for the purpose of supporting the financial products and services we provide to Clients. These parties must agree to strict confidentiality in VFM's agreements with them and VFM expects them to keep all information private.

We do not provide Clients' personally identifiable information to mailing list vendors or solicitors for any purpose.

### 21.5  Maintenance of Records

Personally identifiable information about a Client will be maintained during the time they are a Client, and for the required time thereafter that such records are required to be maintained by federal and state securities laws. After this required period of record retention, all such information will be destroyed.

### 21.6  Requests for Information

Upon Client request VFM shall deliver within a reasonable time a current copy of VFM Privacy Policy. A log of requests and deliveries will be maintained.

| 22.0 | CYBER SECURITY |
|------|----------------|

*An Adviser is required to document and test the measures they employ to ensure cyber security and protect their clients against identity theft and other cyber threats. Advisers are also required to identify and assess the protection required and risks associated with networks, client information, vendors and*

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 4 Page 64

WEAS-SEC-00007465

*other third parties.*

*Ms. Darrah, CCO, with the help of an/the outside technology consultant is responsible for designing and implementing systems to protect the unauthorized access of information electronically or physically. All employees of VFM receive ongoing education and training concerning information security risks and responsibilities.*

*Please see VFM's privacy policy for more information regarding the dissemination of client information.*

### 22.1  Devices, Hardware & Data

VFM maintains an inventory of all hardware including desk top computers, laptop computers, external hard drives and devices capable of storing sensitive information. All laptops and mobile devices must be password protected with a strong password (containing upper & lowercase letters, numbers, symbols). No passwords can be stored for automatic log in.  They must be entered each time a site or application is accessed. Laptops will have encrypted drives so that any information stored on the hard drive is inaccessible if it is removed.

In the event a technology resource is lost or stolen the user must immediately report the event to the CCO who will work with a Third Party Technology Consultant to wipe the device remotely and report the incident to the appropriate authorities if necessary. The CCO will determine if further steps need to be taken to safeguard client data and whether or not client and account custodians need to be contacted. Brad is the administrator of Salesforce.

VFM's network systems are protected by a firewall facilitated through the programs and websites utilized by the firm. Ms. Darrah, CCO will contact a Third Party Technology Consultant when additional network security needs to be implemented.
Any sensitive data that needs to be transmitted electronically including by not limited to account numbers, personal information and social security numbers is sent via a password encrypted email.

### 22.2  Software & Platforms

VFM keeps an electronic database of all software and platforms used to facilitate investment management, financial plans, email, client data and information storage. Ms. Darrah, CCO monitors the current software for any necessary patches or updates to ensure the most secure versions are being used.

Client information is stored in a centralized location which is password encrypted and only authorized personal are provided with the credentials to access client information. Ms. Darrah, CCO maintains a list of all employees with access to client information. In the event an employee is terminated or resigns the CCO will disable any passwords associated with the departing employee.

Remote access by employees is permitted under certain circumstances. Ms. Darrah, CCO monitors all remote access to network systems and reports any unauthorized log in attempts to the IT department or appropriate authority.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007500

Exhibit 4 Page 65

### 22.3  Risk Assessment & Management

The firm's local documents are backed up daily using through online cloud. Only the system administrator or CCO is authorized to alter, manipulate or disable the baseline configuration of any network hardware or software.

The CCO monitors escalation of user privileges by logging in as employees with restricted access to network resources to ensure they cannot view unauthorized information.

VFM conducts periodic assessments to identify electronic and physical risks to cyber security. All onsite computers are inspected randomly by Ms. Darrah, CCO to ensure that:
- Password log in is required after a computer has been idle for more than 15 minutes.
- Computers are shutdown at the end of the business day and not left idling to prevent unauthorized access from a remote location.
- Passwords from former employees can no longer provide access to network systems.
- No network passwords are stored in a visible location.
- Client information is only stored in authorized electronic locations.

Ms. Darrah, CCO maintains a log detailing all reports of physical and electronic cyber security threats.

### 22.4  Social Media & Websites

Ms. Darrah CCO monitors the firm's website on a monthly basis for any attempts of "hacking", unauthorized access or security breaches. Ms. Darrah CCO monitors all social media platforms used by VFM and reports any spam, unauthorized access or suspicious activity.

The firm's name may be used only when referencing VFM as an employer. If the firm's name is used in any other capacity on a personal social media site by an employee, the employee must immediately report the usage to Ms. Darrah CCO and provide access to the account to ensure regulatory compliance and allow the CCO to monitor the page for suspicious activity.

Third Party unaffiliated websites may post information regarding VFM which the firm has no control over. Ms. Darrah, CCO periodically performs internet searches of the firm name and reports any unauthorized use of the firm name or any other suspicious activity.

### 22.5  Customer Access

Clients may be offered access to all of their account through our data aggregator, Black Diamond. However, our firm will also provide clients with access to their accounts through TD Ameritrade Inc., and Fidelity Brokerage Services, LLC, and as IRA Trust Services Trust Company for certain illiquid securities if they wish to view their accounts independent from Black Diamond. Clients are able to request balance inquires, and historical transactions. Services and access may vary by custodian.

Clients can only log in through an individualized username and password, the respective custodian may verify transactions requested electronically and report any suspicious requests or attempts of unauthorized access. Please contact Ms. Darrah, CCO if you would like a copy of your custodian's information technology policy for more information.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

VFM does not accept requests for the transfer or withdrawal of funds electronically.

## 22.6 Vendors & Other Third Parties

Ms. Darrah, CCO maintains a list of all third parties who have access to client information and network access.

Our firm collects privacy policies and disaster recovery plans from all third parties the firm is associated with when available.

If a third party vendor has access to sensitive information relating to clients or VFM they are required to sign a non-disclosure agreement or similar built into a service agreement.

## 22.7 Detection of Suspicious Activity

All employees of VFM are required to report any of the following instances directly to Ms. Darrah, CCO:

- Suspicious emails that may contain attachments or links.
- Electronic requests for the transfer or withdrawal of funds.
- Any events that may have compromised sensitive information or data.
- Unauthorized network access.

Upon receiving this information, the CCO records the incident and notifies a Third Party Technology Consultant and law enforcement agencies, if necessary.  Once the threat has been reported the CCO will ensure that all diagnostic tests have been administered to make certain no data on the network has been compromised.

## 23.0   BUSINESS CONTINUITY/DISASTER RECOVERY PLAN

Our firm has developed a Business Continuity Plan to address disaster recovery and loss of key personnel. A copy of our complete plan is available from Ms. Darrah, CCO.

## 24.0   PROXIES

VFM does not vote client proxies.

## 25.0   POLITICAL CONTRIBUTIONS

In order to avoid conflicts of interests with "Pay to Play" rules, VFM does not maintain any client types that are State or municipal government entities.

