# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>    Plaintiff,<br><br>            v.<br><br>JULIE ANNE DARRAH and VIVID FINANCIAL MANAGEMENT, INC.,<br>        Defendants. | 2:23-cv-08843-DSF-AGR<br><br>Order GRANTING IN PART and DENYING IN PART Plaintiff's Motion for Default Judgment as to Defendant Vivid Financial Management, Inc. (Dkt. 97) |

Plaintiff Securities and Exchange Commission (SEC) moves for default judgment against Defendant Vivid Financial Management, Inc. (Vivid).[1]  Dkt. 97 (Mot.).  Vivid opposes the scope of relief sought by the SEC but does not contest entry of default.  Dkt. 115 (Opp'n) at 2.  The Court deems this matter appropriate for decision without oral argument.  See Fed. R. Civ. P. 78; Local Rule 7-15.  The motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

From 2015 to January 2022, Vivid operated as an SEC-registered investment adviser, with Julie Anne Darrah serving as its "president, chief compliance officer, and an approximately one-third shareholder."  Dkt. 1 (Compl.) ¶¶ 14-15.  In January 2022, Vivid's owners sold Vivid's

---

[1] Final judgment has been entered as to Defendant Julie Anne Darrah.  Dkt. 86.

advisory business to Wealth Enhancement Group, LLC (WEG), and terminated its SEC registration.[2]  Id. ¶ 15; Opp'n at 3; Dkt. 119 (Reply) at 2; Dkt. 122 (SEC Suppl. Br.) at 1 n.1.

## A.    The Scheme to Misappropriate Funds

Starting in 2016, Darrah misappropriated approximately $2.25 million from nine of her advisory clients by gaining control of their assets, liquidating their securities, and taking their money to buy and improve her own properties, pay her personal expenses, buy luxury vehicles, and buy and operate her own food-related businesses.  Compl. ¶¶ 22, 96.

Eight of Darrah's nine clients also hired Vivid as their investment adviser when they retained Darrah.  Id. ¶¶ 24 (client S.S.), 37 (client M.S.), 57 (clients C.H. and C.L.), 63 (client B.C.), 71 (client B.H.), 82 (client D.C.), 89-91 (client J.S., who created a special needs trust for his brother, P.S., and appointed Darrah as trustee).  One of the nine clients, C.H., hired Darrah after Vivid had sold its investment advisory business to WEG, and the complaint alleges that C.H. hired Darrah and WEG, rather than Vivid, as her investment adviser.[3]  Id. ¶ 47.

Darrah's scheme followed a pattern.  She "primarily targeted elderly female advisory clients," many of whom "had come to rely on Darrah for their financial well-being."  Compl. ¶ 5.  After retaining Darrah and Vivid as their investment adviser and giving Darrah discretionary authority over their brokerage accounts, many of these

---

[2] The complaint refers to the purchaser of Vivid's investment advisory business as an "investment adviser based in Minnesota."  Compl. ¶ 14.  The parties' briefing indicates that this investment adviser is Wealth Enhancement Group, LLC (WEG).  Opp'n at 3; Reply at 2; SEC Suppl. Br. at 1 n.1.

[3] There are two clients named C.H.  Compl. ¶¶ 47, 57.  One retained Darrah and Vivid; the other retained Darrah and WEG after Vivid had sold its investment advisory business to WEG.  Id. ¶¶ 15, 47.

clients subsequently "appointed Darrah to serve as a trustee over the trusts they had established for themselves, while others gave Darrah power of attorney to handle their financial affairs" and made Darrah a signatory on their bank accounts.  Id. ¶¶ 5, 27, 40-41, 56, 64, 72, 80, 91.  Darrah also opened new bank accounts in the name of her clients' trusts but under her control.  Id. ¶¶ 30, 58, 76, 83, 92.

With control over both her clients' brokerage and bank accounts, Darrah liquidated their securities, transferred the funds from their brokerage accounts to their bank accounts, and withdrew the money for herself.  Compl. ¶¶ 32, 44, 60, 76-77, 85-87, 94.

In addition, Darrah asked one client, B.C.—a retired teacher in her mid-eighties who had executed a power of attorney appointing Darrah as her agent with the power to manage assets held in all her brokerage and bank accounts—to sign a $150,000 check for Darrah's restaurant business and another $50,000 check for Darrah to buy a house, funded by Darrah's sale of securities held in B.C.'s brokerage accounts.  Id. ¶¶ 64-67.  After the SEC started issuing subpoenas to Darrah for documents related to her advisory clients, she went to B.C.'s home and had B.C. initial two promissory notes—one for $150,000 and another for $50,000—backdated to the dates the checks were signed, stating that Darrah would repay the amounts on December 31, 2033, with two-percent annual interest.  Id. ¶¶ 68-70.

As a result of Darrah's scheme, at least three clients are in a serious financial predicament.  After Darrah misappropriated $1,057,800 from her client S.S., S.S.'s bank and brokerage accounts totaled $87,032 as of July 2023.  Id. ¶ 35.  S.S. has been living in a memory care facility since April 2022 with monthly expenses of $7,845, but her only source of income is her monthly social security payment of $1,631.  Id.  Client M.S., who is now in her late eighties, has a total balance of $24,605 across her bank and brokerage accounts as of July 2023, and her only source of income is her monthly social security payment of $2,027.  Id. ¶ 46.  Client B.H., who had appointed Darrah as trustee of her special needs trust to maintain her "good health, safety, education and welfare," has $1,012 left in her trust bank

account as of June 2023.  Id. ¶ 78.  B.H.'s account would have had a negative balance but for Darrah's deposit of $3,500 that she took from her client S.S.  Id.