## 26.0   BORROWING OF FUNDS

Neither VFM, nor affiliated persons of VFM, shall borrow money or securities from, or lend money or securities to, any Client.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007502

Exhibit 4 Page 67

## 27.0   "BLUE SKY" REQUIREMENTS

VFM shall not place an order to buy or sell a security on behalf of a Client, unless:

- The security is registered in the Client's state of residence, or properly exempted from registration.
- The investment adviser and investment advisory representative effecting the transaction are registered in the Client's state of residence if required. Further, VFM shall not recommend that any Client engage the services of any broker-dealer, agent, or investment adviser that is not registered in the Client's state of residence.

## 28.0   RECORD KEEPING

*Requirement: Generally, an Adviser is required to keep and maintain certain books and records as appropriate for the Adviser's business, pursuant to Adviser Act Rule 204-2. However, books and records required to be made pursuant to Rule 206(4)-7 must be maintained and preserved in an easily accessible place for at least five years, the first two years in an appropriate office of the Adviser.*

VFM may keep books and records in electronic formats. As such, VFM complies with Investment Advisers Act Rule 204-2(g)(3), by putting in place the following requirements and safeguards:

- Records are arranged and indexed in a way that permits easy location, access, and retrieval of any particular record;
- Records are ready at all times to be provided upon request;
- Records are retained for the required retention period;
- Records are reasonably safeguarded from loss, alteration, or destruction;
- Limit access to the records to authorized personnel and the Commission (including its examiners and other representatives); and
- To reasonably ensure that any reproduction of a non-electronic original record on electronic storage media is complete, true, and legible when retrieved.

**General**

Following is a description of records to be maintained by VFM.

### 28.1  Accounting Records

Cash Receipts & Disbursements Journal: VFM maintains a journal that clearly reflects all cash receipts and disbursements.

Ledgers Reflecting Asset, Liability, Reserve, Capital, Income & Expense Accounts: Ledgers are maintained that reflect asset, liability, reserve, capital, income and expense accounts.

Receivables & Payables: VFM shall keep a record showing all receivables and payables.

Retention of Checks & Bank Statements: VFM shall keep all checkbooks, bank statements, canceled checks, and cash reconciliations on its premises.

Retention of Paid & Unpaid Bills: VFM shall keep all bills or statements, either paid or unpaid,

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007503

Exhibit 4 Page 68

relating to its business.

<u>Retention of Trial Balances & Financial Statements:</u> All trial balances and other financial statements relating to VFM's business shall be retained.

## 28.2  Advisory Records

<u>Memoranda of Securities Transactions & Confirmations:</u> For each purchase or sale of any security placed by VFM for a Client, VFM shall maintain a memorandum:

- Showing the terms and conditions of the order, instruction, modification or cancellation;
- Showing the account for which transaction entered, the date of entry, and the broker-dealer by or through whom executed;
- Discretionary authority, if applicable;
- Identifying the person connected with VFM who recommended the transaction to the Client; and
- Identifying the person who actually placed the order.

<u>Transaction Statements</u>: VFM will also retain copies of all transaction confirmations, monthly statements, custodian reports and other records relating to transactions with Clients.

<u>Complaint File:</u> VFM shall keep copies of complaints relating to investment activities for Clients. "Complaint" means any written or oral statement of a Client or any person acting on behalf of a Client alleging a grievance involving the activities of persons under the control of VFM in connection with providing investment advice to or placing orders on behalf of Clients.

<u>Retention of Client Agreements/Powers of Attorney:</u> VFM shall maintain the original or copy of each Client Agreement and/or Powers of Attorney for a period of five years from the date of its termination.

<u>Brochure Retention:</u> VFM shall maintain for five years' historical copies of each version of its Form ADV Part 2 Brochures delivered to Clients. Client acknowledgments as to receipt of such Form ADV Part 2 Brochures shall be made in the contract.

<u>Inadvertent Receipt of Funds/Securities and Return Log:</u> VFM will maintain a log of all funds or securities received and returned. It is not a practice of VFM for such transactions to occur. In any event, funds or securities will be returned to sender within three business days.

<u>Checks Received & Forwarded Log:</u> VFM will maintain a *Checks Received & Forwarded Log*. It is not anticipated that many of these transactions will occur.

<u>Client Records:</u> A separate ledger account for each Client showing all purchases, sales, receipts and deliveries of securities, the date and price of each such purchase and sale, and all debits and credits, together with copies of confirmations of all transactions effected by or for the account of each Client.

<u>Investment Records</u>: For transactions in securities on behalf of Clients utilizing our investment management services, we will maintain:

- A journal or other record showing all purchases, sales, receipts and deliveries of securities (including certificate numbers) for accounts of Clients and all other debits and

36

credits to such accounts;

- A separate ledger for each Client showing all purchases, sales, receipts and deliveries of securities, the date and price of each such purchase and sale, and all debits and credits;
- Copies of confirmations of all transactions effected by or for the account of each Client;
- A record setting forth all securities in which any Clients have positions, showing the name of each Client having any interest in each security, the amount of each interest of each Client and the location of each such security;
- A separate record for each Client showing the name and address of the bank or brokerage firm where such account is maintained, the dates and amounts of deposits in and withdrawals from such account, and the exact amount of each Client's beneficial interest in such account;
- A record of every transaction in a security in which VFM or any advisory representative (as hereinafter defined) of VFM has, or by reason of such transaction acquires, any direct or indirect beneficial ownership, except (i) transactions effected in any account over which neither VFM nor the advisory representative has any direct or indirect influence or control; and (ii) transactions in securities that are direct obligations of the United States. Such record shall state the title and amount of the security involved; the date and nature of the transaction (i.e., purchase, sale or other acquisition or disposition), the price at which it was effected. Such record may also contain a statement declaring that the reporting or recording of any such transaction shall not be construed as an admission that VFM or advisory representative has any direct or indirect beneficial ownership in the security. Every transaction shall be reviewed as it occurs and recorded not later than 10 days after the end of the calendar quarter in which the transaction was effected.

## 28.3 Advertising Records

<u>Written Communication</u>: written communications sent by VFM to Clients or received from Clients shall be maintained. Retention of communications shall be required when the communications deal with (i) recommendations made or proposed to be made about a "security," (ii) receipt, disbursement, or delivery of funds, or (iii) the placing or execution of any order to buy or sell any security.

<u>Retention of E-mail</u>: Rule 204-2(a)(7) promotes the belief that VFM should maintain a record of all e-mails that pertain to advice being offered, recommendations being made, transactions executed, and orders received. VFM will reasonably safeguard the e-mails from loss, alteration, or destruction and limit access to these records to properly authorized individuals. Ms. Darrah, CCO will provide promptly any of the following, if requested by any regulatory authority:

- A legible, true, and complete copy of an e-mail in the medium and format in which it is stored;
- A legible, true, and complete printout of the e-mail; and
- Means to access, view, and print the e-mail.

<u>Website/Social Media:</u> Website language and material changes to website shall be maintained. Social media posts and list of sites shall also be maintained.

## 28.4 Code of Ethics Records

<u>Personal Securities Transactions:</u> All records of personal securities transactions for Supervised Persons need to be maintained.