Darrah took several steps to conceal the scheme.  For example, during the sales process of Vivid's investment advisory business, WEG asked Darrah whether she served as a trustee for any of her Vivid advisory clients.  Compl. ¶ 99.  Darrah lied, stating that she was "not currently acting as trustee on any of our clients" accounts, even though it was her role and powers as trustee that allowed her to misappropriate funds from many of her clients.  Id.  Following the acquisition, Darrah continued to lie regarding her status as trustee of her clients' trusts.  Id.

Additionally, Darrah, on behalf of Vivid as its president and chief compliance officer, made approximately 22 filings with the SEC, falsely stating that (1) no Vivid-related person had custody of any advisory clients' cash, bank accounts, or securities, (2) Vivid's clients received at least quarterly account statements directly from custodians, (3) Vivid promptly notified its clients in writing of the contact information for the bank accounts Darrah opened for certain clients, and (4) Vivid had adopted safeguards to protect its clients' money, including that it maintained records showing that the accounts receiving money from its clients' brokerage accounts were not a related party of Vivid.  Id. ¶¶ 107-13.

These statements were false because (1) Darrah had custody of her and Vivid's clients' assets, (2) she routed account statements of some of her defrauded clients to her own addresses, (3) Vivid did not notify clients in writing of the contact information for the bank accounts Darrah opened in their names, and (4) Vivid failed to adopt safeguards to protect its clients' money.  Id. ¶¶ 111, 113, 116-20.

## B.    Procedural History

On October 20, 2023, the SEC filed suit against Defendants, alleging: (1) violations of section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), for fraud in connection with the purchase and sale of securities;

(2) violations of section 17(a)(1) of the Securities Act, 15 U.S.C. §
77q(a)(1), for fraud in the offer or sale of securities; (3) violations of
sections 206(1) and 206(2) of the Investment Advisers Act (Advisers
Act), 15 U.S.C. § 80b-6(1), (2), for fraud by an investment adviser; and
(4) violations of section 207 of the Advisers Act, 15 U.S.C. § 80b-6(4), for
false statements in reports filed with the SEC.  Compl. ¶¶ 123-34, 142-
45.

Additionally, specific to Vivid, the SEC alleged: (1) violations of
Rule 206(4)-7, implementing section 206(4) of the Advisers Act, for
failing to adopt and implement compliance policies and procedures; and
(2) violations of Rule 206(4)-2 (the Custody Rule), implementing section
206(4).  Compl. ¶¶ 135-37, 146-48.

On October 24, 2023, Vivid was properly served under Fed. R.
Civ. P. 4(h)(1)(B).  Dkt. 16.  Vivid failed to respond to the complaint by
the November 14, 2023 deadline.  The Clerk entered default on
December 27, 2023.[4]  Dkt. 44.

The SEC now moves for default judgment against Vivid,
ordering: (1) a permanent injunction enjoining Vivid from violating
federal securities laws, (2) joint and several liability with Darrah for
the disgorgement of $2,247,330, as well as $169,181.18 in prejudgment
interest, and (3) civil penalties in the amount of $2,247,330.  Mot. at 16-
20; Dkt. 97-4 (Proposed Final Judgment as to Defendant Vivid).

Vivid opposes the scope of relief sought by the SEC but does not
contest entry of default.  Opp'n at 2.

## II. LEGAL STANDARD

Rule 55(b)(2) of the Federal Rules of Civil Procedure permits the
Court to enter a default judgment.  The Court need not make detailed
findings of fact in the event of default.  <u>Adriana Int'l Corp. v. Thoeren</u>,
913 F.2d 1406, 1414 (9th Cir. 1990).  On entry of default, well-pleaded

---

[4] Co-defendant Darrah settled with the SEC, and the Court entered Final
Judgment against her on December 18, 2024.  Dkt. 86.

allegations in the complaint regarding liability are generally deemed to be admitted.  <u>DIRECTV, Inc. v. Huynh</u>, 503 F.3d 847, 851 (9th Cir. 2007).  Allegations as to damages, however, must be proven.  <u>See TeleVideo Sys., Inc. v. Heidenthal</u>, 826 F.2d 915, 917-18 (9th Cir. 1987).  Where damages are liquidated (i.e., ascertainable from definite figures contained in the documentary evidence or in detailed affidavits), default judgment may be entered without a damages hearing.  <u>Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.</u>, 722 F.2d 1319, 1323 (7th Cir. 1983).

The Court considers several factors "in exercising discretion as to the entry of a default judgment," including:  "(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits."  <u>Eitel v. McCool</u>, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

## III. DISCUSSION

### A.  <u>Eitel</u> Factors

#### 1.  Prejudice to Plaintiff

The SEC will suffer prejudice without a default judgment.  "The SEC's duty to enforce federal securities laws would be undermined if the Court were to allow [Vivid], who is aware of this lawsuit, to escape liability simply by not responding to the case."  <u>SEC v. Wallace</u>, No. SACV 16-01788 AG (FFMx), 2017 WL 8230026, at *3 (C.D. Cal. May 8, 2017).  This factor favors default judgment.

#### 2.  Merits of Plaintiff's Claim and Sufficiency of Complaint

The second and third <u>Eitel</u> factors consider the merits and sufficiency of the complaint.  <u>Eitel</u>, 782 F.2d at 1471.  "These two factors require that the Plaintiff 'state a claim on which [it] may

recover.'" <u>Citizens Bus. Bank v. Vessel Bellezza</u>, No. 8:18-cv-02163-
JLS-KES, 2020 WL 7064247, at *4 (C.D. Cal. Oct. 27, 2020) (alteration
in original) (quoting <u>PepsiCo, Inc. v. Cal. Sec. Cans</u>, 238 F. Supp. 2d
1172, 1175 (C.D. Cal. 2002)).  "Of all the Eitel factors, courts often
consider the second and third factors to be the most important."  <u>JFeld
LLC v. Blanket Lovers</u>, No. CV 20-8804 DSF (PLAx), 2021 WL
2302447, at *2 (C.D. Cal. Apr. 29, 2021) (internal quotation marks and
citation omitted).  On entry of a default, well-pleaded allegations in the
complaint regarding liability are generally deemed to be admitted.
<u>DIRECTV, Inc.</u>, 503 F.3d at 851.

       a.    <u>Claims 1, 2, and 3: Fraud</u>

The SEC alleges that Darrah and Vivid's scheme to defraud their
clients violated the antifraud provisions of section 17(a)(1) of the
Securities Act, section 10(b) of the Exchange Act, Rules 10b-5(a) and (c)
implementing section 10(b), and sections 206(1) and 206(2) of the
Advisers Act.  Compl. ¶¶ 123-34.