37

<u>Code of Ethics</u>: A copy of adviser's code of ethics adopted and implemented pursuant to Rule 204A-1 that is in effect, or at any time within the past five years was in effect.

<u>Compliance Issues Log</u>: A record of any violation of the Code of Ethics, and of any action taken as a result of the violation.

**28.5  Custody Records**

VFM does not take or possess custody on Clients accounts; therefore does not have any records to maintain in this regard.

**28.6  Compliance Program Records**

<u>Copies of Written Supervisory Procedures</u>: All draft and final copies of VFM's written supervisory procedures shall be maintained for five years.

<u>Annual Review</u>: Any records documenting the investment adviser's annual review of those policies and procedures conducted pursuant to Rule 206(4)-7(b).

**28.7  Corporate Records**

VFM shall keep all articles of organization, operating agreements and other organizational documents.

| 29.0 | ANTI-MONEY LAUNDERING POLICY/USA PATRIOT ACT COMPLIANCE |
|------|--------------------------------------------------------|

VFM is committed to following the USA Patriot Act through the following measures, even though it is voluntary for investment advisers at this time.

**29.1  Anti-Money Laundering Procedures**

These procedures are divided into three parts: (1) Account Opening and Ongoing Client Account Activity (2) Education and Training and (3) Books and Records.

### 29.1.1          Account Openings & Ongoing Account Activity

In addition to the information required by the Account Application, sponsor and/or other forms, VFM's investment advisory representatives ("IARs") should be alert to the following "Red Flags":

- Client exhibits unusual concern for secrecy, particularly with respect to his/her identity, type of business, assets or dealings with firms, or the Client provides non-verifiable references or is reluctant or refuses to provide financial information or information concerning financial relationships and business activities.
- The Client exhibits a lack of concern regarding risks, advisory fees, commissions or other transaction costs.
- Upon request, the Client refuses to identify or fails to indicate a legitimate source for his/her funds and other assets.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007506

Exhibit 4 Page 71

- The Client appears to operate as an agent for an undisclosed principal but is reluctant to provide information regarding that entity. Beneficial ownership is difficult to ascertain.
- The Client has difficulty describing the nature of his/her business or lacks general knowledge of his/her industry.
- The Client is from, or has accounts in, a country identified as a haven for money laundering.
- The Client, or a person publicly associated with the Client, has a questionable background including prior criminal convictions.
- A Client attempts to open an account with unusual or suspect identification or business documents.
- The opening of an account for a Client who3 is more interested in writing checks and utilizing a debit card than investing.

### 29.1.2    Personal Accounts

For each new Client (and especially for walk-in Clients, foreign Clients or Clients wanting to open an account with a foreign address), the IAR will take reasonable steps to determine the Client's true identity.

Various steps can include: (i) Requiring satisfactory identification to corroborate Client's identity (e.g., a driver's license with a photo, a U.S. passport, or alien registration card); (ii) Obtaining basic background information on Client, such as residence and/or place of business; (iii) Considering the proximity of Client's residence or place of business to branch location and, if it is inconvenient, determine why Client is opening an account at that location; (iv) Obtaining information on Client's source of funds to open the account and investigate the source of funds of large deposits; (v) Calling Client's residence or place of employment to thank him/her for opening the account and further investigate any suspicious responses, including disconnected phone service or no record of employment; and (vi) Considering use of third party references (e.g., credit bureau, verification service, or telephone and web site directories).

### 29.1.3    Business Accounts

For each new Client (and especially for walk-in Clients, foreign Clients and Clients wanting to open an account with a foreign address), the IAR must take reasonable steps to verify the identity of the agent of the business and the beneficial owners of the business.

Various steps can include: (i) Verifying legal status of business (e.g., sole proprietorship, partnership, incorporation or association); (ii) determining beneficial owners of business; (iii) Checking name of business with information-reporting agencies and check prior bank references; (iv) Calling Client's business to thank him/her for opening the account and investigate unusual circumstances, such as disconnected phone service; (v) Verifying that business exists and is conducting its stated activities, if appropriate, by visiting the business; (vi) Considering source of funds used to open account and investigate large deposits; (vii) Consideration of obtaining: a financial statement; description of Client's principal line of business or primary trade area; description of business operations, anticipated volume of cash and total sales, and list of major Clients; and a third-party reference.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 4 Page 72

### 29.1.4      High-Risk Business Entities

The following types of businesses have been identified by regulators as being at a higher risk to money laundering activities: (i) Nontraditional financial entities such as currency exchange houses, money transmitters, and check cashing facilities; (ii) Casinos and card clubs; (iii) Offshore corporations and banks located in tax and/or secrecy havens; (iv) Leather goods stores; (v) Car, boat, and plane dealerships; (vi) Used automobile or truck dealers and machine parts manufacturers; (vii) Travel agencies; (viii) Jewel, gem, and precious metal dealers; (ix) Import/export companies; (x) Auctioneers; (xi) Deposit brokers; (xii) Pawn brokers; (xiii) Professional service providers (e.g., lawyers, accountants, investment brokers); (xiv) Cash-intensive businesses, such as convenience stores, restaurants, retail stores, and parking garages; (xv) Ship, bus, and plane operators; (xvi) Telemarketers.

- Pre-Approval Required for Opening of Certain New Accounts. The IAR shall contact Ms. Darrah, CCO regarding any person or entity who is a citizen of or resides in high-risk countries prior to opening an account for such person or entity. The IAR can also independently research this information by visiting the FATF, FinCEN or OFAC web sites.
- Supplemental Documentation. VFM reserves the right to request supplemental documentation from certain new, existing, and prospective accounts, including, but not limited to audited financial statements, copies of tax returns, employment representations and verifications, credit reports, non-resident alien Client profile forms, banking verifications, any documentation requested by the clearing firm, and general due diligence questionnaires.

## 29.2 Education & Training

VFM may require its members to take part in training and educational programs that provide appropriate instruction on anti-money laundering compliance and procedures (both internal and regulatory) and the detection and reporting of suspicious activity. All appropriately registered persons and employees should receive such training.

## 29.3 Books & Records

Books and records associated with VFM's anti-money laundering policies and procedures are to be maintained for six (6) years.

| 30.0    COMPLIANCE POLICIES TO PREVENT SECURITIES LAWS VIOLATIONS |
|---|

VFM requires each supervised employee to review the WSPs and obtain his or her acknowledgement that he or she has read and understands the relevant provisions of the WSPs as they apply to him/her.

VFM requires written periodic confirmation (e.g., annual) reconfirmations by covered employees that he or she has read and understands the relevant provisions of the WSPs as they apply to him/her.

VFM has implemented a policy requiring Ms. Darrah, CCO be notified in advance of any contemplated changes in business operations and/or the hiring or dismissal of key personnel.

VFM may take part in continuing education programs for purposes of keeping employees abreast of current and regulatory developments.

40

VFM will update the WSPs as appropriate to reflect changes in business operations and/or regulatory requirements.

VFM has established sanction guidelines for violations of the WSPs by employees. Sanctions are sufficiently severe to deter violations, such as termination of employment.