In connection with the sale of securities, section 17(a)(1) of the
Securities Act and Rule 10b-5(a), "make[] it unlawful to 'employ any
device, scheme, or artifice to defraud.'"  <u>Lorenzo v. SEC</u>, 587 U.S. 71,
77-78 (2019) (quoting 15 U.S.C. § 77q(a)(1) and 17 C.F.R. § 240.10b-
5(a)).  Rule 10b-5(c) further prohibits "any act, practice or course of
business which operates or would operate as a fraud or deceit upon any
person[.]"  17 C.F.R. § 240-10b-5(c).  Together, "[t]hese provisions
capture a wide range of conduct."  <u>Lorenzo</u>, 587 U.S. at 79.  Proof of
scienter is required to establish violations of section 17(a)(1), section
10(b), and Rule 10b-5.  <u>Aaron v. SEC</u>, 446 U.S. 680, 701-02 (1980).

Sections 206(1) and 206(2) of the Advisers Act prohibit an
"investment adviser" from "employ[ing] any device, scheme or artifice
to defraud any client" or "engag[ing] in any transaction, practice, or
course of business which operates as a fraud or deceit upon any client,"
respectively. 15 U.S.C. § 80b-6(1), (2).  An "investment adviser" is a
"person who, for compensation, engages in the business of advising
others . . . as to the value of securities or as to the advisability of

investing in, purchasing, or selling securities[.]" 15 U.S.C. § 80b-2(a)(11).  An investment adviser, as a fiduciary, has "a duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading his clients."  SEC v. Cap. Gains Rsch. Bureau, Inc., 375 U.S. 180, 194 (1963) (internal quotation marks and citations omitted).  Proof of scienter is a required element for section 206(1), but not for section 206(2).  Vernazza v. SEC, 327 F.3d 851, 859-60 (9th Cir. 2003).

The showing for scienter under section 17(a)(1), section 10(b), Rule 10b-5, and section 206(1) is the same: violations "may be supported by 'knowing or reckless conduct,' without a showing of 'willful intent to defraud.'"  Vernazza, 327 F.3d at 860 (quoting Nelson v. Serwold, 576 F.2d 1332, 1337 (9th Cir. 1978)).  "Reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1093 (9th Cir. 2010) (citation omitted).

First, the Court finds that Vivid is an "investment adviser" under the Advisers Act.  15 U.S.C. § 80b-2(a)(11).  The complaint alleges that Vivid was "an SEC-registered investment adviser" and was "engaged in the business of providing, for compensation, investment advice as to the value of securities and as to the advisability of investing in, purchasing, and selling securities."  Compl. ¶¶ 15, 18.  Darrah "provided investment advisory services to [Vivid's] clients who compensated Darrah for that investment advice through [Vivid]."  Id. ¶¶ 19, 34.  These allegations satisfy the Advisers Act's definition of an "investment adviser."  15 U.S.C. § 80b-2(a)(11).

Because Vivid and Darrah's scheme forms the basis of the SEC's claims under these statutes and given the "virtually identical language in these provisions," the Court analyzes these claims together.  Malouf v. SEC, 933 F.3d 1248, 1263 (10th Cir. 2019).

First, Darrah gained control of her clients' assets by variously (1) becoming the trustee of their trusts, (2) becoming a signatory on their bank accounts, and (3) gaining power of attorney over their property, including their bank and brokerage accounts. Compl. ¶¶ 23, 25-30, 38-42, 55-58, 64, 72-74, 80-83, 91-92.

Once Darrah had gained control of her and Vivid's clients' assets, she misappropriated their money by (1) selling their securities, (2) using standing letters of authorization to transfer the proceeds of the sale of those securities to their bank accounts, and (3) with her control of those bank accounts, taking out their money for her own benefit. Compl. ¶¶ 32, 44. In one instance, she asked a client to sign checks for her benefit, using in significant part funds from her sale of the client's securities. Id. ¶¶ 65-67. As trustee, she also took money from her clients' trusts for her own benefit. Compl. ¶¶ 60, 76-77, 85-87, 93-94.

Darrah, and Vivid by imputation, then took steps to conceal their scheme from their clients, Compl. ¶¶ 88, 104, from WEG, id. ¶ 99, and from the SEC, id. ¶¶ 99, 107-114.

Darrah's scheme of purporting to manage her client's wealth but instead misappropriating the money for herself is "circumstantial evidence" of her "intent to defraud." United States v. Booth, 309 F.3d 566, 575 (9th Cir. 2002). As the president and chief compliance officer of Vivid, Darrah's "scienter and negligence can be imputed to" Vivid. SEC. v. Lam, No. 2:22-cv-06831-WLH-E, 2024 WL 5047481, at *2 (C.D. Cal. Mar. 22, 2024). Darrah and Vivid's attempts to conceal their scheme are also "strong proof of scienter." In re Nature's Sunshine Prods. Sec. Litig., 486 F. Supp. 2d 1301, 1310 (D. Utah 2007).