Ms. Darrah, CCO will conduct periodic reviews of business operations, no less frequently than annually, to ensure that the Compliance Program continues to address effectively VFM's business operations, with the first annual review to be completed no later than eighteen months after the adoption of the WSPs by VFM.

Ms. Darrah, CCO will periodically review disclosure documents, e.g., Form ADV, Disclosure Brochure, marketing materials, as appropriate to ensure such documents correctly reflect current operations.

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007509

Exhibit 4 Page 74

### CERTIFICATION OF COMPLIANCE WITH THE COMPANY'S WRITTEN SUPERVISORY PROCEDURAL MANUAL AND CODE OF ETHICS

I have read, understand and agree to all of the requirements set forth in VFM's Investment Adviser Compliance Manual and Written Supervisory Procedures ("WSPs"). Furthermore, I understand that all questions pertaining to the WSPs should be directed to Julie Darrah, Chief Compliance Officer. Any violation of the WSPs may result in discipline, up to and including termination of employment.

I certify that as of the date written below, in accordance with the Personal Securities Transactions section of the Compliance and Written Supervisory Procedures Manual and the Code of Ethics of VFM:

1. I have fully disclosed all securities holdings in which I have, or a member of my immediate family has, a beneficial interest.

2. If required, I have obtained pre-clearance for all securities transactions, in which I have, or an immediate member of my family has, a beneficial interest except for transactions exempt from pre-clearance or for which I have received an exception in writing from the Chief Compliance Officer.

3. I have reported all securities transactions, in which I have, or any member of my immediate family has, a beneficial interest except for transactions exempt from pre-clearance or for which I have received an exception in writing from the Chief Compliance Officer.

4. I have complied with the Code of Ethics in all other respects.

**THE CODE OF ETHICS PROVIDED TO ME REQUIRES THAT I AS A SUPERVISED PERSON COMPLY WITH ALL APPLICABLE STATE AND/OR FEDERAL SECURITIES LAWS.**

_____
Signature

_____
Print Name

_____
Date

42

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 4 Page 75

WEAS-SEC-00007465

## CHIEF COMPLIANCE OFFICER ACKNOWLEDGEMENT

I have read and understand all of the requirements set forth in Vivid Financial Management, Inc.'s Investment Adviser Compliance Manual and Written Supervisory Procedures ("WSPs"). Furthermore, I understand that as Chief Compliance Officer I am required to review the procedures in our WSPS annually as well as abide by every provision therein. I hereby represent that all necessary updating to our procedures has been incorporated and adopted by Vivid Financial Management, Inc. I will make myself available to any Access Person or Supervised Person of our firm to answer questions regarding the contents of our adopted WSPs. Any violation of the WSPs may result in discipline, up to and including termination of employment.

Julie Darrah

Print Name of Chief Compliance Officer

6-20-2019

Signature of Chief Compliance Officer          Date

**Updates since previous version:**

Section 3.8 (Prohibited Activities in Advisory Accounts and the Addition of Section 10.5 (Billing on Illiquid Securities), Section 20.5 (Customer Access).
Addition of Section 13 (Senior Investor Protection)

43

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00007511

Exhibit 4 Page 76

# EXHIBIT 5

# WEALTH ENHANCEMENT GROUP, LLC

## SENIOR VICE PRESIDENT
## FINANCIAL ADVISOR AGREEMENT

### [Registered Investment Advisor Only]

THIS IS AN AGREEMENT ("Agreement"), dated as of November 11, 2021, by and between Wealth Enhancement Group, LLC, a Minnesota limited liability company ("WEG") and you, Julie Darrah, Senior Vice President – Financial Advisor ("you," "your," "Sr. VP-FA").

R E C I T A L S :

WHEREAS, WEG, Vivid Financial Management, Inc. ("Seller") and the shareholders of Seller have entered into that certain Asset Purchase Agreement (the "Purchase Agreement") dated as of November 11, 2021, pursuant to which WEG is acquiring substantially all of the assets used in connection with the Seller's holistic asset and wealth management business based in Orcutt, California;

WHEREAS, WEG desires to employ you as an investment adviser representative of Wealth Enhancement Advisory Services, LLC or any other registered investment advisers approved by WEG from time to time (each an "Affiliated Entity" and if more than one, the "Affiliated Entities"), and as a financial planner for clients of WEG and its subsidiaries, subject to and in accordance with applicable law and the terms and conditions herein; and

WHEREAS, you acknowledge and agree that, as a condition of the offer of employment, WEG requires that you agree to the terms and conditions of this Agreement and accompanying Exhibits and execute the same.

NOW THEREFORE, in consideration of the mutual promises and agreements made herein and other good and valuable consideration, and intending to be legally bound hereby, the parties agree as follows:

1. **Scope of Employment**.  You shall serve as Senior Vice President – Financial Advisor for WEG.  WEG will determine in its sole discretion the Affiliated Entities for which you shall serve as representative, and you will be subject to the regulatory supervision of each such Affiliated Entity determined by WEG from time to time.  You shall also serve as a financial planner for clients of WEG and its subsidiaries that WEG may designate in its sole discretion.  You agree to be subject to, and execute if requested by WEG or any Affiliated Entity, certain service agreements with such parties, provided that such agreements shall not be materially inconsistent with the terms herein. You also agree to execute, and be subject to, **Exhibits 1 through 4**, attached hereto.  You further agree to be bound by and execute any amendments, or substituted service agreements with any Affiliated Entities or different parties that WEG or any Affiliated Entities shall determine, which may be required by regulatory authorities, dictated by regulatory policy compliance or for assignment, provided that such agreements shall not be materially inconsistent with the terms herein. You agree to perform such other duties as may be requested by WEG

Exhibit 5 Page 77

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

management from time to time (provided that such additional duties are consistent with this Agreement and your position), including but not limited to participation in various WEG management, culture and education activities that build the culture of WEG's business, and serving as a positive referral for other prospective acquisition candidates. You also agree to follow all company policies and procedures as may be amended from time to time by WEG with or without notice. In all activities, you will lead in a fashion that is consistent with the policies and guidelines established from time to time by WEG or any Affiliated Entities.

     a.   Areas or Client Rotation. Prior to the date (the "Protected Period Expiration Date") that is the five year anniversary of the Closing Date (as defined in the Purchase Agreement), WEG will not re-assign any of your clients to other advisors or teams except as may be requested in writing by any such client or as required for regulatory reasons as determined in WEG or the applicable Affiliated Entities' reasonable discretion. Following the Protected Period Expiration Date, you expressly acknowledge and agree that you are not receiving any protected area, territory, rotation or clients.

     b.   Sr. VP-FA's Right to Engage VP-FAs, Associate FAs, and Team Members. You may train VP-FAs or Associate FAs hired by WEG to help conduct your practice, subject to regulatory supervision of applicable Affiliated Entities. Any such assistant or other team member (i.e., advisors, planners, representatives and other client facing personnel helping you conduct your practice) must be approved by the Affiliated Entities, be a party to all agreements required by WEG for the position filled by such individual, and maintain all appropriate licenses as required by the services and activities of such team member.