The SEC's allegations regarding Darrah's scheme to defraud her and Vivid's clients are sufficient to show that Vivid violated the antifraud provisions of section 17(a)(1), section 10(b), Rules 10b-5(a) and (c) implementing section 10(b), and sections 206(1) and 206(2). See In re ChinaCast Educ. Corp. Sec. Litig., 809 F.3d 471, 476 (9th Cir. 2015) ("[A] corporation is responsible for a corporate officer's fraud

committed 'within the scope of his employment[.]'" (quoting <u>Hollinger v. Titan Cap. Corp.</u>, 914 F.2d 1564, 1577 n.28 (9th Cir. 1990))).

        b.    <u>Claim 4: Compliance Rule Violations</u>

The SEC alleges that Vivid violated Rule 206(4)-7 (the Compliance Rule), implementing section 206(4) of the Advisers Act. Compl. ¶¶ 115-21, 135-37. The Compliance Rule requires an investment adviser to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation . . . of the [Advisers] Act[.]" 17 C.F.R. § 275.206(4)-7(a). "A violation of the Compliance Rule does not require a showing of scienter and may rest on a finding of simple negligence." <u>SEC v. Criterion Wealth Mgmt. Servs., Inc.</u>, 599 F. Supp. 3d 932, 959 (C.D. Cal. 2022).

The Court finds that the SEC has "state[d] a claim on which [it] may recover." <u>Citizens Bus. Bank</u>, 2020 WL 7064247, at *4 (quoting <u>PepsiCo</u>, 238 F. Supp. 2d at 1175). The complaint alleges that Vivid negligently failed to adopt and implement policies or procedures (1) to prevent it or its employees from using client money to benefit themselves, (2) to fulfill the fiduciary duty owed to advisory clients, and (3) concerning custody of client assets. Compl. ¶¶ 115-21. As the president and chief compliance officer of Vivid, Darrah aided and abetted Vivid by failing to adopt or implement these policies and procedures and by carrying out her fraudulent scheme. <u>Id.</u> ¶ 121. The SEC has sufficiently alleged facts to establish violations of the Compliance Rule.

        c.    <u>Claim 6: False Filing Violations</u>

The SEC alleges that Vivid violated section 207 of the Advisers Act. Compl. ¶¶ 106-14, 142-45. Section 207 prohibits "any person" from "willfully" making "any untrue statement of a material fact in any registration application or report filed with the Commission . . . , or willfully to omit to state in any such application or report any material fact which is required to be stated therein." 15 U.S.C. § 80b-7; <u>see</u> <u>Vernazza</u>, 327 F.3d at 858 ("Advisers Act § 207 criminalizes willfully

making false statements of material fact, or material omissions, in applications or reports to the Commission, such as a Form ADV.").

The Court finds that the SEC has "state[d] a claim on which [it] may recover." Citizens Bus. Bank, 2020 WL 7064247, at *4 (quoting PepsiCo, 238 F. Supp. 2d at 1175). The complaint alleges that from approximately March 2017 to December 2021, Darrah, as the chief compliance officer of Vivid, "signed and/or filed approximately twenty-two (22) separate Form[] ADV amendments and Firm Brochures with the SEC on behalf of [Vivid] that contained materially false and misleading statements." Compl. ¶ 107. The Form ADV amendments and Firm Brochures falsely stated that neither Vivid nor a Vivid-related person "had custody of any advisory clients' cash, bank accounts, or securities," even though Darrah did have such custody. Id. ¶¶ 108-10.

The Firm Brochures additionally stated that Vivid's clients "received at least quarterly account statements directly from their custodians . . . and that it promptly notified clients in writing of the contact information for the client's qualified custodians." Compl. ¶ 110. These statements were false because Darrah routed the account statements for certain clients to herself, and Vivid did not notify clients of the contact information for the bank accounts Darrah opened under their names. Id. ¶ 111. Because Darrah knowingly took custody of her clients' assets, she knew, or acted recklessly by not knowing, that the statements contained in the Form ADV amendments and Firm Brochures were false. Id. 114. Based on these allegations, the SEC has sufficiently alleged facts to establish violations of section 207.

### d.    Claim 7: Custody Rule Violations

The SEC alleges that Vivid violated Rule 206(4)-2 (the Custody Rule), implementing section 206(4) of the Advisers Act. Compl. ¶¶ 100-05, 146-48. Under the Custody Rule, "it is a fraudulent, deceptive, or manipulative act, practice or course of business" for an investment adviser to "have custody of client funds or securities unless," among other things, (1) the adviser provides the client with written notice of

the custodial accounts opened by the adviser on the client's behalf; (2) has "a reasonable basis, after due inquiry, for believing that the [client's] custodian[s] send[] account statement[s], at least quarterly" to the client; and (3) has an "independent public accountant" conduct an annual surprise examination to verify the client's "funds and securities." 17 C.F.R. § 275.206(4)-2. "[S]cienter is not required under Section 206(4)." SEC v. Steadman, 967 F.2d 636, 647 (D.C. Cir. 1992).

The Court finds that the SEC has "state[d] a claim on which [it] may recover." Citizens Bus. Bank, 2020 WL 7064247, at *4 (quoting PepsiCo, 238 F. Supp. 2d at 1175). The complaint alleges that Vivid "had custody of the defrauded clients' assets due to Darrah (a) being appointed a trustee of the defrauded clients' trust accounts, (b) becoming a signatory on the defrauded clients' bank accounts and (c) being granted power of attorney over the defrauded clients' assets." Compl. ¶ 103.

Despite having custody, Vivid (1) failed to "inform clients in writing of the bank accounts opened and controlled by Darrah," (2) "did not have a reasonable basis to believe the custodians of the defrauded clients' assets were sending account statements at least quarterly to the defrauded clients" because Darrah had those statements routed to her residences, and (3) "did not verify the defrauded clients' funds and securities through an annual surprise examination." Compl. ¶ 104. Darrah, as Vivid's president and part-owner, aided and abetted Vivid in its violation of the Custody Rule by gaining custody of the defrauded clients' assets and failing to comply with the requirements of the Custody Rule. Id. ¶ 105. Based on these allegations, the SEC has sufficiently alleged facts to establish violations of the Custody Rule.