2.    **Intentionally Omitted**.

3.    **Term**. Your employment under this Agreement shall take effect immediately upon the consummation of the Closing of the transactions contemplated by the Purchase Agreement without the taking of any additional action by any person, and continue until terminated in accordance with the provisions of Section 8 hereof. Certain provisions of this Agreement shall survive termination in accordance with the terms of such provisions.

4.    **Compensation**. During the term of this Agreement, you will earn a base salary and incentive compensation in accordance with this paragraph, each of which shall be paid on the Company's regular payroll dates. Your incentive compensation shall be based on the services performed in accordance with a schedule of compensation for selling the financial services set forth on the WEG or any applicable Affiliated Entity "Approved Products List." as the same may be amended from time to time. Your compensation is subject to (i) regulatory requirements of any Affiliated Entity and (ii) any federal taxes, social security and other applicable withholdings required under state and federal law. The initial schedule of compensation (the "Compensation Schedule") is attached hereto as **Exhibit 1**. Except as explicitly set forth in the Compensation Schedule, the Compensation Schedule is subject to change from time to time by WEG in its sole discretion following the Protected Period Expiration Date. You will be entitled to participate, in

Exhibit 5 Page 78

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00043343

accordance with their terms and conditions, in health insurance and other benefit programs of WEG generally made available to Senior Vice Presidents.

    a. <u>Adjustments, Reconciliation and Uncollected Payments</u>.  In accord with local, state and federal law, if there are any uncollected payments (i) for products sold or services performed that you have failed to remit, (ii) an error occurs and you receive an overpayment, (iii) a payment has been made to you for any cancelled or returned product or service, (iv) there is a loss, refund or payment due to a settlement or claim related to any product or service purchased or provided to or by a client that you serviced, and/or (v) you owe WEG or its affiliates any amount upon termination, such amount may be deducted from any future advances of incentive compensation otherwise payable to you in any accounting period following the event.

    b. <u>Sr. VP-FA's Obligation Regarding Team Members</u>.  You and your co-leads agree to be responsible for wages and any bonuses paid to members of your advisory team (typically made up of a Senior Financial Advisor, a Financial Planner and a Client Service Manager) and initially consisting of Carl Ostapuik, Holland Dwyer, Megan Dickey, James Simonaro, Mikey Ross, Michelle Borjas, Kelly Carter, Roger McConnell, Erika Mercer, and Mike Gorbell .  WEG will administer payment of wages and bonuses to members of your advisory team, and those compensation payments will be deducted from your percentage of net revenues as outlined in **Exhibit 1** to determine your incentive compensation per pay period. You acknowledge that each Affiliated Entity has sole responsibility for all employment decisions regarding team members that may be representatives of such Affiliated Entity; provided, however that prior to the Protected Period Expiration Date, WEG will not require you to hire any additional team members or change the compensation of your team members, except as may be required for compliance and regulatory purposes.  Any agreement regarding any sharing of compensation between you, a VP-FA and/or  an Associate FA must be approved by the applicable Affiliated Entity.

    c. <u>Errors and Omissions Program and Insurance</u>.  WEG agrees to pay during the term of this Agreement the cost of customary errors and omissions coverage for you in accordance with WEG Business Practice Regarding Errors/E&O Liability policy.

    d. <u>Compliance with Regulations</u>.  All elements of compensation payable to you hereunder must in any event be subject to continuing compliance in all material respects with applicable federal and state regulatory requirements and the policies and procedures of WEG and all Affiliated Entities.

    5.     **Warranties, Representations and Duties**.  You agree to adhere to high standards of financial planning, quality advice and customer service, as reasonably determined by the applicable Affiliated Entity, to increase the demand for products and services offered by all FAs and to protect the reputation and goodwill of WEG and its Affiliated Entities.  You warrant and represent to WEG that you have no contractual commitments (including, but not limited to, non-

Exhibit 5 Page 79
WEAS-SEC-00043344
CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

compete agreements, non-solicitation agreements, employment agreements, or confidentiality agreements) inconsistent with your obligations set forth in this Agreement.  You also agree not to use or disclose any confidential information obtained from previous employers during employment with WEG unless the information is publicly known or the previous employers have represented to you that you are entitled to use or disclose such information. You shall be subject to the regulatory, compliance and supervisory obligations of each Affiliated Entity, depending upon the product or service being provided by you, and WEG shall have sole and absolute discretion to determine the investment adviser or other Affiliated Entity that shall supervise you for regulatory purposes.  You agree to use reasonable efforts in your duties and responsibilities along with any duties that may be assigned as additional and/or different duties, provided that such additional and/or different duties are consistent with this Agreement and your position. You agree to devote your full business-time attention, energy, and ability to the business of WEG; provided that the foregoing shall not prevent you from (i) participating in charitable, civic, educational, professional, community, or industry affairs, or (ii) managing your passive personal investments, so long as, in each case, such activities are reported as outside business activities for each Applicable Affiliated Entity and such activities individually or in the aggregate do not materially interfere or conflict with your duties hereunder or create a potential business or fiduciary conflict. You further agree to comply with all federal, state and local laws or regulations and follow WEG's policy and procedures.

    a.   <u>Compliance</u>. You agree to maintain all required licenses and regulatory compliance standards and comply with any agreements that you may have with any Affiliated Entity. You further agree to timely obtain and maintain all licenses that are necessary for the full and proper conduct as a Sr. VP-FA engaged in the business of providing investment advice and the offering of the services in connection therewith as determined by WEG, including any required SEC, self-regulatory or state securities and/or insurance licenses, licenses to do business, state investment advisor registrations, sales tax permits, and/or clearances.  You agree to promptly respond to requests for information and records from WEG and any Affiliated Entity.

    b.   <u>Approved Services Only</u>.  You will only offer, provide and market products and services approved by WEG and any applicable Affiliated Entity as set forth on WEG's "Approved Product List" as the same may be amended from time to time.

    c.   <u>Client Service</u>.  You will: (i) promptly submit complete and accurate applications for the services and other financial information required by any applicable Affiliated Entity to comply with legal, regulatory, underwriting or WEG's internal processing requirements; (ii) promptly forward all payments received from clients for services as directed by WEG; (iii) use reasonable efforts to maintain and increase customer relations; (iv) render competent, prompt, courteous, and knowledgeable service; and (v) meet or exceed such reasonable standards as WEG or any Affiliated Entity may establish from time to time.

    d.   <u>Recordkeeping</u>. You agree to record revenue generating business on a transaction recording system that meets the specifications of WEG and each Affiliated Entity. You further agree to submit to WEG such reports, forms, records, information, and

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 5 Page 80
WEAS-SEC-00043345

data as each Affiliated Entity may require to comply with regulatory requirements of any federal, state or self-regulatory organization law, rule or policy affecting such entity, or that is necessary to respond to any client request.

e.   <u>Client Lists and other Records Belong to WEG</u>.  You acknowledge that all original books and records containing client lists and/or information and transactions belong to WEG and any Affiliated Entity, as the case may be.  You agree to give WEG and its designated agents, including agents of any Affiliated Entities, access at all reasonable times, with or without notice, to examine and copy any books and records, including computerized books and records related to your work for WEG.