Eitel factors two and three favor default judgment.

### 3.    Amount in Dispute

The fourth Eitel factor requires the court to "assess whether the recovery sought is proportional to the harm caused by defendant's conduct." Landstar Ranger, Inc. v. Parth Enters., Inc., 725 F. Supp. 2d 916, 921 (C.D. Cal. 2010). The SEC seeks $2,247,330 in disgorgement

and $169,181.18 in prejudgment interest.  Dkt. 97-2 (Lim Decl. I) ¶ 8.
The SEC also recommends a third-tier civil monetary penalty equal to
Vivid's gross pecuniary gain of $2,247,330 under 15 U.S.C. § 77t(d), 15
U.S.C. § 78u(d)(3), and 15 U.S.C. § 80b-9(e).  Mot. at 20.

Based on the facts alleged and as further detailed below in the
Court's analysis of remedies, the Court finds that the disgorgement,
prejudgment interest, and civil penalty sought are not disproportionate
to Vivid and Darrah's fraudulent scheme.  See SEC v. Blockvest, LLC,
No. 18CV2287-GPB(MSB), 2020 WL 5064330, at *3 (S.D. Cal. Aug. 26,
2020) (finding amount in dispute favored default judgement when the
plaintiff sought disgorgement and civil penalties in connection with
defendants' fraudulent conduct).  This factor favors default judgment.

### 4. Possibility of Dispute of Material Facts

As discussed above, the SEC filed a well-pleaded complaint
alleging facts sufficient to prevail on its claims.  Vivid has conceded
entry of default and opposes only the scope of relief, which the Court
addresses below.  Opp'n at 2.  Moreover, with respect to scope of relief,
Vivid presents legal arguments and does not support its opposition
with evidence.  See Elec. Frontier Found. v. Glob. Equity Mgmt. (SA)
Pty Ltd., 290 F. Supp. 3d 923, 947 (N.D. Cal. 2017) (finding this factor
to favor default because the remaining issues were "largely a question
of law" and "any facts at issue are based entirely on publicly filed legal
documents").  This factor favors default judgment.

### 5. Whether Default Was Due to Excusable Neglect

The risk of excusable neglect is remote.  Vivid was properly
served with the summons and complaint.  Dkt. 16.  Vivid has now
appeared to oppose the scope of relief, but it does not contest entry of
default.  Opp'n at 2.  This factor favors default judgment.

### 6. Policy in Favor of Decision on the Merits

"Cases should be decided upon their merits whenever reasonably
possible."  Eitel, 782 F.2d at 1472.  But when the defendant fails to
answer the complaint, "a decision on the merits [is] impractical, if not

impossible." PepsiCo, 238 F. Supp. 2d at 1177. Under Rule 55, "termination of a case before hearing the merits is allowed whenever a defendant fails to defend an action." Id. Because Vivid failed to respond to the complaint—and has retained counsel to file an opposition—the policy favoring decisions on the merits does not weigh against default judgment.

## B. Relief Sought

### 1. Disgorgement

The SEC seeks disgorgement under sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act. Compl. at 30 (citing 15 U.S.C. § 78u(d)(3), (5), (7)). "Disgorgement need be 'only a reasonable approximation of profits causally connected to the violation.'" Platforms Wireless Int'l, 617 F.3d at 1096 (quoting SEC v. First Pac. Bancorp, 142 F.3d 1186, 1192 n.6 (9th Cir. 1998)). "The SEC 'bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment.'" Id. (quoting SEC v. First City Fin. Corp., 890 F.2d 1215, 1232 (D.C. Cir. 1989)). "Once the SEC establishes a reasonable approximation of defendants' actual profits, . . . the burden shifts to the defendants to 'demonstrate that the disgorgement figure was not a reasonable approximation.'" Id. (quoting First City Fin., 890 F.2d at 1232). "[T]he imposition of joint and several liability for a disgorgement award is permissible so long as it is 'consistent with equitable principles.'" SEC v. Janus Spectrum LLC, 811 F. App'x 432, 433-34 (9th Cir. July 1, 2020) (quoting Liu v. SEC, 591 U.S. 71, 91 (2020)).

The SEC seeks $2,247,330 in disgorgement and $169,181.18 in prejudgment interest. Mot. at 19-20. The SEC's disgorgement figure is the total amount Darrah misappropriated from her clients. Compl. ¶¶ 31 ($1,057,800 from S.S.), 43 ($578,400 from M.S.), 51 ($242,000 from C.H.), 59 ($5,793 from C.H. and C.L.), 65-67 ($200,000 from B.C.), 75 ($96,200 from B.H.), 84 ($27,937 from D.C.), 93 ($39,200 from P.S.). The SEC includes the $242,000 Darrah misappropriated from C.H., even though C.H. retained Darrah and WEG in March 2022, after the

sale of Vivid's investment advisory business.  Id. ¶¶ 47, 51; SEC Suppl. Br. at 1.

Vivid opposes the SEC's request for disgorgement, relying on Liu v. SEC to argue that (1) no "net profits" accrued to Vivid and (2) joint-and-several disgorgement does not apply.  Opp'n at 3-5.  For "net profits," the Supreme Court in Liu v. SEC held that "courts must deduct legitimate expenses before ordering disgorgement[.]"  591 U.S. at 91-92.  But Vivid has failed to provide any evidence of "legitimate expenses" that must be deducted.