6.   **<u>Compliance and Inspections</u>**.

a.   <u>Notice</u>.  You agree to notify WEG and each Affiliated Entity promptly but not more than one business day after you becoming aware of the occurrence of any of the following events: (i) inspection, investigation, or citation of you by the SEC or state securities regulators, any applicable self-regulatory organizations, state insurance commissioners or any other governmental or regulatory agencies; (ii) suspension of any license related to the sale of any products or services; (iii) alleged violation of any federal, state, local, or applicable self-regulatory laws or regulations related to products or services; (iv) action, suit, disciplinary proceeding or other proceeding, and/or the issuance of any fine, sanction, order, writ, injunction, award or decree of the SEC, any self-regulatory body or any court, regulator, agency or other governmental instrumentality, against you or which may adversely affect you; (v) any written client complaint; and/or (vi) any other matter that would be required to be disclosed on Form ADV or Form BD as applicable under federal or state securities laws and regulations.

b.   <u>Inspections</u>.  You agree to (i) permit WEG, any Affiliated Entity and their respective agents, and any governmental and regulatory agencies that are required to have access by law (collectively, the "Inspectors"), to inspect your books and records, with or without notice to you, during normal business hours or otherwise for the purpose of conducting inspections to confirm compliance with the terms of this Agreement; (ii) cooperate with Inspectors in such inspections by rendering such assistance as they may reasonably request, including access to all books and records, including computerized books and records; and (iii) upon notice from Inspectors, and without limiting WEG's other rights under this Agreement, take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection within a reasonable time as determined by WEG.

7.   **<u>Confidential Information, Intellectual Property and Restrictive Covenants Agreement</u>**.  You agree to comply with all provisions contained in the Restrictive Covenants Agreement ("RC Agreement") attached as **Exhibit 2**.  You agree that the obligations with respect to the RC Agreement shall continue in full force and effect following the end of your employment without regard to the reason or circumstances of the termination.

Exhibit 5 Page 81

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

8. <u>**Termination**</u>. This Agreement and your employment may be terminated as follows:

a. <u>Termination by You</u>. You may terminate your employment with WEG at any time with or without cause. If you intend to resign from or terminate your employment, you must give WEG at least thirty (30) days' advance written notice, subject to WEG's power to waive all or any such portion of this notice period. WEG will pay you for the thirty (30) day notice period regardless of whether WEG accepts notice of termination sooner than the end of the thirty (30) day period. If you are terminated for Cause you may not receive the thirty (30) day notice pay. If you terminate employment for Good Reason (as defined below) prior to the Protected Period Expiration Date, you will be entitled to bring a breach of contract claim against WEG.

"Good Reason" means the occurrence of any of the following without your prior written consent:

(i) a material breach by WEG of this Agreement prior to the Protected Period Expiration Date, including without limitation any decrease in your compensation rates as set forth on the Compensation Schedule prior to the Protected Period Expiration Date;

(ii) prior to the Protected Period Expiration Date, a relocation of your primary place of employment to a location that is not located in or within 25 miles of Arroyo Grande, California;

(iii) a change in your position with WEG during prior to the Protected Period Expiration Date that materially reduces your title, except as may be required for regulatory compliance reasons or as a result of an event or circumstance meeting the definition of "Cause".

Notwithstanding the foregoing, "Good Reason" shall not exist unless: (x) you give WEG written notice of the existence of an event described in (i), (ii) or (iii) within 60 days following the occurrence thereof; (y) WEG does not remedy such event within 60 days of receiving such notice; and (z) you terminate employment within 21 days of the end of the 60-day cure period specified in the immediately preceding sub-clause (y) if you still assert at that time that Good Reason exists and has not been cured by WEG.

b. <u>Termination by WEG</u>. Your employment may be terminated by WEG at any time following the Protected Period Expiration Date with or without Cause. If after the Protected Period Expiration Date WEG intends to terminate you without Cause, WEG must give you at least thirty (30) days' advance written notice. Additionally, you may be immediately terminated by WEG at any time, including within the first

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 5 Page 82
WEAS-SEC-00043347

five years of your employment, without a thirty (30) day notice and the corresponding pay, if you (each of the following "Cause"):

i.  Breach any provision of this Agreement or the provisions of the RC Agreement in any material respect, if you have not cured such violation (if curable) within 30 days of prior written notice from WEG;

ii. Engage in gross or willful misconduct in the performance of your duties for WEG or the Affiliated Entities that is injurious to WEG or the Affiliated Entities, or their business, reputation, condition, or prospects, or exposes WEG or the Affiliated Entities to a material threat of or actual civil or regulatory liability, or to significant injury to their reputation;

iii. Violate WEG policies and procedures, if you have not cured such violation (if curable) within 30 days prior written notice from WEG;

iv. Willfully and continually fail or refuse to perform your duties as an employee or officer of WEG, as determined by WEG, if you have not cured such violation (if curable) within 30 days prior written notice from WEG;

v.  Commit any act of fraud, material act of dishonesty, misappropriation, or embezzlement of any kind or in connection with WEG or any Affiliated Entities' business, or knowingly maintain and submit false books, records or reports to WEG;

vi. Cause substantive harm to the reputation of WEG or its Affiliates, through your actions;

vii. Fail to obtain or lose any appropriate licenses which may be required by any Affiliated Entity, the SEC, any self-regulatory body, or any other state or federal or regulatory agencies; provided that with respect to any such loss of a license that is due to what WEG concludes in its reasonable discretion to be excusable circumstances, you fail to cure such loss within a reasonably prompt period of time;

viii. Are convicted or plead *nolo contendere* to an act or failure to act constituting a felony or gross misdemeanor under federal or state law that is injurious to the Company or its Affiliated Entities' reputation, or that impairs your ability to substantially perform your duties for WEG;

ix. Have engaged in any activity that is harmful in a material respect to WEG as is reasonably determined by WEG or any willful act that is likely to substantially injure the reputation, business or a business relationship of WEG, and such conduct has not materially improved following at least forty five (45) days prior written notice from WEG;

x.  Become insolvent or make a general assignment for the benefit of creditors; file a petition in bankruptcy, or such a petition is filed against and not successfully opposed by you; are adjudicated bankrupt or insolvent; allow a final judgment to remain unsatisfied or of record for thirty (30) days or longer (unless a supersedeas bond is filed within such period); or make a compromise with creditors;

xi. Are under actual or threatened investigation (outside of routine regulatory oversight) by the SEC, applicable self-regulatory organizations, state securities regulators, or any other governmental or regulatory agencies for

Exhibit 5 Page 83
WEAS-SEC-00043348

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

claims that WEG reasonably believes could result in an enforcement action, required public disclosure or criminal prosecution;

xii.   Refuse to permit an Inspector to inspect your Business books, records, or accounts upon demand.