With respect to joint and several liability for disgorgement, the Supreme Court explained that there can be "liability for partners engaged in concerted wrongdoing" and that the "historic profits remedy thus allows some flexibility to impose collective liability."  Id. at 90-91.  "Courts interpreting Liu have held individuals [and entities] jointly responsible when the individual exercised decision-making authority over the entity, controlled an entity's finances, or served as its officer."  SEC v. Safeguard Metals LLC, No. 2:22-CV-00693 JFW (SKx), 2025 WL 1276004, at *7 (C.D. Cal. May 2, 2025); SEC v. Kontilai, No. 23-7537, 2025 WL 615190, at *2 (2d Cir. Feb. 26, 2025) ("[C]ourts before and after Liu have found joint-and-several liability appropriate where defendants, including individuals and corporate entities, were 'partners engaged in concerted wrongdoing.'" (quoting Liu, 591 U.S. at 90)).

Vivid argues that it was "at most a passive, non-beneficiary of Darrah's conduct."  Opp'n 5.  But that is belied by the allegations in the complaint.  Eight of the nine clients from whom Darrah misappropriated money were also Vivid's clients.  Compl. ¶¶ 19 (Darrah "provided investment advisory services to [Vivid's] clients who compensated Darrah for that investment advice through [Vivid]."), 24 (client S.S.), 37 (client M.S.), 57 (clients C.H. and C.L.), 63 (client B.C.), 71 (client B.H.), 82 (client D.C.), 89-91 (client J.S.).  And Darrah was the president, chief compliance officer, and one-third shareholder of Vivid.  Id. ¶ 14.

Vivid was not merely a passive actor.  As alleged in the complaint, Vivid's violation of the Custody Rule, Compl. ¶¶ 100-05, its false and misleading submissions to the SEC, id. ¶¶ 106-14, and its failure to implement policies and procedures designed to prevent fraudulent schemes like the one at issue, id. ¶¶ 116-20, together allowed Darrah to engage in her scheme of misappropriating her and Vivid's clients' money.  Id. ¶¶ 8-10; cf. SEC v. Smith, No. CV 20-1056 PA (SHKx), 2020 WL 6712257, at *3 (C.D. Cal. Oct. 19, 2020) (finding joint and several liability between an individual and certain entities where the individual "used his ownership and common control" of the entities to perpetuate his scheme).  The complaint also alleges that Darrah aided and abetted Vivid's violations as its president and chief compliance officer.  Compl. ¶¶ 105, 107-14, 121.

Vivid argues, relying on Liu, that the SEC has not shown it enjoyed the "fruits of the scheme."  Opp'n 4-5 (quoting Liu, 591 U.S. at 91).  Liu, however, concerned two individuals—a married couple.  Liu, 591 U.S. at 91.  The Supreme Court's analysis therefore "says little about whether disgorgement is appropriate when the wrongdoers are an entity and a control person.  For one thing, there's no way for an entity to *actively* receive the scheme's profits or enjoy the scheme's fruits except through its control person."  SEC v. Johnson, 43 F.4th 382, 392 (4th Cir. 2022) (finding that the individual and entity's "coordinated roles in perpetrating the scheme" was tantamount to "concerted wrongdoing").  The Supreme Court itself recognized that there was a "wide spectrum of relationships between participants and beneficiaries of unlawful schemes," and that the Court did "not wade into all the circumstances where an equitable profits remedy might be punitive when applied to multiple individuals."  Liu, 591 U.S. at 91.  Moreover, the Ninth Circuit has "never held that a personal financial benefit is a prerequisite for joint and several liability."  Platforms Wireless Int'l, 617 F.3d at 1098.

Additionally, though Vivid claims that the SEC has not shown commingling of finances between it and Darrah, Opp'n at 5, the SEC's accountant did show a commingling of Vivid's funds with those of

Darrah's defrauded clients in Darrah's personal bank accounts.  Dkt. 97-3 (Grobelski Decl.) ¶ 6.

The Court therefore finds that Darrah and Vivid were "partners engaged in concerted wrongdoing" and that joint and several liability is warranted "consistent with equitable principles."  Liu, 591 U.S. at 90-91.  Together, Vivid and Darrah owed their clients "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts, as well as an affirmative obligation to employ reasonable care to avoid misleading his clients."  Cap. Gains Rsch. Bureau, 375 U.S. at 194 (internal quotation marks and citations omitted).  They both breached that duty.  They had "a close relationship in engaging in the violations of the securities laws," such that they should be "held jointly and severally liable for the disgorgement of illegally obtained proceeds." First Pac. Bancorp, 142 F.3d at 1191; cf. Crites, Inc. v. Prudential Ins. Co. of Am., 322 U.S. 408, 414 (1944) ("Any profits that might have resulted from a breach of these high standards [of fiduciary duty], including the profits of others who knowingly joined him in pursuing an illegal course of action, would have to be disgorged and applied to the estate.").

Vivid next argues that any disgorgement should exclude all post-January 2022 conduct because Vivid's investment advisory business, including its employment of Darrah, ended in January 2022 when it was sold to WEG.  Opp'n at 5-6.  The SEC counters that Vivid "continued to defraud and steal from approximately seven VFM clients—and/or their family members" and continued to benefit from Darrah's post-sale conduct, including her continued fraud.  Reply at 5-6.

Though Vivid sold its investment advisory business in January 2022, it did not sever its ties to that business.  In fact, under the Asset Purchase Agreement (APA) for the sale of Vivid's investment advisory business, Vivid receives post-sale retention and earn-out payments based on the post-sale retention and growth of client revenues, including revenues from the defrauded clients who transitioned to WEG.  Dkt. 119-1 (Lim Decl. II), Ex. 1 (APA) ¶ 2.4(a)-(b).  Indeed, in its

joint stipulation to extend time to respond to the motion for default judgment, Vivid represented that the "earnout period for the APA has now concluded and [it] has earned a total of $5,212,134 in earnout payments," even if WEG is currently withholding those funds.  Dkt. 111 at 3.  Instead of severing its ties, Vivid expected to benefit from Darrah's post-sale retention of its defrauded clients.