If your employment is terminated by WEG without Cause prior to the Protected Period Expiration Date, you will be entitled to bring a breach of contract claim against WEG.

c.   <u>Retirement</u>.  This Agreement will terminate immediately upon your retirement. Upon your retirement or upon any termination by WEG without Cause prior to the Protected Period Expiration Date, if you have not demonstrated an intent to compete, and are not in fact competing with WEG or otherwise violating the Restrictive Covenants in any way (the "Retiring Sr. VP-FA"), then the following provisions shall govern:

i.   <u>Sr. VP-FA Identifies Successor</u>.  If Retiring Sr. VP-FA secures one or more successor agreements (in customary form except as otherwise required by this Agreement or the Purchase Agreement) from one or more Sr. VP-FAs or assistant VP-FAs acceptable to WEG and each Affiliated Entity (each, a "Successor Agreement"), subject to each such entity's approval and compliance with regulatory requirements, and remains licensed and in compliance with all applicable regulatory and supervisory obligations, the Retiring Sr. VP-FA may receive up to 50% of the compensable income from the Retiring Sr. VP-FA's book of business (i.e., that of yours personally and your advisory team) as reasonably determined by WEG and the applicable Affiliated Entity consistent with past practices and subject to any requirements of any applicable self-regulatory organization (the "Retiring Sr. VP-FA's Book of Business"), for a period of up to five (5) years from the date of retirement or termination without Cause.  The payout is dependent upon execution by all parties and approval by WEG and each Affiliated Entity of a written Successor Agreement with such successor FA containing terms consistent with the foregoing.  To the extent there are any restrictive covenants (other than those in any Successor Agreement, which restrictive covenants you understand are in addition to the provisions of this Agreement), the restrictive covenants contained in the RC Agreement shall control.

ii.   If the Retiring Sr. VP-FA does not otherwise secure a Successor Agreement with a Sr. VP-FA or an assistant VP-FA upon retirement or termination without Cause, then subject to compliance with the obligations of any applicable governmental agency or self-regulatory organization, the Retiring Sr. VP-FA maintaining appropriate securities licensing, and subject to compliance with applicable regulatory requirements of any Affiliated Entity, the Retiring Sr. VP-FA shall be entitled to compensation on the Retiring Sr. VP-FA's Book of Business in accordance with the

Exhibit 5 Page 84
CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED
WEAS-SEC-00043349

following schedule: 25% of the standard payout for the first year; 15% for the second; and 10% for the third.  After the third year, no payments shall be made to the Retiring Sr. VP-FA on the Retiring Sr. VP-FA's Book of Business with WEG.

d. <u>Disability.</u>  If you become "disabled" during the term of this Agreement, WEG may terminate this Agreement and your employment with WEG or any Affiliated Entity, and will pay you under your Successor Agreement. Without a Successor Agreement, you will be paid in accordance with state and federal regulations. The term "disabled" means any mental or physical condition which renders you unable to perform the essential functions of your position, with or without reasonable accommodation, as defined by local, state and federal disability laws, for a period of no less than ninety (90) consecutive days, or one hundred fifty (150) days in the aggregate in any three hundred sixty-five (365) day period.  Moreover, you will be presumed to have such a disability for the purpose of this Agreement in the event you qualify, because of illness or incapacity, to begin receiving long term disability income insurance payments.  If there is no such policy in effect at the date of your illness or incapacity, you and WEG will engage in the interactive process and with the decision of disability being made by WEG in its reasonable discretion and in accord with this Agreement and local, state and federal law.

e. <u>Death</u>. If you die during the term of this Agreement, this Agreement will terminate and any compensation due to you shall be paid to your estate in accordance with the provisions of this Agreement and any Successor Agreement in effect as of the date of your death as applicable and acceptable under state and federal regulations.

9. **<u>Obligations Upon Termination, Expiration Or Retirement</u>**.

a. <u>Cease Activities</u>.  Upon termination of employment for any reason, you agree not to directly or indirectly represent to the public or hold yourself out as a Sr. VP-FA of WEG.  You agree to immediately cease to use, in any manner whatsoever, any Confidential Information or Intellectual Property (as each such term is defined in the RC Agreement).  This restriction as to trade secrets shall be perpetual.  This restriction as to Confidential Information and Intellectual Property shall be for the maximum duration permitted by applicable law.

b. <u>Fees and Expenses</u>.  Upon termination of employment for any reason, you agree to promptly pay all sums owing to WEG and its affiliates.  You and WEG agree to each bear their own costs or attorneys' fees for any actions arising out of this Agreement.

c. <u>Return Confidential Information, Intellectual Property and Other Documents and Records to WEG</u>.  You agree to immediately deliver to WEG all documents and records, including most recent financial plans and recommendations, computer databases and files, correspondence and instructions containing Confidential Information or Intellectual Property (as such terms are defined in the RC

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 5 Page 85
WEAS-SEC-00043350

Agreement) (and any copies thereof, including electronic or computer generated copies, even if such copies were made in violation of the RC Agreement), all of which are the property of WEG. To satisfy regulatory requirements, you agree to immediately (i) discontinue use of any computer software developed for WEG, (ii) deliver to WEG all such computer software in your possession or control and any copies made of such computer software, (iii) erase or destroy any of such computer software contained in the computers or data storage devices that remain under your control, and (iv) remove such computer software from any other computer programs or software in your possession or control that incorporates or used such computer software in whole or in part.

    d.   <u>Restrictive Covenants Apply</u>.  You agree to comply with the RC Agreement, **Exhibit 2**, which continues in full force and without regard to the reason or circumstances of termination. You also agree that the scope of the Restrictive Covenants are necessary to protect the goodwill and Confidential Information of the Company. Upon the termination of this Agreement, either of you or WEG may provide notice to any new employer or any person or entity to which you render service about any and all obligations that remain in full force and effect following the termination of this Agreement.

    e.   <u>Non-Disparagement</u>.  You and WEG (for itself and its affiliates) each agree not to disparage or defame the other in any respect or make any negative comments concerning the employment relationship or the termination thereof.

    10.   **Notices**.  Any and all notices required or permitted under this Agreement shall be in writing and shall be: (a) personally delivered; (b) sent by facsimile/telecopier (if confirmed by mail); (c) mailed by certified mail, return receipt requested; or (d) dispatched by overnight delivery envelope, to the respective parties at the following addresses, unless and until a different address has been designated by written notice to the other party.

Notices to WEG:
Wealth Enhancement Group, LLC
505 North Highway 169, Suite 900
Plymouth, MN  55441

Notices to you will be made to your home address on record at WEG, with a copy to [trmiller0825@gmail.com] [bradleyboulton@gmail.com] [jokie48@gmail.com]. Any notice by a means which affords the sender evidence of delivery or rejected delivery shall be deemed to have been given and received at the date and time of receipt or rejected delivery.