As discussed above, Vivid played an active role in enabling and concealing Darrah's scheme from the SEC, WEG, and its clients.  It breached its "duty of utmost good faith owed to those clients."  Compl. ¶ 21.  Because those actions allowed Vivid to benefit from Darrah's post-sale retention of its former clients, it is "consistent with equitable principles" that Vivid should be held jointly and severally liable for Darrah's post-sale misconduct with respect to Vivid's former clients.  Liu, 591 U.S. at 91.

Those clients, and the total amounts misappropriated from them, include:

- S.S. for an amount of $1,057,800, Compl. ¶¶ 24, 31;
- M.S. for an amount of $578,400, id. ¶¶ 37, 43;
- C.H. and C.L. for an amount of $5,793, id. ¶¶ 57, 59;
- B.C. for an amount of $200,000, id. ¶¶ 63, 65-67;
- B.H. for an amount of $96,200, id. ¶¶ 71, 75;
- D.C. for an amount of $27,937, id. ¶¶ 82, 84; and
- P.S. for an amount of $39,200, id. ¶¶ 89, 93.

The Court therefore finds that Vivid is jointly and severally liable for disgorgement amounting to $2,005,330, which "reasonably approximates the amount of unjust enrichment."  Platforms Wireless Int'l Corp., 617 F.3d at 1096 (quoting First City Fin., 890 F.2d at 1232).  Vivid's legal arguments are not enough to meet its burden of "demonstrat[ing] that the disgorgement figure [is] not a reasonable approximation."  Id. (quoting First City Fin., 890 F.2d at 1232).

The SEC argues disgorgement should include the amount misappropriated from a client, C.H., who retained Darrah and WEG after Vivid had sold its investment advisory business to WEG.  SEC

Suppl. Br. at 1.  The SEC, however, does not allege that C.H. ever
retained Vivid as her investment adviser.  Cf. Compl. ¶ 47 ("In March
2022, C.H. hired Darrah and [WEG] as her investment adviser.").  Nor
does the SEC explain how Vivid was a "partner" to the "wrongdoing"
suffered by C.H. such that joint and several liability should attach.
Liu, 591 U.S. at 91.

Instead, the SEC's argument hinges on the benefit Vivid expected
to receive under the APA.  According to the SEC, because "the APA
guaranteed an earnout for [Vivid] tied to the success of Darrah and the
Business" Vivid sold to WEG, Vivid "still benefitted—in the form of a
$5 million earnout—from Darrah taking on and defrauding clients after
January 2022."  SEC Suppl. Br. at 1-2.  Though Vivid may benefit from
Darrah "taking on" new clients, the SEC does not explain how
"defrauding" these new clients benefits Vivid.

The Court therefore denies the SEC's request for disgorgement
with respect to the amount Darrah misappropriated from the client
C.H. who retained her in March 2022.

### 2.    Civil Penalties

"A district court has discretion to impose civil penalties so long as
the amount is within the statutory maximum."  SEC v. Murphy, 50
F.4th 832, 847 (9th Cir. 2022).  "Civil penalties are designed to deter
the wrongdoer from similar violations in the future, and courts apply
the factors set forth in SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980) to
determine the proper penalty."  Id. (internal quotation marks and
citation omitted).  Those factors, known as the Murphy factors, include
"(1) the degree of scienter; (2) the isolated or recurrent nature of the
infraction; (3) defendant's recognition of the wrongful nature of his
conduct; (4) the likelihood that future violations might occur because of
defendant's professional occupation; and (5) the sincerity of defendant's
assurances against future violations."  SEC v. Husain, 70 F.4th 1173,
1184 (9th Cir. 2023) (citing Murphy, 626 F.2d at 655).

The SEC seeks civil penalties under section 20(d) of the
Securities Act, section 21(d)(3) of the Exchange Act, and section 209(e)

of the Advisers Act.  Compl. at 30.  All three statutes apply a three-tier system and provide that the penalty amount "shall be determined by the court in light of the facts and circumstances."  15 U.S.C. §§ 77t(d)(2), 78u(d)(3)(B), 80b-9(e)(2).

The SEC "recommends a third-tier civil monetary penalty equal to [Vivid's] gross pecuniary gain, that is $2,247,330."  Mot. at 20.  For a third-tier penalty across all three statutes, the violation (1) must involve "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and (2) "directly or indirectly resulted in substantial losses . . . to other persons."  15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii), 80b-9(e)(2)(C).  The penalty for a third-tier violation cannot exceed the greater of either a specific statutory amount or "the gross amount of pecuniary gain to such defendant as the result of the violation."  Id.

Vivid argues the <u>Murphy</u> factors counsel against imposing a civil penalty at all.  Opp'n at 6.  It initially concedes the "first two factors— scienter and recurrence—may weigh in the SEC's favor, since Darrah acted with intent and engaged in repeated misconduct."  Id.  But it argues that "Darrah's scienter is at most imputed to Vivid only for a portion of the conduct, and her concealment of the scheme demonstrates that Vivid and its three other shareholders did not benefit from Darrah's scheme."  Id.

As discussed above, however, the concealment of Darrah's scheme benefited Vivid even after the sale of Vivid's investment advisory business.  Darrah's false representations to WEG, while she was president and chief compliance officer of Vivid, "concealed her broad scheme to misappropriate victim clients' money upon obtaining control of their assets."  Compl. ¶ 99.  And with the sale of Vivid's investment advisory business to WEG, Vivid stood to earn retention and earn-out payments under the APA based on the retention and growth of Vivid's former advisory clients, including the defrauded clients.  APA ¶ 2.4(a)-(b).  The Court finds that Vivid acted with scienter, imputed from Darrah, in a scheme of recurring misappropriations of clients' funds.