    11.   **Entire Agreement**.  This Agreement, the Purchase Agreement, the RC Agreement and the attached Exhibits and Schedules contain the complete and exclusive agreement between you and WEG related to your employment with WEG. This Agreement supersedes all past and present agreements, representations and understandings, and may not be modified, waived, or supplemented except in writing signed by the parties. If any part of this Agreement is held invalid, then it shall be deemed modified to the extent necessary and permissible under law to make it valid

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

Exhibit 5 Page 86
WEAS-SEC-00043351

and as best to advance the spirit of the Agreement, and any such invalidity or modification shall not affect any other part of this Agreement.  This is an Agreement between sophisticated parties, and the parties agree that any rule of construing ambiguities against the drafter shall not apply.

12.    **Survival**.  Any provision or covenant of this Agreement and accompanying Exhibits, which expressly or by its nature imposes obligations beyond the expiration, termination, or assignment of this Agreement (regardless of cause for termination), shall survive such termination or assignment of this Agreement.

13.    **Assignment and Transfer**.  WEG shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity that is a successor to the Business, and any designated assignee of WEG agrees to become solely responsible for all obligations of WEG under this Agreement from the date of assignment.  You agree to execute such reasonable documents of acknowledgment or otherwise as WEG or WEG's assignee shall request.  You understand and acknowledge that the rights and duties set forth in this Agreement are personal to you, and that WEG has appointed you, in reliance on your business skills, financial capacity and personal character.  Accordingly, you shall not assign, transfer, convey, pledge, encumber, merge or give away any direct or indirect interest in this Agreement without the prior written consent of WEG, except as otherwise provided for in this Agreement.  Any purported assignment or transfer not having the written consent of WEG shall be null and void and shall constitute a material breach of this Agreement.

14.    **Applicable Law; Venue**.  This Agreement shall be interpreted and construed exclusively under the laws of the State of California.  Any action at law, suit in equity or judicial proceeding arising directly, indirectly or otherwise in connection with, out of, related to or from this Agreement or any provision hereof, shall be venued in the federal or state court located in the county in which you are primarily employed. You waive any claim of inconvenient forum or right you may have to transfer or change the venue of any such action.

15.    **Disputes**.  If you threaten to, attempt to or breach this Agreement, WEG has the right to seek equitable relief (including injunctive relief in addition to monetary damages) and any other legal remedies that may be available.

a.    Injunctive Relief.  You acknowledge that the restrictions contained herein and in the RC Agreement are reasonable, do not impose any undue burden or hardship upon anyone, and are a material inducement to WEG's decision to enter into this Agreement.  You agree that it would be difficult to measure damages to WEG from any breach of this Agreement or the RC Agreement and that injury to WEG from any such breach would be great, incalculable and irremediable, and that damages for it would be an inadequate remedy.  Accordingly, you consent to the issuance of an injunction by a court to enjoin any actual or threatened breach of this Agreement without prejudice to any other rights or remedies that may be available to WEG under the law, this Agreement or the RC Agreement.

b.    Other Damages and Legal Fees.  In addition to the liquidated damages specified in the RC Agreement, you agree to be responsible for additional actual damages

Exhibit 5 Page 87
CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED
WEAS-SEC-00043352

suffered by WEG (other than legal fees and costs) excess of any such liquidated damages as a result of a breach of this Agreement by you. In the event of any action arising out of or relating to this Agreement, you and WEG shall each bear our own expenses, including all legal fees and costs, incurred in connection with such action.

16.    **Effectiveness; Termination**.    This Agreement shall automatically become effective upon the consummation of the Closing of the transactions contemplated by the Purchase Agreement without the taking of any additional action by any person. Notwithstanding the foregoing, this Agreement shall automatically become null and void and shall have no further force or effect if the Purchase Agreement is terminated prior to the Closing.

*[signature page follows]*

Exhibit 5 Page 88

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00043353

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.

_Julie Darrah_

_____

Sr. VP-Financial Advisor

Name:  Julie Darrah

Wealth Enhancement Group, LLC


By: _____

Title: Chief Executive Officer

Signature Page to Sr. VP-FA Agreement

Exhibit 5 Page 89

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.

_____

Sr. VP-Financial Advisor

Name: Julie Darrah

Wealth Enhancement Group, LLC

By: _____
*Jeffrey Dekko*
12C5CA3E2C4E4EE...

Title: Chief Executive Officer

Signature Page to Sr. VP-FA Agreement

Exhibit 5 Page 90

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

**EXHIBIT 1**



Page 14

Exhibit 5 Page 91

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00043356



Exhibit 5 Page 92

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00043357

**EXHIBIT 2**

**RESTRICTIVE COVENANTS AGREEMENT**

**[See attached]**

Exhibit 5 Page 93

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED

WEAS-SEC-00043358

## SHAREHOLDER RESTRICTIVE COVENANTS AGREEMENT

THIS SHAREHOLDER RESTRICTIVE COVENANTS AGREEMENT ("Agreement") is made and entered into as of November 11, 2021 by and among Vivid Financial Management, Inc., a California corporation (the "Seller"), Julie Darrah, an individual residing in California ("Darrah"), Brad Boulton, an individual residing in California ("Boulton"), Calvin Harris, an individual residing in California ("Harris"), Tim Miller, an individual residing in California ("Miller" and together with Darrah, Boulton, and Harris the "Shareholders" and each a "Shareholder" and together with the Seller, the "Restricted Parties" and each a "Restricted Party") and Wealth Enhancement Group, LLC, a Minnesota limited liability company, together with its affiliates, successors and assigns (collectively "WEG or the "Purchaser").  The Purchaser and the Restricted Parties are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties."  Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to them in the Purchase Agreement (as defined below).

### RECITALS:

WHEREAS, WEG and the Restricted Parties are contemporaneously herewith entering into a certain Asset Purchase Agreement (the "Purchase Agreement") dated as of November 11, 2021, pursuant to which WEG is acquiring substantially all of the assets used in connection with the Seller's holistic asset and wealth management business based in Orcutt, California (the "Seller Business"); and

WHEREAS, this Agreement shall become effective as of and following the Closing under the Purchase Agreement (such date, the "Effective Date"); and

WHEREAS, the Shareholders are each equity holders in the Seller and are thereby receiving significant consideration under the Purchase Agreement and related transaction documents;

WHEREAS, the Restricted Parties have detailed knowledge of the Seller Business, intellectual property and other confidential and proprietary information and have gained substantial knowledge and expertise in connection with the Seller's operations, organization and customers;

WHEREAS, the Parties acknowledge that it would be detrimental to the Purchaser if the Restricted Parties were to engage in certain activities involving disclosure or misuse of confidential information, competition, or solicitation following the date hereof;

WHEREAS, as a material inducement for the Purchaser to enter into the transactions contemplated by the Purchase Agreement, each Restricted Party has agreed to enter into this Agreement; and

WHEREAS, each Restricted Party acknowledges and agrees that they will materially benefit from the transactions contemplated by the Purchase Agreement and that this Agreement and its covenants are supported by good and sufficient consideration.

1

Exhibit 5 Page 94
WEAS-SEC-00043359

CONFIDENTIAL
FOIA CONFIDENTIAL TREATMENT REQUESTED