Vivid argues that the remaining factors "overwhelmingly weigh against the imposition of a penalty." Opp'n at 6. The Court disagrees. Though Vivid states that it "acknowledged the wrongful nature of *Darrah's* conduct," id. (emphasis added), it says nothing about the wrongful nature of its own conduct. Darrah and Vivid's scheme caused significant harm to their clients, which "primarily targeted elderly female advisory clients," many of whom "had come to rely on Darrah for their financial well-being" by appointing Darrah as trustee over the trusts they established for themselves. Compl. ¶ 5. For example, their scheme has resulted in the near depletion of financial assets of two clients over the age of eighty—one of whom lives in a memory care facility—and of a special needs trust for a client in her late seventies. Id. ¶¶ 35, 46, 78. Vivid's lack of contrition weighs in favor of imposing a penalty.

For the last two Murphy factors, Vivid claims that because it is "defunct, has not operated for more than three years, and will never again function as a registered investment adviser," there "is no realistic prospect of future violations." Opp'n at 6. First, that there "is no realistic prospect of future violations" is not an "*assurance*[] against future violations." Murphy, 626 F.2d at 655 (emphasis added). Vivid's "less-than-full appreciation of the wrongfulness of [its] conduct" weighs against Vivid's "sincerity" of its "assurances against future violations." SEC v. RMR Asset Mgmt. Co., 553 F. Supp. 3d 820, 830 (S.D. Cal. 2021).

Though Vivid sold its investment advisory business to WEG more than three years ago, the APA provides for post-sale earn-out and retention payments based in part on revenue from new clients "that arise after the Closing as a result of . . . business development efforts by the Business [Vivid sold to WEG and] by the Shareholders [of Vivid]." APA ¶ 2.4(d); APA at 1 (definitions of "Shareholders" and "Business"). The APA therefore contemplates not only the continued existence of some form of Vivid to receive post-sale earn-out and retention payments but also a business development role for Vivid-related persons to solicit new clients. The Court cannot agree with Vivid that there "is no realistic prospect of future violations."

The Court finds that Vivid's scienter, the recurring nature of the violations, and Vivid's lack of contrition outweigh the low likelihood of future violations.  Cf. Murphy, 626 F.2d at 656 ("[T]he totality of the circumstances is the appropriate focus of inquiry.").  Considered together, the Murphy factors weigh in favor of imposing civil penalties.

Additionally, based on the allegations in the complaint, the Court finds that Vivid's violations meet the requirements for a third-tier penalty because they involved "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "resulted in substantial losses" to Vivid's clients.  15 U.S.C. §§ 77t(d)(2)(C), 78u(d)(3)(B)(iii), 80b-9(e)(2)(C).

Per statutory requirements, the amount the SEC seeks—$2,247,330—is lower than the statutory maximum of $9,458,008.[5]  But the SEC's amount is the sum total of money misappropriated by Darrah, including the amount misappropriated from the client C.H. who retained Darrah in March 2022—after Vivid sold its investment advisory business.  Mot. at 19.  The Court therefore subtracts the $242,000 Darrah misappropriated from that client, Compl. ¶¶ 47, 51, and imposes a civil penalty of $2,005,330 on Vivid.

### 3.    Injunctive Relief

The SEC seeks permanent injunctions prohibiting Vivid from violating the Securities Act, Exchange Act, and Advisers Act.  Compl. at 29.  Vivid does not oppose SEC's requested injunctive relief.

"To obtain a permanent injunction, the SEC 'ha[s] the burden of showing there [is] a reasonable likelihood of future violations of the

---

[5] The Court calculated this statutory maximum by multiplying the inflation-adjusted statutory amount of $1,182,251 by eight—the number of Vivid and Darrah's client victims.  17 C.F.R. § 201.1001; Adjustments to Civil Monetary Penalty Amounts, 90 Fed. Reg. 2767, 2769; SEC v. Yang, No. 5:15-cv-02387-SVW-KK, 2021 WL 1234886, at *12 (C.D. Cal. Feb. 16, 2021) ("Courts routinely calculate civil penalties based on a per victim methodology[.]"), aff'd, No. 21-55437, 2022 WL 3278995 (9th Cir. Aug. 11, 2022).

securities laws.'" <u>SEC v. Fehn</u>, 97 F.3d 1276, 1295 (9th Cir. 1996) (quoting <u>Murphy</u>, 626 F.2d at 655).  As with civil penalties, in "predicting the likelihood of future violations," courts "must assess 'the totality of the circumstances surrounding the defendant and his violations,'" considering the <u>Murphy</u> factors.  <u>Id.</u> (quoting <u>Murphy</u>, 626 F.2d at 655).

The Court applies the same <u>Murphy</u> factor analysis as above to find that permanent injunction is appropriate.  The Court finds that "the totality of the circumstances," including Vivid's scienter, the recurring nature of the violations, and Vivid's lack of contrition, weigh in favor of permanent injunction.  <u>Murphy</u>, 626 F.2d at 655.

## IV. CONCLUSION

The SEC's motion for default judgment is GRANTED in part and DENIED in part.  Defendant Vivid is permanently enjoined from committing future violations of section 17(a) of the Securities Act, section 10(b) of the Exchange Act, sections 206(1), 206(2), 206(4), and 207 of the Advisers Act.  Defendant Vivid, jointly and severally with Defendant Darrah, must pay $2,005,330 in disgorgement with prejudgment interest.  Defendant Vivid must pay $2,005,330 in civil penalties.

The SEC is ORDERED to provide, consistent with this order, an amended proposed judgment and a declaration supporting updated prejudgment interest calculations no later than October 15, 2025.

IT IS SO ORDERED.

Date: October 2, 2025

_____
Dale S. Fischer
United States District Judge